## UNITED STATES BANKRUPTCY COURT
### FOR THE WESTERN DISTRICT OF WISCONSIN

---

In re:

    Bernard C. Seidling,

    Debtor.

Case No. 22-11191-rmb

Chapter 7

---

James V. Block, Chapter 7 Trustee,

      Plaintiff,

v.

Bernard C. Seidling, *et al*.,

    Defendants.

Adversary No. 23-00032-rmb

---

## POST-TRIAL DECISION

---

In this adversary proceeding the chapter 7 trustee, James Block ("Trustee"), seeks a declaration that certain property is property of the bankruptcy estate pursuant to 11 U.S.C. § 541. The Court held a trial May 20-24, 2024, and rendered a post-trial oral ruling on July 10, 2024. This written decision supplements and expands on the Court's oral ruling and constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

### FINDINGS OF FACT

Debtor Bernard Seidling has a real estate business that involves purchasing distressed real estate and either selling it at a profit, leasing it to a third party, or entering into some other contractual arrangement (more on those contracts below). Seidling structured his business through a web of trusts, partnerships, sole proprietorships, and other entities. The Trustee contends that the real estate, contracts, bank accounts, and other related assets held in the name

of the trusts and entities are wholly owned and solely controlled by Seidling, and that it is all property of the bankruptcy estate.

Seidling claims that he does not have a personal interest in any of it, and he argues that none of it should be brought into the estate.

The Trustee's Second Amended Complaint names 83 trusts and entities as defendants. ECF No. 175.  Only Seidling filed an answer to the complaint,[1] and he has proceeded pro se throughout this litigation.  Seidling attempted to appear on behalf of the trusts and entities without counsel, but the Court granted the Trustee's motion to strike Seidling's answer to the extent that he purported to answer on behalf of the trusts and entities.  ECF No. 159.  None of the trusts or entities appeared through counsel or otherwise responded to the complaint.

The Court held a five-day trial during which it heard testimony from Cheri Hipenbecker, General Counsel at Knight Barry Title Group; Mary Hudson, an account executive at Spectrum Insurance; Jerome and Dorothea Saavedra, who purchased (or believed they were purchasing) a parcel of real estate from Seidling and who performed work for Seidling on various projects related to his real estate business; Chad Raasch, who similarly purchased (or believed he was purchasing) a parcel of real estate from Seidling and who performed work for Seidling on various projects related to his real estate business; and Austin Mahal, who purchased (or believed he was purchasing) a parcel of real estate for his landscaping company from Seidling; and Mahal's accounting assistant, Kailey Dressel.

---

[1] The Trustee also named as defendants Jerome and Dorothea Saavedra, Chad Raasch, and Jose Rodriguez because documents prepared by Seidling suggest that they are or may have been trustees of Seidling's trusts.  Raasch filed an answer denying that he is or was a trustee and generally denying any liability.  As explained below, Raasch was never a trustee, and he signed documents identifying him as a trustee only because Seidling asked him to.

The Court also heard extensive testimony from Seidling himself. Seidling spent many hours answering questions from counsel for the Trustee, and he also provided lengthy narrative testimony on his own behalf. The Court finds the following facts based on the witness testimony and the exhibits admitted at trial.

### Seidling's Personal History

For at least the past ten years or so, Seidling has split his time between residences in Hayward, Wisconsin and Marathon, Florida. Until 2020 or 2021, during the winter months Seidling lived in a single-family residence located at 152 N. Indies Drive in Marathon, Florida (referred to herein as 152 N. Indies). The property was in the name of Seidling's ex-wife, Christine Seidling, until shortly before it was sold in 2021. Beginning in 2020 or 2021, Seidling began living in one unit of a two-family residence located at 132 N. Indies Drive in Marathon, Florida (referred to herein as 132 N. Indies) when he is in Florida. That property was owned by a partnership affiliated with Seidling until 2022, when Seidling transferred it to the name of a sole proprietorship. When Seidling is not in Florida, generally in the summer months, Seidling lives in a single-family residence in Hayward, Wisconsin. That property has been in the names of various partnerships and trusts affiliated with Seidling and Christine Seidling. Seidling does not pay rent or other consideration to live in the residences in Wisconsin or Florida.

Seidling started a trucking company in the 1980s. The trucking company was called Consolidated Transportation, Inc., and later Supreme Transportation, Inc. Seidling also owned an associated trucking repair company called Hudson Diesel, Inc.[2] While he owned the trucking company, Seidling started an investment vehicle that he referred to as a pension plan, which he

---

[2] One or both of the trucking companies filed bankruptcy in the 1980s not long after Seidling started them. In approximately 1991, Seidling was charged with a felony related to the trucking business, and he spent time in a federal prison.

called the Hudson Diesel, Inc. Money Purchase Pension Plan, or Hudson Diesel MPPP.

Christine Seidling was the only beneficiary of the pension plan.  Seidling later changed the name

to Metro Financial Services.  He said the reason for the change was that people did not want to

buy property from an entity with a name that included the word "Diesel" because the name

suggested that the property may be contaminated from diesel-related operations.  It is unclear

whether the pension plan was a validly formed retirement vehicle.  The pension plan no longer

exists, and any assets that may have once been affiliated with the pension plan are now wholly

controlled by Seidling.

At some point Seidling also formed another retirement vehicle that he referred to as a

"Roth IRA."  The IRA was self-managed and funded.  In the mid-2010s, the Internal Revenue

Service determined that the IRA was not a valid retirement account, that it should be dissolved,

and that the assets held by the IRA belonged to Seidling individually.  Seidling agreed at trial

that the IRA no longer exists.

In April 2011, Seidling filed a voluntary chapter 7 bankruptcy petition in the Southern

District of Florida, Case No. 11-20436.  The chapter 7 trustee in that case pursued many of the

same assets at issue in this case, arguing that the assets, though held in the name of trusts and

entities, were property of the estate.  Seidling ultimately settled with the trustee.  He agreed to

turn over certain assets to the trustee.  Through that settlement, the trustee recovered sufficient

funds to pay all creditors in full, and the remaining assets were abandoned from the estate.  As a

result of the settlement, no determinations were made in the Florida bankruptcy case regarding

whether any particular real or other property was in fact owned by Seidling and therefore

property of the bankruptcy estate.

Also in 2011, Seidling was indicted under a federal mail fraud statute.  The government

alleged that Seidling had filed numerous small claims actions against several individuals in

counties where they did not live or do business, obtained default judgments against them, and

then docketed the judgments in counties where they did live.  *See U.S. v. Seidling*, 737 F.3d

1155, 1158 (7th Cir. 2013).  Seidling "used a variety of fake business names in the lawsuits," and

the names included the words "Enterprises," "Investments," and "LP."  *Id.* n.1.  Seidling was

convicted and sentenced to thirty-six months in prison, followed by three years of supervised

release.

Seidling has a cunning ability to recall facts, some of which involve events that occurred

decades ago.  When asked about the many dozens of properties at issue in this case, Seidling

frequently recalled dates of events, the precise acreage and address of a property, and the names

of parties involved in a transaction, as well as their personal life circumstances, all without

reviewing any documents to jog his memory.  Despite this ability, Seidling frequently claimed

that he could not recall certain important facts and details, often those related to the disposition

of large sums of money or the identity of other people he insists are involved in his entities.

Seidling's poor memory seems to have infected only the facts that are inconvenient for his

argument that the property at issue is not property of the estate.  For this reason, the Court finds

that on the whole Seidling's testimony was generally not credible, particularly when Seidling

claimed an inability to recall important details.

**Seidling's Real Estate Business History and Practices**

In the early to mid-1990s Seidling started a real estate business buying distressed

properties.  Over the years, Seidling acquired many parcels of real property, largely in

Northwestern Wisconsin and in the Florida Keys.  He mostly purchased the property at tax and

mortgage foreclosure sales and from property owners in financial distress seeking to avoid tax

and mortgage foreclosures.  Seidling would then lease or sell the properties at a profit.  Many of

the sales were seller-financed through a land contract or similar arrangement.

Seidling initially purchased the properties in various names, including himself, Christine

Seidling, his children, the Hudson Diesel MPPP, and Four Star Properties, Inc., which was a

Minnesota corporation controlled by Seidling (*see* Ex. 520 at 2[3]).  He attended a seminar in the

1990s during which he learned about holding property in trusts.  Unlike corporate entities,

revocable trusts generally are not required to be registered with a state, and they can be created

through a private trust agreement.  Seidling obtained copies of form trust agreements at the

seminar.

After attending that seminar, Seidling began to acquire properties in the name of trusts.

He acquired property in the name of dozens (maybe hundreds) of trusts over the years.  He

prepared the written trust agreements for the trusts himself.  He used the forms that he obtained

from the real estate seminar, and he admitted at trial that he had never actually read the

documents in full.  When he needed a new trust agreement, he simply changed the name of the

trust and the beneficiary without consideration of the other details and terms in the agreements.

Seidling sometimes prepared a trust agreement for a trust before acquiring the property in

the trust, but he often prepared a trust agreement later to substantiate the existence of the trust

when he needed to transfer the property or take other action that required proof of his ability to

act on behalf of the trust.  In one episode described below, Seidling admitted to preparing a trust

agreement for Mason Land Trust in anticipation of a sale of property that was in the name of

Mason Land Trust.  Though he included a 2005 date in the agreement, the document was

actually prepared in 2021.  The trust agreements almost always named Seidling as the trustee,

they rarely identified a grantor or settlor, and the beneficiary was, with few exceptions, another

trust or an entity.  Seidling testified that it was his intent with the trusts that the grantor and

---

[3] References to "Ex." are to the exhibits admitted at trial and filed on the docket at ECF Nos. 203, 204, 205, 206.

beneficiary almost always be the same.  He also testified to his (incorrect) belief that the default

rule for revocable trusts is that the beneficiary is always the grantor and his (also incorrect) belief

that a grantor or trustor is different from a settlor.

Seidling followed no formalities in creating or operating the trusts.  Seidling often

prepared multiple trust agreements that had the same trust name.  The different versions of the

trust agreements for the same trust often had a different grantor or trustor (where one was

identified) and a different beneficiary.  For example, Seidling prepared at least four different

trust agreements for Washburn Trust.  Exs. 55, 56, 57, 58.  The agreements named three different

beneficiaries, who Seidling said were also the grantors or trustors, and in one trust agreement the

trust name included an "a/k/a."

In addition, the trial record is replete with evidence of transactions between and among

various trusts, partnerships, and Seidling himself (or fake business names for entities that are

actually sole proprietorships).  For example, one parcel of land was transferred among three

different trusts, a partnership, and a sole proprietorship through a series of seven transfers.  *See*

Ex. 288.  The transfers were not accompanied by any documentation other than the recorded

deeds, and no consideration was paid or received for the transfers.  When Seidling transferred

property between or among his trusts and entities and himself, he generally claimed the transfers

as exempt from transfer fees under the related entity exemptions.  *See* Wis. Stat. § 77.25(9), (15),

(15m), (15s), (16).  Seidling's exemption claims are evidence that the trusts and entities are all

related.  In addition, the return address included on the recorded deeds was invariably a street

address or P.O. Box associated with Seidling.

After he purchased the properties, Seidling would rent or sell them to third parties,

sometimes back to the original owners who were in financial distress.  Seidling offered "seller

financing" for many of the deals in the form of a land contract.  He soon determined that the land

contracts were burdensome – a land contract must be recorded, and if the vendee stops paying

then the vendor must foreclose the vendee's interest through a lawsuit.

So Seidling started selling properties using an instrument he titled "Contract for

Complete Beneficial Interest of Trust" or some similar title.  Those documents provided that the

purchasers were buying the beneficial interest in the trust that owned the property and were not

buying the property itself.  However, despite providing for the sale of a beneficial interest in a

trust, Seidling included a provision in the documents stating that when the price was paid in full

he could satisfy the trust's obligation by transferring title to the property rather than transferring

the beneficial interest in the trust.  Seidling often entered into several such contracts for the same

trust.  None of the trusts purporting to sell beneficial interests were registered with the state as

required under Wis. Stat. § 226.14(1).

According to Seidling, the contracts were personal property contracts and did not need to

be recorded.  Structuring the transactions in this way allowed Seidling to avoid recording the

documents in the land records, and he could also avoid the court costs and other expenses, as

well as the time, necessary to regain control of the property if the buyer stopped paying.

Seidling would simply evict the purchasers as though they were tenants.  At least one state court

concluded that "[d]espite being characterized as a sale of an interest in a trust, these [contracts]

were in fact real estate transactions" that must be recorded.  Ex. 521 at 1.

Though Seidling attempted to structure the transactions in a manner designed to avoid the

need to foreclose, sometimes court action was necessary to evict purchasers or otherwise address

title or occupancy issues on his properties.  To avoid hiring a lawyer, Seidling would assign the

causes of action or transfer the property to himself.  But he did not want his name on the chain of

title or in the court records, so he always used a fictitious name that he said was a sole

proprietorship.  These fictitious names often included words like "Enterprises," and his sole

proprietorships included "Florida Land Enterprises" (Ex. 163); RN Enterprises (Ex. 288 at 14);

WX Enterprises (Ex. 385 at 8); JKW Enterprises (Ex. 457 at 10); and Zblocki Enterprises (Ex.

401 at 4).  Seidling would often transfer a property from one of his trusts or other entities to

himself, accomplish his litigation goal, and then transfer the property back to the trust or other

entity.  No consideration was ever paid for these transfers, and Seidling received no

consideration from the trusts for his efforts.

Seidling received a steady stream of payments from the renters and buyers under all these

contracts.  The payments were not sent to the individual trusts and entities that owned the real

property, however.  Instead, Seidling directed all the third parties who had a contract with one of

the trusts to send their payments to a single "servicing entity."  For a time, Seidling used Indies

Family Limited Partnership, then he used Oasis Family Limited Partnership, then Universal

Management LP.  Shortly before filing bankruptcy, Seidling switched the servicing entity to

"Universal Management Trust," and then during this adversary proceeding to "Universal

Management Corporation of Wisconsin, Inc."  As explained below, Seidling owned and

controlled all of these servicing entities, and he followed no corporate formalities for the so-

called "servicing" relationship.  None of the property-owning trusts and entities had contracts

with these "servicing entities" that would allow the servicing entities to collect or distribute

funds on their behalf, nor were there contracts between the servicing entities formalizing the

switch from one to another.  Seidling simply directed the third parties to begin making their

payments to a different entity.

Nor did the servicing entities keep detailed records regarding what funds were received

for which property.  All the funds from all the properties were commingled together and spent

without regard to who owned the funds.  For example, Seidling caused Universal Management

Trust to pay the 2023 property taxes for most of the trusts and entities.  But Seidling testified that

several properties are vacant or have renters or buyers who are not making payments (including

himself).  If one or more properties had no income, then Universal Management Trust

necessarily used proceeds from other properties to fund the taxes.  When questioned about this,

Seidling simply said, "Money came in and bills were paid."

The Trustee presented evidence of more than 80 different trusts and entities controlled by

Seidling in recent years, yet Seidling could produce no records from which anyone would be able

to determine which funds belonged to which properties or entities.  Seidling testified at various

times that such an accounting is unnecessary because "it all flows back to Oasis," meaning that

the ultimate owner of the trusts and entities is Oasis Family Limited Partnership.  However, he

also testified that Christine's pension plan may own some of the properties.  (Christine

disavowed any ownership interest and said the pension plan was dissolved.)  He also said that

VNAL Dec Trust, a purportedly irrevocable trust, owns some of the properties.  Seidling agreed

that he could not say which properties belong to which trusts, and that he would need to see a

ledger of every debit and credit transaction over the years and assign them to individual

properties.  No such ledger exists, and Seidling agreed that his lack of records is a "problem."

Seidling testified that he would not be able to create such a ledger and that an accountant would

be needed to perform that (seemingly Herculean) task.

### Christine Seidling

In 1972, Seidling married Christine Seidling.  The two divorced in 1993.  They reunited,

but did not remarry, in 1994.  They stayed together until 2013, and Christine lived with Seidling

off and on until 2019 or 2020.  Christine was living in Florida at the time of the trial, and the

Trustee subpoenaed her for a deposition in Florida.  The Court admitted the deposition transcript

as testimony at trial.  ECF No. 207.

Christine is or was a licensed CPA, and generally assisted with the finances and accounting work for Seidling's real estate business. Seidling testified that, to the extent records were kept for the various trusts and entities, Christine kept them. There are some detailed records included with a 2017 tax return for Oasis Family Limited Partnership. *See* Ex. 33.

Christine confirmed that she and Seidling "consolidated" the trusts by flowing the money through Oasis and Universal Management "to centralize . . . the income and expenses account, and then it would be reported to the individuals or the company that owned the money, the entity that owned the property." ECF No. 207 at 18.

Christine testified that she handled the finances for the trusts and entities through at least 2018, in part because Seidling was incarcerated and then on federal supervised release for several years in the mid-2010s. Christine said she did the "year-end" accounting for 2018, and she provided some assistance in 2019, but after that she was no longer involved in the real estate business. There is limited evidence in the record suggesting that she may have been involved later than 2019. For example, when Seidling sold a property using a "Contract for Complete Beneficial Interest of Trust" agreement, he told the purchasers that the interest they paid was tax deductible mortgage interest, and he provided them with a Form 1098. Both Seidling and Christine testified that Christine prepared these forms, or at least prepared the accounting necessary to determine the interest amounts to be included on the forms. The record includes at least one Form 1098 for tax year 2021 (*see* Ex. 331 at 6), and Christine Wichelman testified that she received a Form 1098 for tax year 2021. Based on Seidling's other testimony regarding the records he kept, or in reality didn't keep, it seems unlikely that Seidling would have prepared those documents without Christine's assistance.

Whether Christine's involvement ended in 2019 or 2021 is not material to the Court's conclusions of law below. Importantly, Seidling was unable to produce any documentation

similar to the records included with the 2017 Oasis tax return, and he agreed that there is no

current accounting and there has not been such an accounting for quite some time.

Christine testified that she invested in some of the properties that Seidling purchased, but

that her properties were separate from his.  She said she had some of the assets in an IRA (which

was different from Seidling's IRA that was dissolved) and the Hudson Diesel MPPP.  The

chapter 7 trustee in the Florida case argued that those assets were property of the bankruptcy

estate.  Christine ultimately settled with the trustee and paid a substantial sum to have her assets

released.  As part of the settlement, Christine rolled the assets that were in the pension plan into

her IRA, and she said the pension plan no longer exists.  ECF No. 207 at 82-84.  She and

Seidling agreed that any non-liquid assets in the pension plan, such as real estate and associated

contracts, would belong to Seidling.  Christine credibly testified that she has no further interest in

any of the trusts or entities that are defendants in this adversary proceeding.  ECF No. 207 at 24-

25, 85.  Christine had counsel in connection with this proceeding, and she signed a waiver of any

interest that she may have had in the assets at issue.  ECF No. 224.

### Seidling's Attempts to Conceal His Involvement and Evade Creditors

The record indicates that Seidling went to great lengths to conceal his involvement in the

real estate business described above and to evade his creditors.  Several facts bear mention.

First, Seidling admitted that he transferred real estate between his trusts and other entities

for the purpose of evading judgments and other title issues.  For example, Exhibit 239 indicates

that property in Burnett County, Wisconsin was transferred to Burnett Land Trust in 2005.

Seidling transferred the property from Burnett Land Trust to Indies FLP Trust in 2021 in

anticipation of a sale transaction.  (Seidling often transferred property to a different trust before a

sale because the trusts did not have bank accounts into which he could deposit the sale proceeds.)

In early 2022, Seidling transferred the property to Range Line Road Trust.  When asked why he

transferred the property, Seidling testified that several citations had been issued against the

property and he needed to get the property out of the name of Indies FLP Trust before any

judgment was entered on the citations because Indies FLP Trust had other assets he wanted to

protect.  Around the same time, he transferred another property out of the name of Indies FLP

Trust to avoid a judgment against that property.  *See* Ex. 246 at 5-6.  Seidling testified to similar

actions for other properties.

Second, Seidling tried to shield his ownership interest in Oasis Family Limited

Partnership by transferring it to a fake person.  Seidling attempted to transfer his ownership

interest in Oasis Family Limited Partnership to "Jose Rodriguez" in 2010, to transfer the interest

back to himself in 2013, and to again transfer it to Jose Rodriguez in 2018.  Exs. 24, 25.  The

transfer in 2018 indicates that Rodriguez's address is 132 N. Indies.  When asked about Jose

Rodriguez, Seidling's testimony in response was evasive and not credible.  Seidling said that

Rodriguez did not pay any consideration for the interest in Oasis because it was worth only $10.

Seidling said that Rodriguez lives on a boat in Florida that was docked at 152 N. Indies at some

point.  He said he had no contact information for Rodriguez, he could not say when he last saw

him, he could not say when he would see him again, and he could not say why the address used

for Rodriguez was 132 N. Indies.  None of this is credible.  Seidling claimed that all the trusts

and entities "flow back to Oasis" (making any interest in Oasis worth much more than $10);

Rodriguez could not have been the general partner responsible for running the business if

Seidling has no idea where he is or how to contact him.  Based on this incredible and

contradictory testimony, Seidling's demeanor at trial, and his inability to answer questions

regarding Rodriguez, the Court finds that Jose Rodriguez does not exist.

Third, Seidling also used fake names on documents he recorded in both Wisconsin and

Florida.  In Wisconsin a document recorded with the county register of deeds must include the

name of the person who drafted the document.  Wis. Stat. § 59.43(5).  Seidling drafted nearly all

the deeds transferring properties between his trusts and entities, but he frequently put a different

name on the document.  In a decision and order entered in a Wisconsin state court action in 2006,

the state judge noted that a deed in the record indicated that it was drafted by an attorney who

had done work for Seidling but that Seidling and his son had actually drafted the document.  Ex.

250 at 6.  The judge admonished the lawyer that he could not permit Seidling to use the lawyer's

name when the lawyer had not participated in drafting a document.

Despite this admonishment, Seidling continued his practice of using the name of a person

who did not actually draft the document, he just did not use a lawyer's name.  One name that

appears repeatedly is Juan Rodrigues.  Many of the deeds and other documents related to

Seidling's properties indicate that they were drafted by Rodrigues.  *See* Ex. 15 at 8; Ex. 38 at 2;

Ex. 63 at 13, 31; Ex. 64 at 31; Ex. 67 at 21; Ex. 110 at 2; Ex. 157 at 1, 9; Ex. 165 at 2; Ex. 177 at

3, 5; Ex. 188 at 2, 3; Ex. 208 at 2, 3; Ex. 225 at 5; Ex. 233 at 11; Ex. 236 at 1; Ex. 239 at 3, 4, 7;

Ex. 246 at 5, 6; Ex. 253 at 2, 3; Ex. 263 at 46; Ex. 270 at 7; Ex. 328 at 5, 7.  When asked about

Rodrigues, Seidling answers were evasive and not credible.  Seidling claimed that he met

Rodrigues in Florida, and that Juan Rodrigues, like Jose Rodriguez, lived on a boat that was

sometimes docked outside of 152 N. Indies.  (Christine testified that she had never met anyone

named Juan Rodrigues while she lived at 152 N. Indies for many years.)  Seidling said he had no

contact information for Rodrigues, could not say when he last saw him, and could not say when

he would see him again.  He also could not say how Rodrigues obtained the information to draft

the documents or how he transmitted the documents to Seidling.  Later Seidling said that

Rodrigues did not actually draft the documents, but he gave Seidling permission to use his name

on documents that Seidling drafted.  Seidling could not say when or how that permission was

given.  Rodrigues's name also appears as Juan Rodregues (Ex. 16 at 26), Juan Rodriguez (Ex.

14

109 at 3; Ex. 288 at 16; Ex. 467 at 5), Juan Rodreguez (Ex. 208 at 7), and Juan Rodrequez (Ex. 262 at 1).[4]

Seidling also attempted to transfer property in Key West, Florida to "Juan Rodriguez of 132 N. Indies Drive, Marathon, FL." Ex. 467 at 5. The return address for Rodriguez is Seidling's P.O. Box in Hayward, Wisconsin. Seidling said he could not recall if Rodriguez paid any consideration for the transfer, and he could not say why the addresses for Rodriguez were Seidling's addresses in Marathon and Hayward.

Based on Seidling's demeanor at trial, his inability to answer questions about Rodrigues, his far-fetched claim that Rodrigues allowed Seidling to add his name to dozens of documents he had never seen, and the many spellings of the name that appear in the record, the Court finds that Juan Rodrigues – whether under that spelling, under Juan Rodriguez, and any other similar spelling of the name – does not exist.

Other recorded documents in the trial record indicate that they were drafted by Jason Smith (Ex. 14 at 15; Ex. 61 at 19; Ex. 177 at 1; Ex. 199 at 5; Ex. 467 at 4), J.D. Smith (Ex. 16 at 11; Ex. 328 at 3), James Anderson (Ex. 273 at 3), TJ Jones (Ex. 292 at 3), James Smith (Ex. 304 at 5), and Gerald Rodrigues (Ex. 336 at 6). The Court finds that Seidling made up generic names to include on the documents that he drafted for recording. Christine testified that she did not draft at least two documents that included her name as the drafter. *See* ECF No. 207 at 41-42. The reason that Seidling did not want his name to appear as the drafter of the documents is not clear. What is clear, is that the use of these fake names is evidence of Seidling's efforts to disassociate himself with transactions and assets that he controlled.

---

[4] Seidling used the name "Jose Rodrigues" on at least two documents. Ex. 14 at 17; Ex. 16 at 17.

Fourth, Seidling also went to great lengths to avoid signing certain deeds and other documents related to the properties that he controlled, and he cajoled several people into signing deeds and other documents on behalf of his trusts.  Jerome and Dorothea Saavedra met Seidling in 2019 when they contracted to purchase property from Seidling in Washburn County, Wisconsin.  They quickly developed a relationship with Seidling, and Seidling asked Mr. Saavedra to do handyman-type work on several of his properties in the area.  Seidling also invited the Saavedras to spend a couple of winters with him at 152 N. Indies so that Mr. Saavedra could perform work at Seidling's properties in Florida.  At Seidling's request, the Saavedras accompanied him to several real estate closings and signed the documents he asked them to sign.  As described in more detail below, Seidling prepared documents that would allow the Saavedras to sign on behalf of his trusts.  The Saavedras credibly testified that they did not know what they were signing, that they did not know they were named as trustees of any trust, and that they signed the documents only because Seidling asked them to sign.  Mrs. Saavedra testified that Seidling told her he needed the Saavedras to sign documents because he was "selling too many properties" so he could not sign any more deeds.

Seidling developed a similar relationship with Chad Raasch after Raasch contracted to purchase a property in Sawyer County, Wisconsin.  Seidling similarly asked Raasch to perform handyman-type work at his properties, and he also asked Raasch to sign documents for him.  Like the Saavedras, Raasch credibly testified that he did not know what he was signing, that he did not know he was named as a trustee of any trust, and that he signed the documents only because Seidling asked him to sign.  Seidling prepared trust agreements indicating that Raasch was a trustee, but the trust agreements were dated in 1998 and 2011, well before Raasch met Seidling.

It is unclear why Seidling needed the Saavedras or Raasch to sign documents for his trusts.[5]  Seidling signed many transfer documents himself both before and after the Saavedras and Raasch signed documents.  These episodes are evidence of Seidling's desire and willingness to mold the documentary record to fit his needs.

In another example, Austin Mahal contracted with Seidling to purchase a property in Chippewa County.  Mahal needed certain permits from the local government, but the property was still in the name of Lafayette Land Trust.  So Seidling provided Mahal with a document titled "Notice of Co-Trustee Status" that purported to confirm that Mahal had authority to sign documents and take certain actions on behalf of the trust.  Mahal credibly testified that he did not know he was a trustee of the trust, and that he never saw a trust agreement or similar document making him a trustee.

Finally, in an attempt to disclaim involvement in his trusts, Seidling purported to resign from them on October 31, 2022.  *See* Ex. 1070 at 2.  On a blank sheet of notebook paper, he handwrote a statement saying, "Kevin Swanson has agreed to be trustee of all real property trusts where I am trustee and I resign this date."  *Id.*[6]  Seidling agreed that he did not follow the procedure for resigning that is typically included in his trust agreements, which requires sending a notice by certified mail to the trust beneficiary.

When asked about Kevin Swanson, Seidling had evasive, contradictory, and generally not credible answers.  Seidling said that Swanson lives "up toward Bayfield[, Wisconsin]" but he could not provide an address or any other contact information.  Seidling could not answer how

---

[5] It appears that Seidling also had a similar relationship with someone named Gregg (or Greg) Beckley, who signed documents for his trusts.  *See*, *e.g.*, Exs. 221, 225, 233, 357 at 3.

[6] Seidling had previously resigned from his position as trustee of LCO Trust II in connection with litigation against that trust in Wisconsin state court.  *See* Ex. 1070 at 1; *see also Thake v. Taylor, et al.*, Sawyer County, Wisconsin Case No. 21-CV-115.

Swanson could manage the properties as trustee if he cannot be contacted.  Seidling said that he would somehow get in touch with Swanson "if deeds need to be signed," but he did not explain how he would do that.  Seidling also said that Swanson could not transfer the properties without Seidling's permission and oversight because Swanson "doesn't have documentation" and the county register of deeds would not let him record documents.

The registered address for nearly all the properties is a street address or P.O. Box associated with Seidling, so there is no way for someone to contact Swanson if there is an issue with one of the properties.  Seidling admitted that, despite resigning as trustee, he continued to collect payments, pay property taxes, and take other action on behalf of the trusts.  Seidling also admitted that he did not communicate with Swanson regarding any of the trusts or the actions he took on their behalf after he supposedly resigned as trustee.  Seidling said he simply took care of the properties because he could not "abandon" them.

Based on Seidling's demeanor at trial and his evasive answers to questions regarding Kevin Swanson, the Court finds that Kevin Swanson does not exist.  The Court further finds that Seidling did not resign as trustee from any trust, to the extent the trusts exist, and that Seidling continued to control all the properties after October 31, 2022.

### Individual Trusts and Entities

The parties presented evidence at trial regarding the many trusts, sole proprietorships, and other entities associated with Seidling.  Those entities can be grouped into two broad categories: the "servicing" entities that did not hold title to real property, and the various entities that held title to real property in Wisconsin and Florida.  The entities that held title to property can be further broken into four groups: (1) the "trusts" for which there was evidence at trial of a trust agreement; (2) the "trusts" for which there was no evidence at trial of a trust agreement; (3) the corporate entities; and (4) the sole proprietorships that are alter egos of Seidling.

### *The Servicing Entities*

The following trusts and corporate entities served as a "servicing entity" for Seidling's business at some point.  The servicing entities collected funds and spent them for property-related expenses and property taxes, and for other, unidentified expenses.  The payments were all commingled into a single account.  Seidling testified that he did not keep records regarding which incoming payments or outgoing expenses related to which properties.  The Court finds that Seidling controlled each of the "servicing entities."

### *Indies FLP Trust*

Indies FLP Trust functioned for a time as the "servicing entity" for Seidling's real estate business.[7]  The evidence at trial included three trust agreements for Indies FLP Trust.  The first is dated September 1, 2012.  Ex. 1.  Seidling is named as the trustee, and "Universal Management LP aka Universal Management" is named as the beneficiary.  No grantor or settlor is identified in the body of the document, but the document indicates the trust is revocable.  Seidling testified that he created the document and that the grantor of the trust was Universal Management LP.  Seidling signed only as "Trustee."  *Id.* at 4.  Universal Management was a limited partnership, which did not have a trustee, and there is no signature on behalf of Universal Management LP.

The second agreement is dated January 2, 2020.  Ex. 2.  Seidling is named as the trustee, and Indies FLP Partnership is named as the beneficiary.  No grantor or settlor is identified in the body of the document, but the document indicates the trust is revocable.  Seidling signed the

---

[7] Seidling also had a partnership entity called Indies Family Limited Partnership.  *See* https://apps.dfi.wi.gov/apps/CorpSearch/Details.aspx?entityID=O020706&hash=76115979&searchFunctionID=ed2b351a-6e18-4aff-8053-d585c22979f9&type=Simple&q=indies+family.  Seidling may have begun using Indies FLP Trust rather than Indies FLP because it was easier to conduct business for a trust that was not required to register with the state.  As will be seen, Seidling similarly began using "Universal Management Trust" after a bank account in the name of "Universal Management LP" was closed by the bank.

document as trustee of Indies FLP Trust and as "GP" of "Indies FLP Partnership, Beneficiary."
*Id.* at 3.

The third agreement is dated June 1, 2020. Ex. 3. Seidling is named as the trustee, and
Universal Management LP is named as the beneficiary. No grantor or settlor is identified in the
body of the document, but the document indicates the trust is revocable. Seidling signed the
document as "GP" on behalf of "Universal Management LP, Grantor." *Id.* at 4.

There was no evidence at trial as to why there are three different trust agreements for
Indies FLP Trust or why the beneficiary (and supposed grantor) changed from Universal
Management LP to Indies FLP Partnership and back again. The Court finds that none of the
three trust agreements in the record is reliable or credible evidence of the creation or existence of
an identifiable and valid trust, the grantor or settlor of any such trust, or the beneficiary of any
such trust.

The Trustee presented evidence that Indies FLP Trust owned bank accounts before and
after the petition date. On July 31, 2020, Seidling opened an account at Centennial Bank in the
name of "Indies FLP Trust FBO Universal Management." Ex. 4. The account agreement
indicates that Seidling is trustee under a trust agreement dated September 1, 2012, though there
were two other trust agreements dated after the 2012 agreement but before the account was
opened. Seidling used the Universal Management LP tax identification number ending in 9922
to open the account. *Id.* at 9. On April 7, 2022, Centennial Bank issued two "force pay debits"
in the total amount of $1,091,036.01 to close the account. Ex. 5.

On April 8, 2022, Seidling opened an account in the name of Indies FLP Trust at Truist
Bank, and he funded the account with an initial deposit of $1,091,036.01, likely the funds from
the Centennial Bank account. Ex. 6. On February 28, 2023, Seidling withdrew $1,040,000 from
the account to purchase a cashier's check payable to "clerk of court or Bernard Seidling." Exs.

8, 11. He made this withdrawal despite claiming to have resigned as trustee from all trusts on

October 31, 2022. Ex. 1070 at 2. Before trial, the Trustee obtained a preliminary injunction

prohibiting Seidling from transferring or attempting to negotiate the check and prohibiting the

bank from honoring the check. Seidling testified at trial that he could not recall the transaction

and did not know what happened to the check.

The Trustee also presented evidence of several real estate sale transactions involving

Indies FLP Trust that occurred before the petition date. Exs. 12, 13, 14, 15, 16. Indies FLP

Trust received the sale proceeds from these transactions, but there was no evidence at trial

regarding where the proceeds were deposited. The transactions are therefore unhelpful in

determining what assets Indies FLP Trust may currently own, and the Trustee did not explain

how pre-petition transactions with third parties are relevant to determining what specific assets

are property of the bankruptcy estate if the sale proceeds cannot be traced or identified.

The sale documents do, however, provide evidence of the way Seidling conducted

business. The properties were all held in different trusts, and they were transferred to Indies FLP

Trust shortly before the sale for the purpose of allowing Indies FLP Trust to act as the seller and

receive the sale proceeds. *See* Ex. 13 at 19 (RL Trust to Indies FLP Trust); Ex. 14 at 17 (Mason

Land Trust to Indies FLP Trust); Ex. 15 at 8 (Duck Island Trust to Indies FLP Trust); Ex. 16 at

28 (Goindies Trust to Indies FLP Trust). Seidling testified that such transfers among trusts that

he controlled were not accompanied by consideration or documentation other than the deed. The

Court finds that these transfers are evidence that Seidling did not observe any corporate

formalities between the trusts/entities, and that he could and did transfer property among them

whenever it suited him.

In addition, Seidling signed a "Certification of Trust" in connection with each of the

transactions in which he certified, under oath, certain information regarding Indies FLP Trust. In

three of the documents, he certified that he was the settlor of the Indies FLP Trust and that the

trust is revocable by him.  Ex. 13 at 52; Ex. 14 at 28; Ex. 15 at 74.  In a fourth document, he

indicated that the trust is irrevocable, though he cited the June 1, 2020 trust agreement, which

does not indicate the trust is irrevocable.  Ex. 16 at 44.

Seidling testified at trial to his belief that the certifications were all incorrect.  He said he

was not the settlor for any trust, and that none of them are revocable by him.  He claimed that he

initialed and signed the documents, and that an employee of Knight Barry later filled in the

information incorrectly.  In contrast, Knight Barry's General Counsel credibly testified that the

title company's employees would not allow a seller to sign a blank certification of trust and fill

in the information later without input from the signer.  The Court finds that Seidling's

explanation is not credible and that Seidling did, in fact, sign documents indicating that he is the

settlor of the Indies FLP Trust and that he has the power to revoke the trust.

Finally, Seidling provided a bank account number at Centennial Bank ending in 8800 for

the sale proceeds of the transactions, which is the account in the name of Indies FLP Trust that

was closed in April 2022.  Ex. 13 at 55; Ex. 14 at 25; Ex. 15 at 70; Ex. 16 at 46.  Recall that

Seidling provided the tax ID number for Universal Management LP when he opened that bank

account.  However, the tax ID number that he provided for each of the real estate sales ended in

7216 and was associated with Oasis Family Limited Partnership.  Ex. 13 at 49; Ex. 14 at 22; Ex.

15 at 69; Ex. 16 at 42.

The Court finds that Indies FLP Trust is solely controlled by Seidling, and that he can

change or revoke the trust, if one existed.

*Oasis Family Limited Partnership*

Oasis Family Limited Partnership is a limited partnership organized in Wisconsin and first registered on November 6, 2002. Ex. 25. For some period of time before 2021, Oasis served as a "servicing entity" for Seidling's real estate business.

Seidling was the general partner with a 1% interest, and his Roth IRA was a limited partner owning 99% of the partnership interest. Ex. 527 at 2; *see also* ECF No. 29 at Ex. 10. The IRA was dissolved during Seidling prior Florida bankruptcy, leaving Seidling as the only partner. Seidling purported to transfer his general partnership interest to "Jose Rodriguez" in 2010 and back to himself in 2013. Ex. 25. In a document dated January 1, 2018, but supposedly signed on January 1, 2017, Seidling's general partnership share was transferred to "Jose Rodriguez" and his limited partnership share was transferred to "ZDWA Irrevocable Trust." Ex. 24. Jose Rodriguez supposedly signed the document on behalf of himself and the trust.

As explained above, the Court finds that Jose Rodriguez does not exist, so he could not sign a document on behalf of ZDWA Irrevocable Trust. Moreover, there was no evidence at trial indicating that ZDWA Irrevocable Trust is a valid trust. And even though the document indicates that the partnership has $100,000 in assets, Seidling received no consideration for the transfer of his partnership interest. The Court finds that there is not sufficient evidence in the record to conclude that Seidling's partnership interests were transferred to anyone. The Court further finds that Seidling owns 100% of the partnership interest and that Seidling is the only owner of Oasis Family Limited Partnership.

Oasis Family Limited Partnership had an account at Centennial Bank. Ex. 31. The evidence at trial established that funds owned by other trusts and entities were deposited in and flowed through the Oasis account. On August 10, 2021, $600,000 was deposited in the account from an account in the name of Seidling Family Trust IV. *Id.* at 17. These funds represented a

portion of the sale proceeds from the 152 N. Indies property, which was in the name of Seidling

Family Trust IV at the time of the sale.

In October 2021, several transfers were made into the account from an account ending in

6441 in the name of Universal Management LP.  Ex. 31 at 22.  Seidling could not recall where

the money came from or why funds were transferred between the two accounts.  The November

2021 statement shows several more transfers back and forth between the Oasis and Universal

Management accounts.  *Id.* at 24.  Another transfer of $100,000 from Universal Management

was made on February 25, 2022.  *Id.* at 30.  On April 7, 2022, two checks totaling $1,144,018.28

were issued to close the account.  *Id.* at 35.

On June 23, 2008, Seidling opened an account in the name of Oasis Family Limited

Partnership at Charter Bank.  Ex. 28.  In August 2020, following the acquisition of Charter Bank

by Nicolet National Bank, the Oasis Partnership Account was transferred to Nicolet Bank.  Ex.

29.  It appears that the funds from the closure of the Centennial Bank account were deposited in

Nicolet Bank.  In March 2023, the Court issued a preliminary injunction in the main bankruptcy

case freezing the funds in that account.

*Universal Management LP*

Universal Management LP is a Wisconsin limited partnership that was originally formed

as Ottercreek Trails Family Limited Partnership.  Ex. 35.  The name was changed in 2007 to

Universal Management LP.  *Id.* at 5.  Around the same time, the IRS issued a tax ID number to

Universal Management LP ending in 9922.  *Id.* at 12.  Seidling signed many documents as

general partner of Universal Management LP.  There is also evidence in the record that Seidling

owns 1% of the partnership interest, and that Oasis Family Limited Partnership owns 99% of the

interest.[8]  Because the Court finds that Seidling owns all the partnership interest in Oasis Family

Limited Partnership, Seidling also necessarily owns 100% of the partnership interest in Universal

Management LP.

Universal Management LP had a bank account at Centennial Bank.  Ex. 37.  Universal

Management functioned as a "servicing entity" for Seidling's real estate business.  The bank

statements between January 2021 and April 2022 reflect many monthly deposits made into the

account, which is consistent with the payments being made by third parties on account of the

various contracts with other trusts and entities that are discussed below.  Ex. 37.

The account statements also reflect many debits out of the account.  Of note, these debits

include credit card payments and payments for property taxes for many parcels of real estate.

Seidling testified that both he and Christine used the credit card or cards for expenses related to

the real estate business.  Seidling offered none of the credit card statements in evidence and was

vague about the nature of the expenses.  He also admitted that there is no accounting that would

associate any specific expense with a particular property.  Similarly, there is no accounting

attributing any property tax payment to a particular property or set of properties.  There is also no

way to know whether payments made to Universal Management for a particular property were

sufficient to cover the property taxes and other expenses for that property.

On September 4, 2021, Seidling wrote a check to each of his three sons in the amount of

$15,080.77.  Ex. 37 at 80.  Seidling testified that his sons were beneficiaries of Royal Land

---

[8] There is a document from 2007 that indicates DKLCO Trust owns 99% of the partnership interest in Universal
Management LP.  Ex. 34.  However, a document prepared by Christine Seidling in 2021 indicates that Oasis Family
Limited Partnership owns the 99% interest.  Ex. 527.  The Court finds that the document prepared by Christine
Seidling is trustworthy and – given the passage of time between 2007 and 2021 and Seidling's penchant for
transferring property and ownership interests among his entities – it is more likely to be accurate than the 2007
document.  Regardless, the same document prepared by Christine indicates that Seidling owns 100% of DKLCO
Trust, which would also make him the sole owner of Universal Management LP.

Trust, that a property owned by the trust had been sold, and that the checks represented the proceeds of the sale. Seidling said he did not have records of the sale, the amount of the sale proceeds or when they were received, or how he calculated the amount of the payments made to his sons. There are also no records between Universal Management and Royal Land Trust that would allow Seidling to distribute money from Universal Management's bank account to the supposed beneficiaries of Royal Land Trust.

On October 9, 2021, Seidling wrote a check for $17,000 to Sunshine FLP. Ex. 37 at 89. Seidling testified that it related to the property titled in the name of Broken Arrow Condo Trust. On November 16, 2021, Seidling wrote another check to Sunshine FLP for $55,000. *Id.* at 98. There are no documents regarding the transfers of funds from Universal Management to Sunshine FLP. On April 18, 2022, the account was closed with a withdrawal in the amount of $36,877.81. *Id.* at 137.

In addition to using Universal Management LP as a "servicing entity," Seidling also used the entity for certain property transfers. On September 30, 2021, he transferred a parcel of real estate in Washburn County, Wisconsin from Shells Lake Trust to Universal Management LP. Ex. 38 at 2. A week later, he caused Universal Management LP to enter into a Land Contract with a third party. *Id.* at 5-8. Seidling signed the land contract, along with a related affidavit, as General Partner of Universal Management LP. *Id.* at 3-4, 8. Despite representing himself as general partner for the purpose of entering into a real estate transaction, Seidling claims that he was not in fact the general partner, and he claimed not to know who the general partner was or is. The Court finds this testimony by Seidling to be not credible.

Seidling also used Universal Management LP to make a loan to his acquaintances, Charles and Kristen Currier. Ex. 39. The Curriers wanted to purchase a property on Duck Key in Florida. Seidling agreed to lend them $2,000,000 in June 2021. In preparation for making the

loan, Seidling wrote in an email to Ms. Currier, "We need to remove my name from the
Mortgage . . . I never have my name on recorded documents." *Id.* at 27.

Seidling made the loan in the name of Universal Management LP.  Seidling funded the
loan with checks from three different bank accounts at Centennial Bank – $328,356.16 from an
account in the name of Oasis Family Limited Partnership, $660,000 from an account in the name
of Washburn Trust and Polk Land Trust, and $1,010,000 from an account in the name of
Universal Management LP.  *Id*. at 13.  Though the money came from three different
accounts/entities, the Curriers issued a promissory note to and granted a mortgage in favor of
Universal Management LP only.  Ex. 40 at 11-15.  There are no documents memorializing the
contributions to this loan from Oasis Family Limited Partnership, Washburn Trust, or Polk Land
Trust, and those entities do not appear to have a formal interest in the loan.  Seidling testified to
his belief that this sort of formality was unnecessary because the money in these entities "flows
back to Oasis."

Seidling attempted to sell the Currier mortgage in March of 2022 and entered into a
brokerage agreement for that purpose. Ex. 40 at 39-42.  He signed the agreement as General
Partner of Universal Management LP.  *Id.* at 42.  Seidling testified that he learned sometime after
signing the document that he was no longer the general partner and claims that he does not know
how he was purportedly removed as general partner.  The Court finds that this testimony is not
credible.  The Court further finds that at all relevant times Universal Management LP was solely
controlled by Seidling.

*Universal Management Trust*

Universal Management Trust took over the "servicing" role in 2022 after Centennial
Bank closed the account in the name of Universal Management LP.  The evidence at trial
included four trust agreements for Universal Management Trust.  The first is dated April 8, 2007.

Ex. 42.  Seidling is named as the trustee, and "Chris Seidling" is named as the beneficiary.  No

grantor or settlor is identified in the body of the document, but the document indicates the trust is

revocable.  Seidling signed the document, and below his signature is "Universal Management

Trust, Bernard Seidling, Trustor/Trustee."

The second is dated January 1, 2011.  Ex. 43.  Chad Raasch is named as the trustee, and

Universal Management LP is named as the beneficiary.  No grantor or settlor is identified in the

body of the document, but the document indicates the trust is revocable.  The document is not

signed.  The text below the signature line indicates that it is set up to be signed by "Universal

Management Trust, and Universal Management LP-Trustor, Chad M. Raasch, Trustee."  *Id*. at 3.

The third trust agreement is also dated January 1, 2011.  Ex. 44.  Seidling is named as the

trustee, and Universal Management LP is named as the beneficiary.  No grantor or settlor is

identified in the body of the document, but the document indicates the trust is revocable.

Seidling signed the document.  Below the signature line is "Universal Management Trust, and

Universal Management LP-Trustor, Bernard Seidling, Trustee & GP for Trustor."  *Id*. at 3.

The fourth trust agreement is dated January 2, 2020.  Ex. 45.  Seidling is named as the

trustee, and Oasis Family Limited Partnership is named as the beneficiary.  No grantor or settlor

is identified in the body of the document, but the document indicates the trust is revocable.

Seidling signed the document on behalf of Universal Management Trust as trustee and on behalf

of Oasis Family Limited Partnership as "GP."  *Id.* at 3.

The Court finds that none of the trust agreements is reliable or credible evidence of the

creation or existence of an identifiable and valid trust named Universal Management Trust, the

grantor or settlor of any such trust, or the beneficiary of any such trust.  The first agreement

identifies no grantor or settlor.  The second agreement is not signed, and it cannot be a valid trust

agreement anyway because Raasch did not meet Seidling until 2018 so he could not have been a

trustee for a trust associated with Seidling in 2011.  The existence of the first and second

agreements calls into question the validity of the third and fourth agreements.  Moreover, a trust

can have only one settlor or set of settlors; the settlor cannot change from one partnership to an

entirely different partnership as purportedly happened between the third and fourth agreements.

Seidling opened an account at Truist Bank in the name of Universal Management Trust

on April 15, 2022.  Ex. 46.  With the account opening information in Seidling's files is a

handwritten page with a list of people and dates.  *Id.* at 2.  The top of the document states "Gave

new banking info Universal."  Seidling disclaimed any knowledge regarding the document, but it

was found among his files and it appears to be in his handwriting.[9]  The Court finds that the

document is likely a list of persons with whom Seidling's entities had a contract.  Many of the

counterparties to Seidling's contracts would electronically transfer their monthly payments into

the account at Centennial Bank in the name of Universal Management LP.  With the closure of

that account Seidling would need to provide the information for the new account at Truist Bank

so they could continue to send their payments electronically.

The Truist Bank statement for April 2022 indicates that $36,877.81 was deposited into

the account on April 19, 2022, which matches exactly the amount that was withdrawn from the

Centennial Bank account in the name of Universal Management LP.  Ex. 47; *see also* Ex. 37 at

137.  It appears that with the closure of the Universal Management LP account, Seidling decided

to simply continue operations under a new Universal Management entity.  He later did the same

thing after this adversary proceeding was filed by forming a new entity named Universal

---

[9] In November 2023, the FBI seized documents and other materials from Seidling's residence in Hayward, Wisconsin.  The Trustee later received copies of the seized documents. The seized documents have Bates stamps in the lower right corner that were applied by the FBI.  Documents with such Bates stamps were necessarily found among Seidling's files.

Management Corporation of Wisconsin, Inc. into which he also deposited checks made payable to "Universal Management."

As with the account at Centennial Bank, the Truist Bank account received many deposits each month, which appear to be payments on the various contracts. Exs. 47, 48. The account also reliably received a deposit each month in the amount of $8,333.33 for payment on the $2 million mortgage with the Curriers. Ex. 47 at 4, 6, 9, 12, 15, 16, 21, 24, 25; Ex. 48 at 5, 8, 9. Though the mortgage was granted to and in the name of Universal Management LP, Seidling directed the Curriers to pay Universal Management Trust. There are no documents allowing Universal Management Trust to collect mortgage payments on behalf of Universal Management LP, and there is no evidence that these payments were later transferred to Universal Management LP. In January 2023, Universal Management Trust made several payments that appear to be payments for property taxes on the various parcels of real estate using commingled funds that included the payments from the Curriers. Ex. 49.

On February 28, 2023, Seidling withdrew $445,000 from the Truist Bank account in the form of a cashier's check payable to "clerk of court or Bernard Seidling." Ex. 51. Seidling signed the check request as trustee, despite his claim that he resigned as trustee from all trusts on October 31, 2022. On April 20, 2023, Seidling withdrew $162,000 from the Truist Bank account in the form of a cashier's check payable to "Bernard Seidling, Agent for Beneficiary." Ex. 52. Again, Seidling signed to withdraw the funds despite his claim that he was no longer trustee. Seidling claimed to have no knowledge of the purpose of the withdrawals or the location of the checks. Before trial, the Court entered a preliminary injunction prohibiting Seidling from transferring or attempting to negotiate the checks and prohibiting the bank from honoring the checks.

In May 2023, Seidling opened an account in the name of Universal Management Trust at First Horizon Bank.  Ex. 53.  It appears that Seidling then directed the contract counterparties to make payments into the First Horizon account.  For example, the payment of $8,333.33 on the Duck Key Mortgage appears monthly.  Ex. 53 at 3, 5, 8, 16, 22, 28, 34.

In September and October of 2023, Seidling caused five payments totaling $225,100 to be made to himself "as agent for beneficiary."  Ex. 53 at 25, 28, 30.  Seidling claimed to have no knowledge regarding the payments.  He claimed that the beneficiary of Universal Management Trust is Christine, and that he was planning to send the funds to Christine.  Again, she testified that she has no interest in any of Seidling's trusts and she signed a waiver of any interest.

The First Horizon account was closed at the end of 2023.  A "Misc. Debit" of $115,008 on December 28, 2023 appears on the statement, but Seidling claimed to have no knowledge of where that money went.  Ex. 53 at 43.  A check in the amount of $5,484.61 was issued to close the account on December 29, 2023.  Ex. 54.

*Universal Management Corporation of Wisconsin*

Seidling incorporated Universal Management Corporation of Wisconsin, Inc. ("UM Corp.") on October 19, 2023.  Ex. 502.  Seidling agreed that he is the sole shareholder of UM Corp.  On November 2, 2023, the IRS issued a tax ID ending in 9062 to UM Corp.  Ex. 504 at 14. The same day, Seidling opened an account at Chippewa Valley Bank in the name of UM Corp.  *Id.* at 1.

Seidling immediately began depositing checks made out to Universal Management into the UM Corp. account.  *See* Ex. 506.  Seidling also used the UM Corp. account to make property tax payments for the various properties.  Ex. 507.  It seems that Seidling used UM Corp. to continue the "servicing" role.  Despite his claim that other, unidentified people have interests in

the various trusts and entities, Seidling allowed the funds to be deposited in a corporation solely

owned by him and therefore subject to the claims of his creditors.

Chippewa Valley Bank quickly closed the UM Corp. account, and Seidling opened

another account for UM Corp. at Johnson Bank.  Ex. 510.  He deposited into that account the

check from First Horizon Bank in the amount of $5,484.61 that closed the Universal

Management Trust account at that bank.  Ex. 510 at 3; Ex. 511 at 1.  He also deposited several of

the other missing checks from the First Horizon account, including a check in the amount of

$115,000, a check in the amount of $27,000, and a check in the amount of $49,900.  Exs. 510,

511.  The latter two were among the checks that Seidling claimed he was planning to deliver to

Christine.  Seidling instead deposited them in the account of a corporation he solely owns.

Johnson Bank also quickly closed the account and issued a check in the amount of $160,247.21

on February 21, 2024.  Ex. 512.  Seidling claims he does not know what happened to the money.

### *Real Property-Owning Trusts and Other Entities*

The following trusts and entities own or have owned various parcels of real estate in

Wisconsin and Florida.  As explained below, the Court finds that Seidling created and controlled

each of the trusts and entities.  Seidling placed the properties he purchased into separate trusts

much like a legitimate real estate company might use single purpose or single asset entities.

Seidling did not follow any corporate formalities necessary to maintain the separate existence of

these trusts.  He frequently transferred properties between and among the trusts and commingled

their assets.  It seems that he wanted the benefits of separate entities, but he tried to evade all

associated burdens and obligations.  As one state court put it, "Bernard C. Seidling has tried to

put up shell trusts to evade litigation, but they come back to him through intimate connections."

Ex. 522 at 2.

<u>Trusts with Trust Agreements</u>

The evidence at trial included trusts agreements for a number of the trusts.  As explained
in more detail below, the Court finds that none of the trust agreements is reliable or credible
evidence of the existence of any of the trusts as an identifiable and valid trust.

*Mason Land Trust*

The evidence at trial included copies of three trust agreements for Mason Land Trust.
The first is dated June 1, 2005.  Ex. 216.  Seidling is named as the trustee, and G&A Trust is
named as the beneficiary.  No grantor or settlor is identified in the body of the document, but the
document indicates the trust is revocable.  Seidling signed the document as trustee of Mason
Land Trust and as trustee of "G&A Trust, Grantor and beneficiary."

The second agreement is also dated June 1, 2005.  Ex. 217.  Seidling is named as the
trustee, and Indies FLP Trust is named as the beneficiary.  No grantor or settlor is identified in
the body of the document, but the document indicates the trust is revocable.  Seidling signed the
document as trustee of Mason Land Trust and as trustee of "Indies FLP Trust, Grantor and
beneficiary."

The third agreement is dated August 22, 2005.  Ex. 218.  Seidling is named as the trustee
and Oasis Family Limited Partnership a/k/a Oasis LP is named as the beneficiary.  No grantor or
settlor is identified in the body of the document, but the document indicates the trust is
revocable.  Seidling signed the document as trustee of Mason Land Trust and on behalf of "Oasis
LP, Trustor."  *Id*. at 4.

When asked why there were multiple trust agreements for Mason Land Trust all dated in
mid-2005 but with different beneficiaries, Seidling admitted to simply creating trust documents
when they were needed.  For example, Exhibit 217 has a Bates number applied by the FBI that
includes the name Polzin.  Seidling found significance in the numbering scheme and recalled a

transaction with someone named Polzin.  He said the property associated with Polzin was sold in 2021.  Seidling testified, "The title company would want to have a Declaration of Trust and Trust Agreement to work with.  In addition to this trust document . . . there was also a deed . . . from Mason to Indies just before the closing to satisfy the requirement of the title company.  They would require that the property be titled in whatever name they are going to send [the sale proceeds] to."  That is, Seidling had to prove his authority to sign documents on behalf of Mason Land Trust, and he also needed to have the property in the name of Indies FLP Trust so that the proceeds could be sent to Indies FLP Trust.

Seidling's testimony is confirmed by other documents in the record.  Exhibit 235 is a rental/lease agreement with Dondi Polzin, dated July 16, 2018, for 30990 Tody Road in Mason, Wisconsin.  Exhibit 237 is an option to purchase contract for the Tody Road property between Mason Land Trust and Robert Matthews.  The same document is part of a closing packet for a sale transaction between Indies FLP Trust and Robert Matthews that closed in September 2021.  Ex. 14.  The closing packet indicates that Mason Land Trust acquired the property in 2005.  *Id.* at 8.  On September 16, 2021, Seidling caused Mason Land Trust to transfer the property to Indies FLP Trust.  *Id.* at 17.  Seidling said he did this because he "wanted [the sale proceeds] to go into the Indies account."  Indies FLP Trust then transferred the property to Robert Matthews on September 22, 2021.  *Id.* at 31.

The Court finds Seidling prepared the trust agreement dated June 1, 2005 with Indies FLP Trust as the beneficiary (Ex. 217) for the sole purpose of facilitating the sale transaction to Matthews.  The Court further finds that before the sale transaction Indies FLP Trust was not a beneficiary of the Mason Land Trust, and that there are no documents by which the grantor or beneficiary of the Mason Land Trust, if any, agreed to transfer the beneficiary interest in the trust to Indies FLP.  Moreover, there is no evidence in the record that Indies FLP Trust existed as a

34

valid trust in 2005 when the Mason Land Trust was supposedly created; the first version of a trust agreement for Indies FLP Trust is dated in 2012.  *See* Ex. 1.  Seidling simply created a document making Indies FLP Trust the beneficiary so that the title company could disburse the sale proceeds to Indies FLP Trust.

The Court finds that the other two trust agreements (Exs. 216 and 216) were also likely created for the purpose of facilitating a sale or other transaction and that they are not reliable or credible evidence of the creation or existence of an identifiable and valid trust named Mason Land Trust, the grantor or settlor of any such trust, or the beneficiary of any such trust.

On September 4, 2009, Mason Land Trust entered into a Land Contract with Patrick Fuller, and on October 3, 2009, Mason Land Trust transferred the property to Fuller.  Ex. 221.  Both the Land Contract and the Trustee's Deed were signed by Gregg Beckley on behalf of Mason Land Trust.  On July 2, 2009, Mason Land Trust entered into a Land Contract for a different parcel with Steven Harvey.  Ex. 225.  That document was also signed by Gregg Beckley.  Seidling testified that he permitted Beckley to sign documents for Mason Land Trust.  It is unclear whether Seidling created documents that would have formally authorized Beckley to sign the documents, and none of the trust agreements in the record include Gregg Beckley as a trustee.

As explained in more detail below, Seidling sometimes prepared new trust agreements when he wanted someone else to sign a document.  He did not observe any formalities in creating these new trust agreements or appointing new trustees.  Based on Seidling's testimony and his demeanor at trial, the Court finds that Seidling believed he alone had authority to let others sign documents for the various trusts, and that Seidling believed he did not need to observe any formalities or obtain permission from anyone else to grant that authority.

The evidence at trial included several other land contracts and other contracts related to property in the name of Mason Land Trust.  Exs. 227, 229, 230, 232, 234, 235, 237.  Seidling signed each of those documents as trustee of the Mason Land Trust.

The Court's review of the public records indicates that Mason Land Trust still owns at least three parcels of real property in Bayfield County, Wisconsin – Tax ID Nos. 35538, 35539, and 35648. [10]  *See* https://novus.bayfieldcounty.wi.gov/access/master.asp (search Last/Org. name Mason Land Trust).  The registered address for all three parcels is 132 N. Indies.  The 2023 property taxes for all three parcels were paid by Universal Management Trust.  Ex. 238.  The same payment sent by Universal Management Trust was also used to pay the taxes for two parcels in the name of Bayfield Land Trust.

The Court finds that Mason Land Trust is solely owned and controlled by Seidling, and that he can change or revoke the trust, if one exists.

*Washburn Trust*

The exhibits at trial included four different trust agreements for Washburn Trust.  Exs. 55, 56, 57, 58.  The first is dated June 1, 2015.  Ex. 55.  Seidling is named as the trustee, and Five Star Land Trust is named as the beneficiary.  No grantor or settlor is identified in the body

---

[10] The Trustee's exhibit list submitted before trial included many property tax documents printed from county websites, which show that real property is held in the names of the various trusts and other entities.  For reasons unknown, the Trustee did not seek admission of many such exhibits at trial.  Nevertheless, the Court may take judicial notice of the property information posted on the county websites.  A court may take judicial notice of a fact that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b); *see also* Fed. R. Bankr. P. 9017 ("The Federal Rules of Evidence . . . apply in cases under the Code."); Fed. R. Evid. 201(c)(1) (a court can sua sponte take judicial notice of a fact).  Courts "may take judicial notice of public record information obtained from an official government website." *Gilsinger v. Cities & Villages Mut. Ins. Co.*, 693 F. Supp. 3d 975, 988 n.3 (E.D. Wis. 2023) (citing *Ambrosetti v. Oregon Cath. Press*, 458 F. Supp. 3d 1013, 1017 n.1 (N.D. Ind. 2020)); *see also Denius v. Dunlap*, 330 F.3d 919, 926-27 (7th Cir. 2003) (information maintained by a government and "readily available in the public domain" cannot be reasonably disputed).  This includes county websites that provide online access to property tax and land records data.  *See In re Trenton Ridge Invs., LLC*, 461 B.R. 440, 483 (Bankr. S.D. Ohio 2011) (taking judicial notice of the status of real estate taxes as provided on website maintained by the county auditor); *In re Hodel*, No. 23-80182, 2024 WL 409352, at *2 (Bankr. C.D. Ill. Feb. 2, 2024) (taking judicial notice of tax records on the county's website).  The Court has therefore taken judicial notice of the information maintained by the counties where the various properties at issue are located.

of the document, but the document indicates the trust is revocable.  Seidling signed the document

on behalf of "Washburn Trust, Trustor" and "Five Star Land Trust, Beneficiary."

The second agreement is dated June 1, 2017.  Ex. 56.  The name of the trust is

"Washburn Trust a/k/a Chippewa Land Trust."  Seidling is named as the trustee, and Oasis LP is

named as the beneficiary.  No grantor or settlor is identified in the body of the document, but the

document indicates the trust is revocable.  Seidling signed on behalf of "Washburn Trust a/k/a

Chippewa Land Trust Grantor" and "Oasis LP-Beneficiary."

The third agreement is dated June 22, 2017, just three weeks after the second.  Ex. 57.

This time, the trust name has no "a/k/a."  Seidling is named as the trustee, and Indies Trust is

named as the beneficiary.  No grantor or settlor is identified in the body of the document, but the

document indicates the trust is revocable.  Seidling signed on behalf of Washburn Trust and on

behalf of "Indies Trust-Beneficiary."

The fourth agreement is dated March 28, 2020 and is titled "Amended-Declaration of

Trust and Trust Agreement."  Ex. 58.  The agreement names "Bernard Seidling or Dorothea A.

Saevedra [sic] or Jerome Saevedra [sic]" as trustees, and Indies Trust is named as the

beneficiary.  No grantor or settlor is identified in the body of the document, but the document

indicates the trust is revocable.  Seidling signed the document on behalf of Washburn Trust and

on behalf of "Indies Trust-Beneficiary."  The document appears to be identical to the June 22,

2017 version, except that the Saavedras are added as named trustees and "Amended" was added

to the title.

The Court finds that none of the trust agreements is reliable or credible evidence of the

creation or existence of an identifiable and valid trust named Mason Land Trust, the grantor or

settlor of any such trust, or the beneficiary of any such trust.  The signature lines for the first two

agreements identify the named trust as the grantor, which is impossible.  The third and fourth

agreements identify no grantor or settlor anywhere in the document.  The Court further finds that

Seidling created the fourth agreement solely to facilitate the sale transaction described below.

The Trustee presented evidence of at least six sales of property by Washburn Trust,

which included the closing packets maintained by Knight Barry Title Group, the title agent that

closed the transactions.  The first was a sale that closed in May 2019.  Ex. 61.  The documents

for that sale indicate that Washburn Trust acquired property from Washburn County on July 19,

2017.  *Id.* at 13.  The date of the transfer is conveniently less than a month after the June 22,

2017 version of the trust agreement, a copy of which is in the closing packet.  *Id.* at 36.  The

closing packet also includes a copy of a version of an "Amended-Declaration of Trust and Trust

Agreement" dated March 1, 2019, which conveniently precedes the closing date for the sale by

about two months.  *Id.* at 39.  That version names "Bernard Seidling or Dorothea A. Saavredra

[sic]" as trustees and is otherwise identical to the version dated March 28, 2020.  Seidling signed

many of the documents for the closing on behalf of Washburn Trust.  The check for the sale

proceeds was made out to "Washburn Trust c/o Bernard Seidling."  *Id.* at 45.  The tax ID

provided to Knight Barry for the seller ends in 7216, which is consistent with the tax ID number

for Oasis Family Limited Partnership.  *Id.* at 30.

The second closing packet was for a sale that closed in June 2019 and was for two parcels

that were part of the same property that Washburn Trust acquired in July 2017.  Ex. 62.  Seidling

provided the same June 22, 2017 and March 1, 2019 versions of the trust agreement.  *Id.* at 39-

44.  This time, however, Dorothea Saavedra signed the deed transferring the property.  *Id.* at 53.

Ms. Saavedra credibly testified at trial she had never seen the trust agreements for Washburn

Trust before this litigation and that she was not aware that she had been named as the trustee of

any trust.  She testified that Seidling brought her to Knight Barry for a closing, that she signed

the documents she was asked to sign, and that she did not know at the time what she was signing.

These documents included a Certification of Trust in which Ms. Saavedra certified that Seidling

was the settlor of the trust and that Seidling had the power to revoke the trust.  *Id.* at 47.  Ms.

Saavedra credibly testified at trial that she did not go over the document with anyone at the

closing, that she did not know what she was signing, and that she did not provide the information

in the document.  She said that Seidling was with her at the closing.  The Court finds that

Seidling provided the information on the certification of trust.  The check for the closing

proceeds was made out to Washburn Trust at an address in Marathon, Florida associated with

Seidling.  *Id.* at 55.

The third closing packet was for a sale that closed in early July 2020.  Ex. 63.  The

documents indicate that the parcel was part of the same property that Washburn Trust received

from Washburn County in July 2017.  On November 17, 2017, "Washburn Land Trust"

transferred the property to Florida Land Trust through a Trustee's Deed signed by Seidling.  *Id.*

at 9.  On June 23, 2020, Florida Land Trust transferred the property to Washburn Trust through a

Trustee's Deed signed by "Jerome Saevedra [sic]."  *Id.* at 13.  The transfer occurred the day

before Seidling signed a sale contract for the property.  *Id.* at 24.  Seidling provided Knight Barry

with a March 28, 2020 document titled "Amended-Declaration of Trust and Trust Agreement"

for the Florida Land Trust that named "Bernard Seidling or Dorothea A. Saevedra [sic] or

Jerome Saevedra [sic]" as trustees of the Florida Land Trust.  *Id.* at 25.  Seilding also provided

the March 28, 2020 version of the Amended-Declaration of Trust and Trust Agreement that

included "Jerome Saevedra [sic]" as a trustee of the Washburn Trust.  *Id.* at 28.  Mr. Saavedra

signed the deed conveying the property to the buyers, *id.* at 36, but Seidling signed many of the

other closing documents, including a Certification of Trust in which Seidling certified that he

and "Jerome Saevedra" were the settlors of the trust and that he had the power to revoke the

trust. *Id.* at 34. The check for the closing proceeds was made out to Washburn Trust at a P.O.

Box in Spooner, Wisconsin associated with Seidling. *Id.* at 39.

The fourth set of closing documents was for a sale that also closed in early July 2020.

Ex. 64. Like the third sale, the parcel was part of a larger property that was conveyed to Florida

Land Trust in November 2017 and back to Washburn Trust on June 23, 2020. *Id.* at 9, 13.

Seidling provided the same March 28, 2020 trust documents for Florida Land Trust and

Washburn Trust. *Id.* at 25, 28. Again, Mr. Saavedra signed the deed conveying the property

from Washburn Trust to the buyer. *Id.* at 38. Seidling signed a Certification of Trust, which

indicated that he was the lone settlor of the trust and that he had the power to revoke it. *Id.* at 37.

The check for the closing proceeds was made out to Washburn Trust at a P.O. Box in Spooner,

Wisconsin associated with Seidling. *Id.* at 41. The tax ID provided to Knight Barry for the seller

ended in 7216, which is consistent with the tax ID for Oasis Family Limited Partnership. *Id.* at

35.

The fifth closing packet was from a sale that closed in January 2021. Ex. 65. Like the

third sale, the parcel was part of a larger property that was conveyed to Florida Land Trust in

November 2017 and to Washburn Trust on June 23, 2020. *Id.* at 12, 14. Seidling provided the

same March 28, 2020 trust document for the Washburn Trust. *Id.* at 29. Seidling signed the

deed on behalf of Washburn Trust. *Id.* at 37. The check for the closing proceeds was made out

to Washburn Trust at a P.O. Box in Spooner, Wisconsin associated with Seidling. *Id.* at 39. The

tax ID provided to Knight Barry for the seller ended in 7216, which is consistent with the tax ID

number for Oasis Family Limited Partnership. *Id.* at 35.

The sixth closing packet was for a closing that occurred in June 2020. Ex. 67. Seidling

provided the same March 28, 2020 trust document for Washburn Trust. *Id.* at 24. Mr. Saavedra

signed the deed on behalf of Washburn Trust. *Id.* at 27. The check for the closing proceeds was

made out to Washburn Trust. *Id.* at 29. The tax ID provided to Knight Barry for the seller ended in 7216, which is consistent with the tax ID number for Oasis LP. *Id.* at 18.

The Trustee presented evidence of a "Rent-to-Own Agreement" between Washburn Trust and Philip Bowe dated July 27, 2023. Ex. 70. Despite claiming to have resigned his duties as trustee on October 31, 2022, Seidling was familiar with the details of the agreement and even corrected counsel's pronunciation of the lessee's name. The agreement purports to be signed by R. Johnson. Seidling could not, or would not, identify who R. Johnson is or any details about the person. Based on Seidling's familiarity with the agreement and Seidling's demeanor and testimony at trial, the Court finds that Seidling signed the agreement as R. Johnson and that it is likely no such person named R. Johnson exists.

The Trustee also presented evidence of a bank account at Centennial Bank in the name of "Washburn Trust and Polk Land Trust." Ex. 59. When asked why the bank account was in the name of both trusts, Seidling responded that the interest in both trusts ultimately "flowed to Oasis," so it did not matter which trust owned the money in the account. The account statements indicate that the account was closed in April 2022, and that a "force pay debit" was issued in the amount of $349,791.65. *Id.* at 37. When asked where the funds were deposited, Seidling claimed that he could not recall. In addition, as noted above, Seidling caused $660,000 to be withdrawn from the account and used to fund a portion of a $2 million loan made by Universal Management LP. Ex. 59 at 13.

The Trustee alleged in his Second Amended Complaint that several parcels of real estate are still titled in the name of Washburn Trust. ECF No. 175 at ¶ 111. No evidence was presented on that score at trial, but the Court's review of the public records confirms this allegation. The Washburn County, Wisconsin property tax records indicate that Washburn Trust owns the properties identified by Tax ID Nos. 125, 35688, 35689, and 35690.

https://tax.co.washburn.wi.us/access/master.asp (search Last/Org. name Washburn Trust).  The

registered address for each of these properties is 132 N. Indies Drive.

The Court finds that Washburn Trust is solely owned and controlled by Seidling, and that

he can change or revoke the trust, if one exists.

*Ottercreek Trails Trust*

The evidence at trial included two trust agreements for Ottercreek Trails Trust.  The first

was a Declaration of Trust and Trust Agreement dated December 1, 1996.  Ex. 79.  Seidling is

named as the trustee, and Indies Trust is named as the beneficiary.  No grantor or settlor is

identified in the body of the document, but the document indicates the trust is revocable.

Seidling signed the document on behalf of Ottercreek Trails Trust and on behalf of "Indies Trust-

Beneficiary."

The second agreement is dated June 1, 2017.  Ex. 82.  Seidling is named as the trustee,

and Oasis LP is named as the beneficiary.  No grantor or settlor is identified in the body of the

document, but the document indicates the trust is revocable.  The agreement is not signed, but it

is set up to be signed by "Ottercreek Trails Trust a/k/a Chippewa Land Trust Grantor, by Bernard

Seidling Trustee" and by "Oasis, LP-Beneficiary by Bernard Seidling, General Partner."  *Id.* at 3.

The agreement was accompanied in Seidling's files by a copy of a Trust Certification for

Ottercreek Trails Trust, which indicates that Oasis LP is the grantor of the trust and that Seidling

or Christine Seidling had the power to revoke the trust.  *Id.* at 4-5.  Seidling testified that the

funds in the trust were invested from his Roth IRA, but the Roth IRA was dissolved effective

2011 and was not in existence in 2022 when the Certification of Trust was dated.

The Court finds that neither trust agreement is reliable or credible evidence of the

creation or existence of an identifiable and valid trust named Ottercreek Trails Trust, the grantor

or settlor of any such trust, or the beneficiary of any such trust.  The first agreement does not

identify any grantor in the document, and the second agreement is not signed.  Moreover, Seidling testified that the interest in the trust flowed ultimately to Oasis Family Limited Partnership, but Oasis was not formed until 2002, after the agreement dated 1996 was purportedly signed.  *See* Ex. 25 at 1.

The Trustee also presented evidence of a bank account at Centennial Bank in the name of "Ottercreek Trails and Chippewa Land Trust FBO Oasis LP."  Ex. 80.  No withdrawals were made from the account between January 2021 and April 18, 2022, though several hundred thousand dollars were deposited.  On April 18, 2022, two checks were issued to close the account.  *Id.* at 36.  The checks totaled $1,409,962.61.  Seidling agreed that he received the checks from the account, but he claims that he could not recall what he did with the money.  He said that "it all belongs to Oasis."

On May 25, 2022, Seidling opened an account at Truist Bank in the name of Ottercreek Trails Trust.  Ex. 81.  The account opening documents indicate that Seidling is the grantor for the trust.  It appears that Seidling deposited one of the checks from the Centennial account into the Truist account, in the amount of $704,981.31.  It is unclear what happened to the other check from the Centennial account.

On February 28, 2023, Seidling requested that Truist issue a cashier's check in the amount of $704,000.  Ex. 85.  Seidling signed the request as trustee of the Ottercreek Trails Trust, despite his claim that he had resigned as trustee on October 31, 2022.  The check was made out to "Clerk of Court or Bernard Seidling."  *Id.* at 2.[11]  Before trial, the Court issued a preliminary injunction prohibiting Seidling from transferring or attempting to negotiate the check and prohibiting the bank from honoring the check.

---

[11] The payee name may have included "Clerk of Court" because Seidling may have intended to use the funds to purchase one or more properties at a foreclosure sale.

The Court finds that Ottercreek Trails Trust is solely owned and controlled by Seidling, and that he can change or revoke the trust, if one existed.

*LCO Trust*

The evidence at trial included a trust agreement for LCO Trust dated March 1, 2001.  Ex. 87.  Seidling is named as the trustee, and Sunshine LP is named as the beneficiary.  No grantor or settlor is identified in the body of the document, but the document indicates the trust is revocable.  Seidling signed the document on behalf of LCO Trust as trustee and on behalf of "Sunshine LP-Beneficiary."  Seidling testified that he understood Sunshine LP was the grantor even though the document does not name a grantor.

Because the trust agreement does not identify a grantor or settlor, the Court finds that the trust agreement is not reliable or credible evidence of the creation or existence of an identifiable and valid trust named LCO Trust, the grantor or settlor of any such trust, or the beneficiary of any such trust.  The Court further finds that Seidling's testimony regarding the intent with respect to the grantor also is not credible.  The records available with the Wisconsin Department of Financial Institutions indicate that there is no registered entity named Sunshine LP.  There is a record of a Sunshine Family Limited Partnership associated with Seidling, but that entity was formed in 2002.  *See*

https://apps.dfi.wi.gov/apps/CorpSearch/Results.aspx?type=Simple&q=sunshine.  As explained below, Seidling transacted some business in the name of "Sunshine LP," apparently believing or contending it to be a trust, but there is no evidence that it is, in fact, a validly formed trust, and the only trust agreement in the record is dated December 1, 2006.  Sunshine LP could not have formed the LCO Trust and could not have been a beneficiary of the LCO Trust in 2001.  The Court finds that Seidling created the document after the fact to facilitate a transaction.

On June 22, 2017, LCO Trust acquired a parcel of real estate in Sawyer County, Wisconsin at a foreclosure sale. Ex. 90. The tax records indicate that LCO Trust still owns the property, and the registered address is 132 N. Indies. Ex. 91. The 2023 property taxes were paid by Universal Management Trust, and the address on the payment receipt is a P.O. Box in Hayward, Wisconsin associated with Seidling. Ex. 92. The Trustee also presented evidence of two lease agreements for the property that Seidling signed as trustee of LCO Trust. Exs. 93, 94.

On November 30, 2021, Seidling opened an account at Frandsen Bank in the name of LCO Trust. Ex. 88. Seidling signed the account opening documents as trustee of LCO Trust, and he provided a tax ID number ending in 5761, which is associated with Sunshine Family Limited Partnership. *Id.*; Ex. 527 at 2. On September 25, 2023, Seidling requested that Frandsen issue a cashier's check from the account in the amount of $72,000 made out to "Bernard Seidling as Agent FBO." Ex. 89. Before trial, the Court issued a preliminary injunction prohibiting Seidling from transferring or attempting to negotiate the check and prohibiting the bank from honoring the check.

The Court finds that LCO Trust is solely owned and controlled by Seidling, and that he can change or revoke the trust, if one exists.

*LCO Trust II*

The evidence at trial included a trust agreement for LCO Trust II dated June 19, 2017. Ex. 176. Seidling is named as the trustee, and Wisconsin Land Trust is named as the beneficiary. No grantor or settlor is identified in the body of the document, but the document indicates the trust is revocable. Seidling signed the document on behalf of LCO Trust II and on behalf of "Wisconsin Land Trust, Grantor and beneficiary."

On June 19, 2017, the same day that the trust agreement was purportedly signed, Amanda Taylor deeded a parcel of real property in Sawyer County, Wisconsin to LCO Trust II. Ex. 177.

45

On April 27, 2021, Seidling caused the property to be transferred to Florida Land Trust. *Id.* at 3. On August 16, 2021, Seidling caused the property to be transferred back to LCO Trust II. *Id.* at 5.

Seidling could not say why the property was transferred back and forth, and there was no evidence at trial of any agreements or consideration between LCO Trust II and Florida Land Trust related to the transfers. For this reason, the Court finds that the June 19, 2017 trust agreement is not reliable or credible evidence of the creation or existence of an identifiable and valid trust named LCO Trust II, the grantor or settlor of any such trust, or the beneficiary of any such trust.

On June 10, 2018, Seidling signed a "Rental/Lease Agreement" and an "Option to Purchase Trust" on behalf of LCO Trust II as trustee. Ex. 178. The counterparty to the agreements is Chad Raasch, who testified at trial that he believed he was entering into a contract to purchase the property, and that he spent significant funds renovating the property in reliance on Seidling's representations that Raasch was contracting to purchase the property. Despite relating to the purchase of real estate, the agreements were never recorded.

The public property tax records indicate that LCO Trust II still owns the property, and the registered address is 132 N. Indies. https://tas.sawyercountygov.org/Access/master.asp (search Last/Org. named LCO Trust II). The 2023 property taxes were paid by Universal Management Trust. *Id.* (view Tax Records).

The Court finds that LCO Trust II is solely owned and controlled by Seidling, and that he can change or revoke the trust, if one exists.

*Florida Land Trust*

The evidence at trial included three trust agreements for Florida Land Trust. The first is dated May 1, 2017. Ex. 146. Seidling is named as the trustee, and Christine Seidling is named

as the beneficiary.  No grantor or settlor is identified in the body of the document, but the

document indicates the trust is irrevocable.  Seidling signed the document as trustee of the

Florida Land Trust.  He also signed as "authorized agent" for "Christine A. Seidling, Grantor and

Beneficiary."  *Id.* at 3.  Despite the indication in the agreement that the trust is irrevocable, the

Court finds that there is no evidence of an intent by Christine Seidling to create an irrevocable

trust.  Christine testified that she had no interest in any of the trusts at issue in this case, and there

are versions of the trust agreement that are dated after May 1, 2017 indicating that it is revocable.

If the trust were irrevocable, it could not be changed or amended as the later agreements purport

to do.  Moreover, Christine testified that the trusts were "always revocable."  ECF No. 207 at 16.

The second trust agreement is dated January 1, 2020.  Ex. 147.  The name of the trust is

"Florida Land Trust LLC a/k/a Florida Land Trust."  Seidling is named as the trustee, and

Chippewa Land Trust is named as the beneficiary.  No grantor or settlor is identified in the body

of the document, but the document indicates the trust is revocable.  Seidling signed as trustee of

the Florida Land Trust and as GP of "Oasis Family Limited Partnership, Beneficiary."  *Id.* at 3.

When asked about the discrepancy in the name of the beneficiary in the body of the document

and in the signature line, Seidling simply responded that the trust agreements "are not prepared

with the idea that they are going to be distributed."

The third trust agreement is also dated January 1, 2020.  Ex. 148.  Seidling is named as

the trustee, and Chippewa Land Trust is named as the beneficiary.  No grantor or settlor is

identified in the body of the document, but the document indicates the trust is revocable.

Seidling signed as trustee of the Florida Land Trust and as trustee of "Chippewa Land Trust,

Beneficiary."  *Id.* at 3.

When asked why there were two trust documents with the same date, Seidling testified to

his belief that there were two separate trusts, one to hold title to real estate and one to hold title to

a bank account at Centennial Bank.  The Court finds this explanation to be not credible.  The

Court finds that it is more likely that the trust agreements were created after the fact and when

Seidling needed documentary proof of a trust.  For example, Seidling sold a parcel in the name

of Florida Land Trust LLC to a third party in May 2021.  Ex. 157.[12]  A trust agreement showing

that the name of the trust was "Florida Land Trust LLC a/k/a Florida Land Trust" would allow

Seidling to sign the transfer documents as trustee of Florida Land Trust LLC.

The Court finds that none of the three trust agreements is reliable or credible evidence of

the creation or existence of an identifiable and valid trust named Florida Land Trust, the grantor

or settlor of any such trust, or the beneficiary of any such trust.  The first agreement cannot have

been irrevocable as indicated, the second agreement does not identify a grantor and has an

unexplained discrepancy in the name of the beneficiary, and the third agreement does not

identify a grantor.

Florida Land Trust still owns at least four parcels of real estate in Washburn County,

Wisconsin – Tax ID Nos. 35706, 35707, 35708, and 35709.  *See*

https://tax.co.washburn.wi.us/access/master.asp (search Last/Org. name Florida Land Trust).

The registered address for all four properties is 132 N. Indies.  *Id.*  The 2023 taxes for all four

parcels were paid by Universal Management Trust.  *Id.* (view Tax Records, view Receipt).  The

same payment from Universal Management Trust was also used to pay the taxes for two parcels

owned by Spooner Land Trust.  *Id.*

Between November 2017 and June 2020, Seidling signed at least three Contract for

Complete Beneficial Interest of Trust agreements for property in the name of Florida Land Trust.

Exs. 159, 160, 161.  On September 8, 2023, Seidling signed a "Rent-to-Own Agreement" for a

---

[12] Notably, Seidling provided the tax ID ending in 7216 for Oasis Family Limited Partnership as the tax ID for
Florida Land Trust LLC.  Ex. 158 at 1.

property owned by Florida Land Trust, despite his claim that he resigned as trustee from all

trusts on October 31, 2022.  Ex. 162.

On April 28, 2021, Seidling brought an eviction action related to the property in the name

of Florida Land Enterprises.  Ex. 163.  Florida Land Enterprises is a sole proprietorship and is

not an incorporated entity.  Seidling testified that he caused Florida Land Trust to assign the

eviction cause of action to himself so that he could bring the action without a lawyer.

The Court finds that Florida Land Trust is solely owned and controlled by Seidling, and

that he can change or revoke the trust, if one exists.

*Maple Grove Trust*

The evidence at trial included two trust agreements for Maple Grove Trust.  The first is

dated January 1, 2008.  Ex. 182.  Seidling is named as the trustee, and JVR Land Trust is named

as the beneficiary.  No grantor or settlor is identified in the body of the document, but the

document indicates the trust is revocable.  The agreement is unsigned, but the text below the

signature line indicates that it is set up to be signed by "Maple Grove Land Trust, as Trustor, by

Bernard Seidling, Trustee."  *Id.* at 3.

The second trust agreement is dated January 7, 2011.  Ex. 183.  Christine Seidling is

named as the trustee, and JVR Land Trust is named as the beneficiary.  No grantor or settlor is

identified in the body of the document, but the document indicates the trust is revocable.  The

agreement is signed by Christine Seidling.  Below her signature it states, "Maple Grove Trust, as

Trustor, JVR Land Trust, beneficiary, by Christine Seidling, Trustee."  *Id.* at 3.

The Court finds that neither of the trust agreements is reliable or credible evidence of the

creation or existence of an identifiable and valid trust named Maple Grove Trust, the grantor or

settlor of any such trust, or the beneficiary of any such trust.  The first agreement is not signed,

and in the second agreement Maple Grove Trust cannot be both the trustor and the trust itself.

In October 2003, Oakridge Family Limited Partnership acquired a parcel of real estate in Barron County, Wisconsin. Ex. 184. In August 2006, Seidling caused Oakridge Family Limited Partnership to transfer the property to Hillsdale Trust. *Id.* at 3. In September 2010, Seidling caused Hillsdale Trust to transfer the property to Hillsdale Land Trust. *Id.* at 4. The return address for Hillsdale Land Trust is a P.O. Box associated with Seidling in Eau Claire, Wisconsin.

In February 2011, Seidling caused "Hillsdale Trust and Hillsdale Land Trust" to transfer the property to Maple Grove Trust. *Id.* at 5. Seidling said that he transferred the property from the Hillsdale trusts to Maple Grove Trust because he liked the name Maple Grove better, and he thought the property would be more marketable with that name. There are no documents relating to the transfers other than the deeds, and neither Hillsdale Trust nor Hillsdale Land Trust received any consideration for the transfers.

Maple Grove Trust still owns most or all of the property, which apparently was subdivided into separate parcels at some point. *See* Ex. 186. The registered address for each parcel is 132 N. Indies. *Id.*

The Court finds that Maple Grove Trust is solely owned and controlled by Seidling, and that he can change or revoke the trust, if one exists.

*Spooner Land Trust*

The evidence at trial included a trust agreement for Spooner Land Trust dated July 1, 2005. Ex. 198. Seidling is named as the trustee, and Oasis LP Trust is named as the beneficiary. No grantor or settlor is identified in the body of the document, but the document indicates the trust is revocable. The agreement is not signed, but the text below the signature line indicates that it is set up to be signed by Seidling on behalf of "Spooner Land Trust, and Oasis LP Trust as Trustor." Seidling testified that he did not know if there was a signed copy of the agreement. Because the document is not signed, the Court finds that the trust agreement is not reliable or

credible evidence of the creation or existence of an identifiable and valid trust named Spooner

Land Trust, the grantor or settlor of any such trust, or the beneficiary of any such trust.

Spooner Land Trust owns at least two parcels of real property in Washburn County,

Wisconsin.  *See* Exs. 202, 203, 205.  The online property records indicate that the registered

address for both parcels is 132 N. Indies.  https://tax.co.washburn.wi.us/access/master.asp

(search Last/Org. name Spooner Land Trust); *see also* Ex. 200.  The 2023 property taxes for both

parcels were paid by Universal Management Trust.  Ex. 205.  The payment from Universal

Management Trust was also used to pay the taxes for four parcels owned by Florida Land Trust.

*Id.*  In 2017 and 2020, Seidling caused Spooner Land Trust to enter into two Contract for

Complete Beneficial Interest of Trust and Trust agreements for the properties.  Exs. 202, 203.

The Court finds that Spooner Land Trust is solely owned and controlled by Seidling, and

that he can change or revoke the trust, if one exists.

*Bayfield Land Trust*

The evidence at trial included a trust agreement for Bayfield Land Trust dated January 1,

2006.  Ex. 211.  Seidling is named as the trustee, and Oasis LP Trust is named as the beneficiary.

No grantor or settlor is identified in the body of the document, but the document indicates the

trust is revocable.  The agreement is not signed, but the text below the signature line indicates

that it is set up to be signed by Seidling on behalf of "Bayfield Land Trust, and Oasis LP Trust as

Trustor."  Seidling testified that he did not know if there was a signed copy of the agreement.

Because the document is not signed, the Court finds that the trust agreement is not reliable or

credible evidence of the creation or existence of an identifiable and valid trust named Bayfield

Land Trust, the grantor or settlor of any such trust, or the beneficiary of any such trust.

On July 7, 2007, Seidling caused Mason Land Trust to transfer several parcels of real

property in Bayfield County, Wisconsin to Bayfield Land Trust.  Ex. 212.  Seidling testified that

the transfer was done because he had tried to subdivide a larger parcel that was in the name of

Mason Land Trust, but the county would not update the property records until the property was

transferred.  Other than the deed, there was no evidence of any agreement between Mason Land

Trust and Bayfield Land Trust regarding the transfer or consideration for the transfer.

The online property records indicate that Bayfield Land Trust still owns two of the

parcels.  https://novus.bayfieldcounty.wi.gov/access/master.asp (search Last/Org. name Bayfield

Land Trust); *see also* Ex. 214.  The registered address for both parcels is 132 N. Indies.  The

2023 property taxes for both parcels were paid by Universal Management Trust.  Ex. 215.  The

payment from Universal Management Trust was also used to pay the property taxes for several

parcels in the name of Mason Land Trust and a parcel in the name of Scott Mundt.[13]  *Id.*

The Court finds that Bayfield Land Trust is solely owned and controlled by Seidling, and

that he can change or revoke the trust, if one exists.

*Silver Land Trust*

The evidence at trial included a trust agreement for Silver Land Trust dated January 1,

2005.  Ex. 249.  Seidling is named as the trustee, and Metro Financial Services Land Trust is

named as the beneficiary.  No grantor or settlor is identified in the body of the document, but the

document indicates the trust is revocable.  The document is not signed, but the text below the

signature line indicates that it is set up to be signed by Seidling on behalf of "Silver Land Trust,

and Metro Financial Services Land Trust as Trustor."  Because the document is not signed, the

Court finds that the trust agreement is not reliable or credible evidence of the creation or

---

[13] As an example of Seidling's ability to recall details, Seidling testified from memory that Mundt has a contract
with one of his trusts.  Though he could not identify which trust, Seidling knew exactly which parcel Mundt had
contracted to purchase and other details regarding the deal.  This sort of testimony renders his other testimony that
he could not recall or did not know important details to be not credible.

existence of an identifiable and valid trust named Silver Land Trust, the grantor or settlor of any

such trust, or the beneficiary of any such trust.

Silver Land Trust owns at least one parcel of real property in Burnett County, Wisconsin.

Ex. 252.  The registered address for the property is 132 N. Indies.  Seidling testified to his belief

that the assessed value for 2023 was too high.  He said he contacted the assessor to have the

assessment lowered.  The public records reflect that the assessed value for 2024 is lower than the

value for 2023.  *See* https://web.burnettcounty.org/access/master.asp (search Tax ID 33408).

Seidling did this work despite his claim that he resigned as trustee from all trusts on October 31,

2022 and has no personal interest in them.

The Court finds that Silver Land Trust is solely owned and controlled by Seidling, and

that he can change or revoke the trust, if one exists.

*Polk Land Trust*

The evidence at trial included a trust agreement for Polk Land Trust dated June 21, 2017.

Ex. 259.  Seidling is named as the trustee, and Polk Trust is named as the beneficiary.  No

grantor or settlor is identified in the body of the document, but the document indicates the trust is

revocable.  Seidling signed the document, and below the signature line it says, "Polk Land Trust,

by Bernard Seidling Trustee, Polk Land Trust, Beneficiary by Bernard N Seidling-Trustee."  *Id.*

at 3.  Because no grantor or settlor is identified anywhere in the document, the Court finds that

the trust agreement is not reliable or credible evidence of the creation or existence of an

identifiable and valid trust named Polk Land Trust, the grantor or settlor of any such trust, or the

beneficiary of any such trust.

Polk Land Trust acquired a parcel of real estate from Polk County on August 21, 2017.

Ex. 260.  Seidling signed a Contract for Complete Beneficial Interest of Trust dated October 22,

2020 on behalf of Polk Land Trust with Amelia Josephine La Brake.  Ex. 261.  On August 31,

53

2023, Seidling caused Chad Raasch to sign a Trustee's Deed conveying the property to Ms. La

Brake.  Ex. 262.  Seidling testified that he did not know whether any documents exist that would

give Raasch authority to sign a deed on behalf of Polk Land Trust.  Raasch credibly testified that

he did not recall signing the document, but that he signed several documents that Seidling asked

him to sign without understanding their effect.  It appears that the deed was never recorded and

the property is still in the name of Polk Land Trust, with a registered address of 132 N. Indies.

Ex. 265.

The Trustee presented evidence of a sale transaction in February 2021 for another parcel

of real estate in Polk County, Wisconsin that was in the name of Polk Land Trust.  Ex. 263.  In

connection with that transaction, Seidling signed a Certification of Trust in which he certified,

under oath, that he is the settlor of the Polk Land Trust, and that he has the power to revoke the

trust.  *Id.* at 38.  Seidling provided Knight Barry with a copy of the 2017 trust agreement in

connection with the sale.  *Id.* at 35.  Seidling received a check in the amount of $36,255.98 for

the closing proceeds.  *Id*. at 48.  The funds were deposited in an account at Centennial Bank in

the name of Washburn Trust and Polk Land Trust.  Ex. 59 at 4.  The Court finds that the June 21,

2017 trust agreement was likely prepared to facilitate the February 2021 sale transaction.

The Court finds that Polk Land Trust is solely owned and controlled by Seidling, and that

he can change or revoke the trust, if one exists.

*Chippewa Land Trust*

The evidence at trial included a trust agreement for Chippewa Land Trust dated March 1,

2000.  Ex. 267.  Seidling is named as the trustee, and Five Star Land Trust is named as the

beneficiary.  No settlor or grantor is named in the body of the document, but the document

indicates that the trust is revocable.  The document is not signed, but the text below the signature

line indicates that it is set up to be signed by "Chippewa Land Trust, and Five Star Land Trust as

Trustor, by Bernard Seidling, Trustee." *Id.* at 3.  Because the agreement is not signed, the Court

finds that it is not reliable or credible evidence of the creation or existence of an identifiable and

valid trust named Chippewa Land Trust, the grantor or settlor of any such trust, or the

beneficiary of any such trust.

In July 2021, Seidling caused Chippewa Land Trust to sell a parcel of real estate in La

Crosse County, Wisconsin to a third party.  Ex. 270.  Seidling had caused his son, Vincent

Seidling, to transfer the property to S & S Properties, an entity associated with Seidling, in 1998.

*Id.* at 6.  On July 6, 2021, after the sale contract was signed, Seidling caused S & S Properties to

transfer the property to Chippewa Land Trust.  *Id.* at 7.  Seidling had the proceeds of the sale sent

by wire transfer to an account at Centennial Bank with an account number ending in 5251.  *Id.* at

56, 62.  The account was in the name of Ottercreek Trails and Chippewa Land Trust FBO Oasis

LP.  *See* Ex. 80.  The July 2021 statement for that account confirms a wire transfer deposit of the

proceeds.  *See* Ex. 80 at 17; Ex. 270 at 63.  Seidling provided a tax ID ending in 5761 for

Chippewa Land Trust.  Ex. 270 at 48.  This tax ID is associated with Sunshine Family Limited

Partnership.  *See* Ex. 527 at 2.  The Court finds that Seidling's use of two different partnership

entities with two different tax ID numbers is evidence of Seidling's commingling of funds

among his entities.

On June 3, 2002, Seidling caused a parcel of real estate in Chippewa County, Wisconsin

to be transferred from his daughter, Angela Seidling, to Four Star Properties, Inc., a corporate

entity associated with Seidling.  Ex. 268 at 1.  On November 1, 2006, Seidling caused a portion

of that property to be transferred to Chippewa Land Trust.  *Id.* at 2-4.  The return address for

Chippewa Land Trust on the deed is a P.O. Box associated with Seidling in Hayward,

Wisconsin.

Chippewa Land Trust still owns at least one parcel of that property.  Seidling caused

Chippewa Land Trust to enter into a Contract for Complete Beneficial Interest of Trust

agreement on October 8, 2020.  Ex. 269.  The registered address for the property is 132 N.

Indies.  Ex. 271.  The 2023 taxes were paid by Universal Management Corp. of WI.  *See*

https://cc-tax.chippewacountywi.gov/GCSWebPortal/Search.aspx (search Parcel No. 22808-

1032-66570011, view Taxes).

The Court finds that Chippewa Land Trust is solely owned and controlled by Seidling,

and that he can change or revoke the trust, if one exists.

*Oakridge Land Trust*

The evidence at trial included a trust agreement for Oakridge Land Trust dated July 27,

2001.  Ex. 286 at 1.  Seidling is named as the trustee.  No beneficiary or grantor is named in the

body of the document, and the document is silent as to revocability.  The agreement is signed by

Seidling with the following text under the signature line: "TRUSTEE: Bernard C. Seidling –

100% BENEFICIARY."  Because no grantor or settlor is identified in the document, the Court

finds that the trust agreement is not reliable or credible evidence of the creation or existence of

an identifiable and valid trust named Oakridge Land Trust, the grantor or settlor of any such

trust, or the beneficiary of any such trust.

On October 6, 1999, the Christine A. Seidling Living Trust acquired a parcel of real

estate in Sawyer County, Wisconsin at a foreclosure sale.  Ex. 288 at 1.  On July 30, 2001,

Christine Seidling, on behalf of her trust, transferred the property to Oakridge Land Trust.  *Id.* at

5.  On August 16, 2001, Seidling caused Oakridge Land Trust to transfer the property to

Oakridge Trust.  *Id.* at 7.  On October 1, 2002, Seidling caused Oakridge Trust to transfer the

property to Oakridge Family Limited Partnership.  *Id.* at 10.

On December 11, 2008, Seidling caused Oakridge Family Limited Partnership to transfer the property to RN Enterprises. *Id.* at 14. Seidling testified that RN Enterprises is a sole proprietorship operated by Seidling. Seidling did not provide consideration to the partnership for the property. It appears that the purpose of the transfer was to allow Seidling to prosecute an action related to the property in state court because the partnership would have needed counsel to file a lawsuit. *See* Ex. 295.

On October 2, 2009, Seidling transferred the property back to Oakridge Family Limited Partnership. Ex. 288 at 15. Seidling did not receive any consideration for the transfer. Finally, on August 16, 2022, Seidling caused Oakridge Family Limited Partnership to transfer the property to Oakridge Land Trust, signing the deed as "GP" of the partnership. *Id.* at 16.

Seidling filled out a real estate transfer return form for each of the transfers described above. Ex. 289. He provided his own social security number ending in 4292 as the tax ID number for Oakridge Land Trust and Oakridge Trust. *Id.* at 1, 3. He also provided his own social security number for Oakridge Family Limited Partnership for two of the transfers, even though the partnership supposedly had its own tax ID number. *Id.* at 6, 10; *see also* Ex. 527 at 2.

In 2007, while the property was in the name of Oakridge Family Limited Partnership, the property sustained damage for which the Seidlings made a claim with their property insurance carrier. Ex. 294. The claim was made in their own names, and the proceeds of the claim were paid to them, even though the property was supposedly owned by a partnership entity. *Id.*

The property is still in the name of Oakridge Land Trust, and the registered address is a P.O. Box in Hayward, Wisconsin associated with Seidling. Ex. 296. The 2023 property taxes were paid by Universal Management Trust. Ex. 297.

Seidling himself lives in the property owned by Oakridge Land Trust. He pays no rent or other consideration for his use of the property. When asked where the funds came from for

Universal Management Trust to pay the 2023 property taxes, Seidling was evasive.  The Court finds that Universal Management Trust used funds received from third parties in connection with other properties held in the name of other trusts to pay the property taxes.

The Court finds that Oakridge Land Trust is solely owned and controlled by Seidling, and that he can change or revoke the trust, if one exists.

*BW 25935 State Road 35 Trust*

The evidence at trial included a trust agreement for BW 25935 State Road 35 Trust dated June 1, 2006.  Ex. 308.  Seidling is named as the trustee, and Oasis Family Limited Partnership is named as the beneficiary.  No grantor or settlor is named in the body of the document, but the document indicates that the trust is revocable.  Seidling signed the agreement as trustee of BW 25935 State Road 35 Trust, and as "GP" of "Oasis Family Limited Partnership, Beneficiary."  *Id.* at 3.  Because no grantor or settlor is identified in the agreement, the Court finds that the trust agreement is not reliable or credible evidence of the creation or existence of an identifiable and valid trust named BW 25935 State Road 35 Trust, the grantor or settlor of any such trust, or the beneficiary of any such trust.  The Court further finds that it is likely Seidling prepared the document to facilitate the sale transaction described below.

On June 18, 2021, Seidling caused BW 25935 State Road 35 Trust to sell a parcel of real estate in Burnett County, Wisconsin.  Ex. 309.  The sale documents indicate that BW 25935 State Road 35 Trust acquired the property at a foreclosure sale held in late June 2006.  *Id.* at 10.  Before it sold the property, the registered address for BW 25935 State Road 35 Trust was 152 N. Indies.  *Id.* at 15.  The tax ID that Seidling provided for the trust was the tax ID for Oasis Family Limited Partnership ending in 7216.  *Id.* at 18.  A check in the amount of $106,015.83 for the sale proceeds was made out to BW 25935 State Road 35 Trust or Bernard Seidling.  *Id.* at 25.  Seidling testified that he did not know what happened to the funds, and that he may have

endorsed the check to Oasis.  The June 2021 statement for the Oasis Family Limited Partnership

account at Centennial Bank includes a deposit for that amount on June 21, 2021.  Ex. 31 at 12.

The Trustee did not present evidence that BW 25935 State Road 35 Trust currently owns

any other property.  To the extent it does own property, the Court finds that BW 25935 State

Road 35 Trust is solely owned and controlled by Seidling, and that he can change or revoke the

trust, if one exists.

### Pegasus Trust

The Trustee presented evidence of a trust agreement for Pegasus Trust dated May 10,

2006.  Ex. 310.  Seidling is named as the Trustee, and Universal Management Trust is named as

the beneficiary.  No grantor or settlor is identified in the body of the document, but the document

indicates the trust is revocable.  Seidling signed the agreement as trustee of Pegasus Trust and as

trustee of Universal Management Trust.  *Id.* at 4.  Because no grantor or settlor is identified in

the agreement, the Court finds that the trust agreement is not reliable or credible evidence of the

creation or existence of an identifiable and valid trust named Pegasus Trust, the grantor or settlor

of any such trust, or the beneficiary of any such trust.  Moreover, Universal Management Trust is

named as the beneficiary, but the record includes no evidence that Universal Management Trust

existed before April 8, 2007.  *See* Ex. 42.

Pegasus Trust owns two Dodge Caravans.  Ex. 313 at 3.  The trust may also own a 1995

Ford motorhome and a Ford van.  Ex. 313 at 1.  Seidling uses one or both of the Caravans as his

personal vehicle.  He does not pay Pegasus Trust for use of the vehicle.

The Court finds that Pegasus Trust is solely owned and controlled by Seidling, and that

he can change or revoke the trust, if one exists.

*Excell Land Trust*

The evidence at trial included a trust agreement for Excell Land Trust dated July 1, 2005. Ex. 314. Seidling is named as the trustee, and Oasis Family Limited Partnership is named as the beneficiary. No grantor or settlor is identified in the body of the document, but the document indicates that the trust is revocable. Seidling signed the document on behalf of Excell Land Trust as Trustee and on behalf of Oasis Family Limited Partnership as beneficiary. *Id.* at 3. Because no grantor or settlor is identified in the agreement, the Court finds that the trust agreement is not reliable or credible evidence of the creation or existence of an identifiable and valid trust named Excell Land Trust, the grantor or settlor of any such trust, or the beneficiary of any such trust.

In February 2022, Excell Land Trust sold a parcel of real estate in Eau Claire, Wisconsin. Ex. 320. Seidling signed all the documents on behalf of Excell Land Trust. The tax ID that he provided for Excell Land Trust was the one ending in 7216 for Oasis Family Limited Partnership. *Id.* at 11. He also requested that the funds be wired to the Oasis bank account at Centennial Bank. *Id.* The February 2022 statement for that bank account confirms that a wire transfer was received from the title company on February 11, 2022. Ex. 31 at 30. The funds were commingled with other funds from other properties in the Oasis account.

Excell Land Trust still owns a parcel of property in Eau Claire County, Wisconsin at 912 Daniels Avenue in Altoona, Wisconsin. https://ascent.co.eau-claire.wi.us/LandRecords/PropertyListing/RealEstateTaxParcel#/Details/25863. The registered address for the property is 132 N. Indies, and the 2023 property taxes were paid by Universal Management Trust. *Id.* (view 2023 tax year).

The property has a convoluted history. In July 2009, an entity named Daniel's Land Enterprise affiliated with Seidling acquired the property at a foreclosure sale. Ex. 315. Seidling

caused the entity to enter into a Land Contract with a third party named James Gunderson, but

Seidling signed the contract on behalf of "JV Enterprises a/k/a Daniels Land Enterprises." *Id.* at

2-4.  An entity named B&A Partnership, also affiliated with Seidling, foreclosed the land

contract in 2011.  *Id.* at 5-6.  It is unclear when or how the property was transferred to B&A

Partnership; Seidling initially drafted the lis pendens with an entity named "Jvac Enterprises" as

the plaintiff.  *Id.* at 5.  On September 28, 2011, before the foreclosure was complete, Seidling

caused B&A Partnership to enter into a Purchase Agreement with Cynthia Mitchell.  Ex. 316.

Mitchell provided a $2,000 down payment made out to "Sunshine SLP."  *Id.* at 2.  On October

15, 2011, Seidling caused Excell Land Trust to enter into a land contract with Mitchell.  Ex. 315

at 9.  On October 26, 2011, after the land contract was signed, Seidling caused B&A Partnership

to transfer the property to Excell Land Trust.  *Id.* at 7.

      The Court finds that Excell Land Trust is solely owned and controlled by Seidling, and

that he can change or revoke the trust, if one exists.

*Milwaukee Land Trust*

      The evidence at trial included a trust agreement for Milwaukee Land Trust dated January

7, 2011.  Ex. 323.  Christine Seidling is named as the trustee, and the beneficiary is Oasis Family

LP.  No grantor or settlor is identified in the body of the document, but the document indicates

that the trust is revocable.  The agreement is unsigned, but the text below the signature line

indicates that it is set up to be signed by Christine Seidling as Trustee of Milwaukee Land Trust.

*Id.* at 4.  Because the agreement is not signed and because no grantor or settlor is identified in the

agreement, the Court finds that the trust agreement is not reliable or credible evidence of the

creation or existence of an identifiable and valid trust named Milwaukee Land Trust, the grantor

or settlor of any such trust, or the beneficiary of any such trust.

Milwaukee Land Trust owns a parcel of real estate in Milwaukee County, Wisconsin, and the registered address for the property is 132 N. Indies.  Ex. 324.  The Court finds that Milwaukee Land Trust is solely owned and controlled by Seidling, and that he can change or revoke the trust, if one exists.

*BW Land Trust*

The evidence at trial included a trust agreement for BW Land Trust dated June 1, 2007. Ex. 332.  Seidling is named as the trustee, and the beneficiary is "Oasis LP and as otherwise agreed."  No grantor or settlor is named in the body of the document, but the document indicates that it is revocable.  The agreement is not signed, but the text below the signature line indicates that it is set up for Seidling to sign for "BW Land Trust and Oasis LP, as Trustor."  *Id.* at 3. Because the agreement is not signed, the Court finds that the trust agreement is not reliable or credible evidence of the creation or existence of an identifiable and valid trust named BW Land Trust, the grantor or settlor of any such trust, or the beneficiary of any such trust.

In July 2007, BW Land Trust acquired a parcel of real estate in Burnett County, Wisconsin at a foreclosure sale.  Ex. 333.  The registered address for the property is 132 N. Indies, and the 2023 property taxes were paid by Universal Management Trust.  Ex. 334.  The same payment sent by Universal Management Trust was also used to pay the taxes for properties in the name of Abdo Land Trust and Zblocki Enterprises.  Ex. 255.

The Court finds that BW Land Trust is solely owned and controlled by Seidling, and that he can change or revoke the trust, if one exists.

*Georgetown Polk Trust*

The evidence at trial included a trust agreement for Georgetown Polk Trust dated December 15, 2010.  Ex. 366.  The named trustee is "either Christine Seidling or Bernard Seidling," and the beneficiary is MFS Trust.  No grantor or settlor is named in the body of the

document.  The document indicates that it is an irrevocable trust.  Seidling signed the agreement

on behalf of "MFS Trust Grantor/beneficiary" and on behalf of Georgetown Polk Trust as

trustee.  *Id.* at 3.  The Court finds that the trust agreement is not reliable or credible evidence of

the creation or existence of an identifiable and valid trust named Georgetown Polk Trust, the

grantor or settlor of any such trust, or the beneficiary of any such trust.  The name "MFS" refers

to Metro Financial Services, the name of Christine's pension plan.  Christine testified that neither

she nor her pension plan has any interest in any of the trusts or entities named in this adversary

proceeding, and that the pension plan no longer exists.  Georgetown Polk Trust cannot be an

irrevocable trust for the benefit of a trust in Christine's pension plan if the pension plan has no

interest in the trust.

"Metro Financial Services" acquired a parcel of real estate in Polk County, Wisconsin in

December 2002 at a foreclosure sale.  Ex. 367.  Seidling caused Metro Financial Services to

transfer the property to Georgetown Polk Trust in January 2011.  *Id.* at 2.

Georgetown Polk Trust still owns the property, and the registered address is 132 N.

Indies.  Ex. 372.  In October 2023, Georgetown Polk Trust initiated an eviction action against

persons living in the property.  Seidling signed an affidavit on October 27, 2023 on behalf of the

trust, despite his claim to have resigned from all trusts in October 2022.  Ex. 371.

The Court finds that Georgetown Polk Trust is solely owned and controlled by Seidling,

and that he can change or revoke the trust, if one exists.

*Brown Valley Trust*

The evidence at trial included two trust agreements for Brown Valley Trust.  The first is

dated December 1, 2004.  Ex. 374 at 1.  Seidling is named as the trustee, and the beneficiary is

Oasis LP Trust.  No grantor or settlor is named in the body of the document, but the document

indicates that the trust is revocable.  The document is not signed, but the text below the signature

line indicates that it is set up to be signed by Seidling on behalf of "Brown Valley Trust, and

Oasis LP as Trustor." *Id.* at 3. Seidling had a second copy of the same trust agreement in his

files, with a handwritten date of "3/16/12" in the upper right corner. *Id.* at 4.

The second agreement is also dated December 1, 2004. Ex. 374 at 7. Seidling is named

as the trustee, and 123 Land Trust is named as the beneficiary. No grantor or settlor is named in

the body of the document, but the document indicates that the trust is revocable. The agreement

is not signed, but the text below the signature line indicates that it is set up to be signed by

Seidling on behalf of "Brown Valley Trust and 123 Land Trust as Trustor." *Id.* at 10. The first

page of the document has a handwritten date of "10/17/10" in the upper right corner. *Id.* at 7.

Because they are not signed, the Court finds that neither trust agreement is reliable or

credible evidence of the creation or existence of an identifiable and valid trust named Brown

Valley Trust, the grantor or settlor of any such trust, or the beneficiary of any such trust.

In January 2005, Brown Valley Trust acquired several parcels of real estate in Burnett

County, Wisconsin at a foreclosure sale. Ex. 375 at 1. Seidling caused Brown Valley Trust to

enter into a land contract for part of the property. Ex. 376. Seidling used the Oasis Family

Limited Partnership tax ID ending in 7216 for the real estate transfer return. *Id.* at 5. He

instructed the vendees to make their payments to Indies FLP and then to Universal Management

LP. *Id.* at 7, 11.

Seidling also caused Brown Valley Trust to enter into several Contract for Complete

Beneficial Interest of Trust agreements with third parties in 2019 and 2022. Exs. 377, 378, 379.

The signature on one of the agreements is Roy Smith, who purportedly signed as trustee of the

Brown Valley Trust. Ex. 378 at 2. Seidling claimed not to know who Smith is or how his

signature came to be on the agreement. The Court finds that either Seidling signed the

agreement using the name Roy Smith or that Seidling directed someone else to sign the

agreement. There was no evidence of a trust agreement or any other document that would have permitted Roy Smith to act on behalf of the trust.

Brown Valley Trust still owns one parcel of the property, and the registered address is 132 N. Indies. Ex. 381 at 1. The 2023 property taxes were paid by Universal Management Trust. *Id.* at 7.

The Court finds that Brown Valley Trust is solely owned and controlled by Seidling, and that he can change or revoke the trust, if one exists.

*DW Trust*

The evidence at trial included a trust agreement for DW Trust dated March 1, 2006. Ex. 384. Seidling is named as the trustee, and the named beneficiary is "Oasis LP and as otherwise agreed." *Id.* at 1. No grantor or settlor is named in the body of the document, but the document indicates that the trust is revocable. The document is not signed, but the text below the signature line indicates that it is set up to be signed by Seidling on behalf of "DW Trust and Oasis LP, as Trustor." *Id.* at 3. Because the agreement is not signed and it is dated after the trust acquired the real property described below, the Court finds that the trust agreement is not reliable or credible evidence of the creation or existence of an identifiable and valid trust named DW Trust, the grantor or settlor of any such trust, or the beneficiary of any such trust.

In January 2005, GT Trust acquired several parcels of real estate in Chippewa County, Wisconsin at a foreclosure sale. Ex. 385 at 1. At some point, one parcel of the property was transferred to an entity named WX Enterprises, which foreclosed on an unrecorded land contract. *Id.* at 8. Seidling signed the lis pendens on behalf of WX Enterprises, indicating that it was a sole proprietorship and alter ego of Seidling. *Id.* DW Trust acquired the property at the foreclosure sale. *Id.* at 9. Seidling caused DW Trust to enter into a Contract for Complete

Beneficial Interest of Trust agreement in October 2022.  Ex. 387.  DW Trust still owns that

property, and the registered address is 132 N. Indies.  Ex. 388.

In April 2006, D.W. Trust acquired a parcel of real estate in Ashland County, Wisconsin

at a foreclosure sale.  Ex. 386 at 1-2.  In July 2008, Seidling caused D.W. Trust to enter into a

land contract with Jeffrey Wendler.  *Id.* at 3-6.  It is unclear if D.W. Trust is intended to be the

same trust as DW Trust, but the return address for the land contract is DW Trust at a P.O. Box in

Eau Claire, Wisconsin associated with Seidling.  *Id.* at 3.  DW Trust still owns the property,

subject to the land contract, and the registered address is "Jeffrey Wendler c/o Bernard Seidling"

at 132 N. Indies.  *See* https://pp-ashland-co-wi-fb.app.landnav.com/Search/RealEstate/Search?f=

(search Parcel # 010001860200).

The Court finds that DW Trust is solely owned and controlled by Seidling, and that he

can change or revoke the trust, if one exists.

*JT Trust*

The evidence at trial included a trust agreement for JT Trust dated March 5, 2005.  Ex.

404.  Seidling is named as the trustee, and the beneficiary is JTX Land Trust.  No grantor or

settlor is named in the body of the document, but the document indicates that the trust is

revocable.  The document is not signed, but the text below the signature line indicates that it is

set up to be signed by Seidling on behalf of "JT Trust, and JTX Land Trust as Trustor."  *Id.* at 3.

Because the agreement is not signed, the Court finds that the trust agreement is not reliable or

credible evidence of the creation or existence of an identifiable and valid trust named JT Trust,

the grantor or settlor of any such trust, or the beneficiary of any such trust.

In October 2006, JT Trust acquired a parcel of real estate from Burnett County.  Ex. 405.

JT Trust still owns the property, and the registered address is 132 N. Indies.  Ex. 406.  The 2022

property taxes were paid by Universal Management Trust.  *Id.* at 5.

The Court finds that JT Trust is solely owned and controlled by Seidling, and that he can change or revoke the trust, if one exists.

*Ryan-Siegel Land Trust*

The evidence at trial included a trust agreement for Ryan-Siegel Land Trust dated September 15, 2010.  Ex. 408.  Christine Seidling is named as the trustee, and the beneficiary is Oasis LP.  No grantor or settlor is named in the body of the document, but the document indicates that the trust is revocable.  The document is not signed, but the text below the signature line indicates that it is set up to be signed by Seidling as "GP" of Oasis LP and by Christine Seidling as trustee of Ryan-Siegel Land Trust.  *Id.* at 4.  Because the agreement is not signed, the Court finds that the trust agreement is not reliable or credible evidence of the creation or existence of an identifiable and valid trust named Ryan-Siegel Land Trust, the grantor or settlor of any such trust, or the beneficiary of any such trust.

In May 2007, Seidling caused Oasis Family Limited Partnership to transfer several parcels of real estate in Chippewa County, Wisconsin to Ironwood Trust, a trust associated with Seidling.  Ex. 409 at 1.  In September 2009, Seidling caused Ironwood Trust to transfer a portion of the property to Ryan-Siegel Land Trust.  *Id.* at 2-3.  Ryan-Siegel Land Trust still owns the property, and the registered address is 132 N. Indies.  Ex. 411.  On January 14, 2018, Seidling caused Ryan-Siegel Land Trust to enter into a Contract for Complete Beneficial Interest of Trust agreement related to the property.  Ex. 410.  Seidling signed the contract as trustee of the trust, even though the unsigned trust agreement indicates that Christine would be the trustee.  *Id.* at 3.

The Court finds that Ryan-Siegel Land Trust is solely owned and controlled by Seidling, and that he can change or revoke the trust, if one exists.

*Chippewa Falls Trust*

The evidence at trial included two trust agreements for Chippewa Falls Trust.  The first is dated May 7, 1998.  Ex. 424.  Seidling is named as the trustee, and Chippewa Land Trust is named as the beneficiary.  No grantor or settlor is identified in the body of the document, but the document indicates that the trust is revocable.  Seidling signed the document on behalf of Chippewa Falls Trust and on behalf of "Chippewa Land Trust, Trustor."  *Id.* at 3.

The second trust agreement is also dated May 7, 1998.  Ex. 423.  Chad Raasch is named as the trustee, and Chippewa Land Trust is named as the beneficiary.  No grantor or settlor is identified in the body of the document, but the document indicates that the trust is revocable.  Raasch signed the document on behalf of Chippewa Falls Trust and on behalf of "Chippewa Land Trust, Trustor."

The Court finds that neither document is reliable or credible evidence of the creation or existence of an identifiable and valid trust named Chippewa Falls Trust, the grantor or settlor of any such trust, or the beneficiary of any such trust.  Raasch and Seidling both testified that they did not know one another in 1998, so it is impossible for the second agreement to have been signed in or been effective in 1998.  That renders the trustworthiness of the first agreement with the same date also suspect.

In July 2001, Seidling's son, Neil Seidling, transferred a parcel of real estate in Chippewa County, Wisconsin from himself to Chippewa Falls Trust.  Ex. 425 at 4.  The return address for the deed is "B. Seidling" at a P.O. Box in Hayward, Wisconsin associated with Seidling.

In June 2022, Seidling negotiated a potential transaction to sell the property to a third party.  Ex. 427; *see also id.* at 40-44.  A title search conducted in May 2022 revealed a judgment against Seidling.  *Id.* at 48-49.  Seidling then recruited Chad Raasch to sign documents on behalf of Chippewa Falls Trust.  A copy of the trust agreement at Exhibit 423 was provided to the title

company.  *Id.* at 13-15.  The Court finds that Seidling likely created that agreement for the purpose of facilitating the transaction and to avoid the judgment entered against him interfering with the transaction.  Raasch physically signed some of the documents, but several of them include an electronic signature for Raasch.  Seidling testified that he applied Raasch's electronic signature to the documents, purportedly with Raasch's permission.  Seidling provided the tax ID ending in 7216 for Oasis Family Limited Partnership as the tax ID for Chippewa Falls Trust.  *Id.* at 11.

The transaction never closed, and Chippewa Falls Trust still owns the property.  Ex. 430. The registered address is 132 N. Indies.  Seidling testified that he caused Universal Management to pay the 2023 property taxes.

The Court finds that Chippewa Falls Trust is solely owned and controlled by Seidling, and that he can change or revoke the trust, if one exists.

*Hoard Land Trust*

The evidence at trial included two trust agreements for Hoard Land Trust.  The first is dated April 10, 2007.  Ex. 433.  Seidling is named as the trustee, and Oasis LP is named as the beneficiary.  No grantor or settlor is named in the body of the document, but the document indicates that the trust is revocable.  The document is not signed, but the text below the signature line indicates that it is set up to be signed by Seidling on behalf of "Hoard Land Trust, and Oasis LP as Trustor."  *Id.* at 3.

The second agreement is an amended trust agreement dated May 3, 2013.  Ex. 434. Bruce D. Johnson is named as the trustee, and "Oasis Family Limited Partnership a/k/a Oasis LP" is the beneficiary.  No grantor or settlor is identified in the document, but the document indicates that the trust is revocable.  Bruce D. Johnson signed the document, and below the signature line is only "Bruce D. Johnson-Trustee."

The Court finds that neither document is reliable or credible evidence of the creation or existence of an identifiable and valid trust named Hoard Land Trust, the grantor or settlor of any such trust, or the beneficiary of any such trust.  The first document is not signed.  The second document is signed only by the purported trustee of the trust.  There is no indication that any grantor or settlor intended to create the trust.

In April 2007, Seidling caused Oasis Family Limited Partnership to transfer several parcels of real estate in Clark County, Wisconsin to Hoard Land Trust.  Ex. 435 at 1.  In April 2011, Seidling signed another deed transferring one parcel of the same property from Clarksville Expressways to Hoard Land Trust; it is unclear when or how that parcel was transferred to Clarksville Expressways, if at all.  *Id.* at 2.  Hoard Land Trust still owns that parcel, and the registered address is 132 N. Indies.  Ex. 436.  Seidling testified at trial that there was a land contract for the property, but that the vendee was not paying.

The Court finds that Hoard Land Trust is solely owned and controlled by Seidling, and that he can change or revoke the trust, if one exists.

*Catherine Lake Land Trust*

The evidence at trial included a trust agreement for Catherine Lake Land Trust dated January 7, 2010.  Ex. 450.  Seidling is named as the trustee, and Sunshine FLP is named as the beneficiary.  No grantor or settlor is named in the body of the document, but the document indicates that the trust is revocable.  The document is not signed, but the text below the signature line indicates that it is set up to be signed by Seidling on behalf of "Catherine Lake Land Trust, and Sunshine FLP as Trustor."  *Id.* at 3.  Because the agreement is not signed, the Court finds that the trust agreement is not reliable or credible evidence of the creation or existence of an identifiable and valid trust named Catherine Lake Land Trust, the grantor or settlor of any such trust, or the beneficiary of any such trust.

On January 7, 2010, the same date of the unsigned trust agreement, Seidling caused Oasis Family Limited Partnership to transfer to Catherine Lake Land Trust a parcel of real estate in Douglas County, Wisconsin.  Ex. 451.  Catherine Lake Land Trust still owns the property, and the registered address is 132 N. Indies.  Exs. 452, 454.

The Court finds that Catherin Lake Land Trust is solely owned and controlled by Seidling, and that he can change or revoke the trust, if one exists.

### Rain-Tree Investments and Bren Land Trust

The evidence at trial included a trust agreement for "Rain-Tree Investments, a/k/a Rain-Tree Investments Trust" dated May 9, 2006.  Ex. 456.  Seidling is named as the trustee, and the beneficiary is "Oasis LP, a/k/a Oasis Trust 100%."  No grantor or settlor is named in the body of the document, and the document indicates that the trust is revocable.  Seidling signed the document as trustee of the trust and on behalf of "Oasis LP, a/k/a Oasis Trust, Trustor."  *Id.* at 2.

The Court finds that the trust agreement alone is not reliable or credible evidence of the creation or existence of an identifiable and valid trust named Rain-Tree Investments a/k/a Rain-Tree Investments Trust, the grantor or settlor of any such trust, or the beneficiary of any such trust.  As described below, Seidling transferred parcels of property between and among various trusts, including the purported Rain-Tree Investments Trust, without regard to his fiduciary duties as trustee.  Moreover, there is no evidence in the record that Oasis LP (as opposed to Oasis Family Limited Partnership) is a validly incorporated entity or that Oasis Trust is a validly formed trust.

In March 2003, Green Valley Trust acquired two parcels of real estate in Douglas County, Wisconsin at a foreclosure sale.  Ex. 457 at 1-3.  It appears that one of the parcels, tax ID AM-002-00144-00 was sold many years ago.  It appears that the other parcel, tax ID AM-002-00152-00, was subdivided into several parcels.  In May 2003, Seidling caused Green Valley

Trust to enter into a land contract for one of the subdivided parcels. *Id.* at 4-8. On March 30, 2007, Seidling signed a Quit Claim Deed on behalf of Green Valley Trust conveying the vendor's interest in the land contract to "Rain-Tree Investments f/k/a JKW Enterprises." *Id.* at 9. On November 9, 2007, Seidling signed another deed on behalf of Green Valley Trust conveying the same parcel to "JKW Enterprises, a Sole Proprietorship of Bernard Seidling." *Id.* at 10. In February 2008, Seidling signed a deed on behalf of Rain-Tree Investments a/k/a Rain-Tree Investments Trust conveying the property to Gary and Nichole Bauer. *Id.* at 11. The property tax records indicate that the property is in the name of the Bauers but with an address of "c/o Rain-Tree Investments" at 132 N. Indies. *See* https://landnav-publicportal.douglascountywi.org/Search/RealEstate/Search (search Parcel # AM-002-00152-00). It is not clear if Rain-Tree Investments has any continuing interest in the property.

In May 2003, Seidling caused Green Valley Trust to enter into a land contract for a parcel with tax ID AM-002-00152-04. Ex. 461 at 1-4. On January 7, 2011, Seidling signed an Assignment of Land Contract on behalf of Green Valley Trust conveying the trust's interest in the land contract to Bren Land Trust. *Id.* at 5-6. It appears that Bren Land Trust still owns the property, subject to the land contract, and the registered address is 132 N. Indies. Ex. 462. There is no evidence in the record that Bren Land Trust was validly created through a trust agreement or other document.

The Court finds that both Rain-Tree Investments Trust and Bren Land Trust are solely owned and controlled by Seidling, and that he can change or revoke the trusts, if they exist.

*Seidling Family Trust IV and Chain of Islands Limited Partnership*

The evidence at trial included a trust agreement for Seidling Family Trust IV dated May 10, 2019. Ex. 475. Seidling is named as the trustee, and Seidling Family Trust IV is named as the beneficiary. No grantor or settlor is identified in the body of the document, but the document

indicates that the trust is revocable.  The document is not signed, but the text below the signature line indicates that it is set up to be signed by Seidling.  *Id.* at 3.

The Court finds that the trust agreement is not reliable or credible evidence of the creation or existence of an identifiable and valid trust named Seidling Family Trust IV, the grantor or settlor of any such trust, or the beneficiary of any such trust.  The agreement is not signed, no grantor or settlor is identified anywhere in the document, and the beneficiary of a trust cannot be the trust itself.

Seidling caused the Seidling Family Trust IV to obtain a tax ID number from the IRS.  Ex. 480.  The information he provided to the IRS indicates that he is the grantor and that the trust is revocable.  *Id.*

In July 2021, Seidling opened an account at Iberia Bank in the name of Seidling Family Trust IV.  Ex. 478.  The account agreement indicates that the trust is revocable.  Seidling signed the account agreement as "G.P."  In February 2024, Seidling opened an account at Associated Bank in the name of Seidling Family Trust IV.  Ex. 485.  For the first time, Seidling indicated that the trust was irrevocable.  He signed the account application as trustee of the trust.  Seidling also signed a certification of trust in connection with the account opening, on which he indicated that he was the settlor of the trust, as well as the trustee.  Ex. 486.

On June 29, 2021, Christine Seidling conveyed the property located at 152 N. Indies Drive in Marathon, Florida to "Chain of Islands Limited Partnership, a Wisconsin domestic limited partnership, as Trustee of the Seidling Family Trust IV."  Ex. 482 at 1.  Christine Seidling testified that she tried to transfer the property to the Seidling Family Trust IV in 2019, but that the transfer was not effective because the deed did not include the name of a trustee for the trust.  ECF No. 207 at 42.  Christine testified that Seidling had control over the property beginning in 2019 after that transfer.

In January 2020, Seidling signed a lease of the property for the period of February 1, 2020 to January 31, 2022. Ex. 476. The lease indicates that Universal Management, LP was the lessor. It also indicates that the lessee paid or was to pay $3,000 to "King Street, FLP" and $3,000 to "Universal Management, LP" in connection with signing the lease. *Id.* at 2.

In March 2021, Seidling signed a listing agreement with a real estate agent. Ex. 477. He signed it as trustee of Seidling Family Trust IV. *Id.* at 4, 8. The property was sold to a third party in July of 2021. The grantor on the deed is "Chain of Islands Limited Partnership . . . as Trustee of the Seidling Family Trust IV and Bernard C. Seidling." Ex. 482 at 3. Seidling signed a Certification of Trust in connection with the sale in which he certified, under oath, that the trust is revocable and that Seidling is both the settlor and the sole beneficiary of the trust. *Id.* at 10. Seidling claimed at trial that the information is incorrect, and that he would have signed "almost anything" to close the transaction. The Court finds that this testimony is not credible because Seidling signed other documents indicating that he is the settlor and beneficiary of the trust.

Seidling Family Trust IV received $1,373,272.03 in sale proceeds from the transaction. The funds were deposited in the account in the name of Seidling Family Trust IV at Iberia Bank. Ex. 481 at 1. Seidling then transferred $600,000 to an account in the name of Oasis Family Limited Partnership. Ex. 481 at 4; Ex. 31 at 17. Seidling testified at trial that he transferred the funds to the Oasis account because, according to Seidling, Christine Seidling had access to that account and could take money out of the account. Seidling also transferred $100,000 to an account in the name of Washburn Trust. Ex. 481 at 4; Ex. 59 at 18. Seidling said he could not recall why the funds were transferred to Washburn Trust. Seidling also transferred $266,105.94 to Christine Seidling. Ex. 481 at 9; Ex. 483. This is consistent with Christine Seidling's testimony that she received approximately $266,000 after the sale transaction. ECF No. 207 at 37. She said that the amount was calculated based on the $250,000 tax exclusion for gains on

homestead property, plus other expenses she had incurred related to the property.  She said she

had no interest in any other proceeds from the sale transaction.

Seidling also caused Seidling Family Trust IV to fund a portion of the purchase price

paid by the buyers.  The buyers signed a note and mortgage in the amount of $1,625,000 to

Seidling Family Trust IV.  Ex. 482 at 5-8.  The amount of the monthly payments due under the

note is $6,432.29.  *Id.* at 8.  Beginning in August 2021, that amount was deposited each month in

the Universal Management accounts.  *See* Ex. 37 at 75, 84, 93, 101, 111, 120, 128, 137

(Centennial Bank); Ex. 47 at 6, 10, 13, 16, 19, 22, 24 (Truist Bank); Ex. 48 at 2, 6, 9, 12 (Truist

Bank); Ex. 53 at 5, 7, 18, 30, 34, 39 (First Horizon Bank).  Once the funds were deposited in the

Universal Management accounts, they were commingled with funds received on account of other

properties.

It is unclear from the record whether Seidling himself or Chain of Islands Limited

Partnership is the trustee of the Seidling Family Trust IV, if the trust exists.  Chain of Islands

Limited Partnership was registered to do business in Wisconsin, but Seidling canceled the

registration in June 2022.  Ex. 473.  In addition, Seidling has signed several documents,

purportedly as trustee of the trust.  Regardless of the identity of the trustee, the Court finds that,

if the trust exists, Seidling is the grantor or settlor of the trust, that Seidling is the beneficiary of

the trust, and that the trust is revocable because Seidling signed several documents indicating

that he was the grantor and beneficiary and that the trust is revocable.  An account application

signed in February 2024, after Seidling filed bankruptcy, is the only document indicating that the

trust may be irrevocable, but there is no evidence of a trust agreement or other document

establishing the trust as irrevocable.

*Sunshine LP*

The evidence at trial included a trust agreement for "Sunshine LP a/k/a Sunshine FLP" dated December 1, 2006.  Ex. 99.  Seidling is named as the trustee, and Indies FLP Trust is named as the beneficiary.  No grantor or settlor is identified in the body of the document, but the document indicates the trust is revocable.  Seidling signed the document on behalf of Sunshine LP a/k/a Sunshine FLP, and on behalf of "Indies FLP Trust, Trustor."

The Trustee presented evidence of a sale transaction that closed in February 2022 for real property that was in the name of Sunshine LP.  Ex. 101.  The title agent working on the closing asked Seidling provide "partnership papers" for Sunshine LP.  In response, Seidling provided a copy of the December 1, 2006 trust agreement.  *Id.* at 40-44.  Seidling provided a tax ID ending 5761 for the seller, which is the tax ID for Sunshine Family Limited Partnership.  *Id.* at 49; *see also* Ex. 527 at 2.  Seidling claimed that he does not know where the sale proceeds were deposited.

There is at least one parcel of property in Bayfield County, Wisconsin still titled in the name of Sunshine LP.  Ex. 103.  The registered address for the property is a P.O. Box in Hayward, Wisconsin associated with Seidling.  Between 2019 and 2022, Seidling caused Sunshine LP and Sunshine LP Trust to enter into several Contract for Complete Beneficial Interest of Trust and Trust agreements for the property.  The status of those contracts is unknown.

The Court finds that the December 1, 2006 trust agreement is not reliable or credible evidence of the creation or existence of a trust named "Sunshine LP a/k/a Sunshine FLP," the grantor or settlor of any such trust, or the beneficiary of any such trust.  The Court further finds that Seidling prepared the document to facilitate the February 2022 sale transaction or a similar transaction.  It is suspect that Seidling provided the tax ID number for a partnership with a

similar name, yet there is no evidence that the partnership was a beneficiary of or in any way associated with the trust.

The Court finds that Sunshine LP a/k/a Sunshine FLP is solely owned and controlled by Seidling, and that he can change or revoke the trust, if one exists.

*VNAL Dec Trust*

The evidence at trial included a trust agreemen for VNAL Dec Trust dated October 31, 2002. Ex. 206. The trust is named for Seidling's children – Vincent, Neil, Angela, and Luke – and their descendants. Seidling is named as the trustee. The beneficiary section states that Seidling "shall receive 100% of all income from 10/31/2002 to 12/31/2013," and that income from January 1, 2014 and thereafter "shall be paid into [an] account for the lineal grandchildren of Bernard Seidling." No grantor or settlor is identified anywhere in the document. The agreement indicates that the trust is irrevocable. It is signed by "Bernard Seidling – Trustee."

Unlike most of the other trusts discussed above, the VNAL Dec Trust has a tax ID number, and it filed at least one tax return, in 2014. Ex. 207. It appears that 2014 was the first year that VNAL Dec Trust filed a tax return. *Id.* at 40. Seidling testified to his belief that the trust became irrevocable on January 1, 2014 with the change in beneficiary.

In December 2021, Roadhouse Trust acquired a parcel of real estate from Burnett County, Wisconsin. Ex. 208 at 1. In January 2022, Seidling caused Roadhouse Trust to transfer the property to Indies FLP Trust. *Id.* at 2. In April 2022, Seidling caused Indies FLP Trust to transfer the property to VNAL Dec Trust. *Id.* at 3. In September 2023, VNAL Dec Trust entered into a Land Contract with Red Door Remodeling, LLC for the property. *Id.* at 4-8. The land contract is signed by Chad Raasch as trustee. *Id.* at 7. The property is still in the name of VNAL Dec Trust, subject to the land contract, and the 2023 property taxes were paid by UM Corp. Exs. 209, 210.

Raasch credibly testified that he signed the land contract because Seidling asked him to sign it, and that he did not know what he was signing or its legal significance. He also did not know or believe that he had been named as the trustee of a trust. The Court finds that Seidling arranged the transaction and caused Raasch to sign the land contract, despite his claim that he resigned as trustee from the VNAL Dec Trust in October 2022.

*Royal Land Enterprises Trust a/k/a Royal Land Enterprises, Inc.*

The evidence at trial included a trust agreementfor "Royal Land Enterprises Trust a/k/a Royal Land Enterprises, Inc." dated March 2, 2009. Ex. 489. Seidling is named as the trustee, and Octobird LP is named as the beneficiary. No grantor or settlor is named in the body of the document, but the document indicates that the trust is revocable. The document is not signed, and the text below the signature line does not include the name of an individual person. Because the document is not signed, the Court finds that the trust agreement is not reliable or credible evidence of the creation or existence of an identifiable and valid trust named Royal Land Enterprises Trust a/k/a Royal Land Enterprises, Inc., the grantor or settlor of any such trust, or the beneficiary of any such trust.

In May 1998, the Bernard C. Seidling Living Trust acquired real property with an address of 1106 17th Street in Key West, Florida. Ex. 493 at 1. Through a series of convoluted and unclear transactions, the property was titled in the name of Royal Land Enterprises, Inc. *Id*. at 2-6. On March 16, 2023, Seidling signed a Warranty Deed transferring the property from Royal Land Enterprises, Inc. to himself. *Id.* at 7. He signed the deed as "Grantor agent." Eight days later, on March 24, 2023, Seidling signed a Quit Claim Deed transferring the property from himself back to Royal Land Enterprises, Inc. *Id.* at 8. Seidling testified at trial that he transferred the property to himself for the purpose of obtaining a permit to perform repair work

for the property.  The property is still in the name of Royal Land Enterprises, Inc. with a

registered address of a P.O. Box in Key West, Florida associated with Seidling.  Ex. 495.

The property was leased to a third party for a number of years.  The lessor for each of the

leases is Universal Management, though it does not appear that Universal Management ever

owned the property.  Ex. 490.  Seidling signed all of the leases on behalf of Universal

Management, except one that Christine Seidling signed in December 2014 while Seidling was

incarcerated.  The Trustee presented evidence that Seidling obtained insurance for the property

with a policy period of January 5, 2022 to January 5, 2023.  Ex. 472.  The named insured on the

policy was the Bernard C. Seidling Living Trust, even though that trust does not appear to have

had an interest in the property at that point.

In April 2021, Seidling signed a sale contract for the property.  Ex. 492.  He signed as

"G.P." of "Oasis Family Limited Partnership d/b/a Royal Land Enterprises, Inc."  *Id.* at 12.

Seidling testified that the sale did not close because there were title issues with the property.

There is no evidence that Royal Land Enterprises, Inc. is registered as a separate corporate entity

in any state, that Royal Land Enterprises, Inc. is a trade name of Oasis Family Limited

Partnership, or that it is a valid trust.  The Court finds that it is likely Seidling signed the sale

contract in that manner so that the sale proceeds could be distributed to Oasis upon closing.  The

Court finds that if a trust named Royal Land Enterprises Trust exists, is solely owned and

controlled by Seidling, and that he can change or revoke the trust.

<u>Trusts Without a Trust Agreement</u>

The Trustee presented evidence at trial that the following trusts associated with Seidling

are the title owners of various real property.  There was no evidence of any trust agreement or

other document establishing the existence of these trusts as valid trusts, nor is there any evidence

of any identifiable grantor or settlor of any of these trusts.  The Court therefore finds that the

following entities that include the name "Trust" in the title are not trusts and are sole

proprietorships and alter egos of Seidling.

*Broken Arrow Condo Trust*

On October 15, 2021, Sunshine LP acquired a parcel of real estate in Sawyer County,

Wisconsin at a foreclosure sale. Ex. 109. On March 3, 2022, Sunshine LP transferred the

property to Broken Arrow Condo Trust. *Id.* at 3. Seidling signed the deed on behalf of Sunshine

LP, and the return address for Broken Arrow Condo Trust is a P.O. Box in Hayward, Wisconsin

associated with Seidling. *Id.* Seidling could not say whether Broken Arrow Condo Trust paid

any consideration to Sunshine LP for the transfer.

On June 6, 2023, Broken Arrow Condo Trust granted a mortgage on the property to

Trombo Financial Trust. Ex. 110. The return address for Trombo on the mortgage is Seidling's

address at 132 N. Indies Drive in Marathon, Florida. Seidling signed the mortgage on behalf of

Broken Arrow Condo Trust as its trustee, despite his claim that he had resigned as trustee several

months earlier. *Id.* at 2. Seidling claimed that Broken Arrow received funds from Trombo on a

line of credit; he could not say how much or who was involved in providing the funds even

though his address was used as Trombo's address. He said that no payments are being made on

the mortgage.

The registered address for the property is Seidling's address at 132 N. Indies Drive in

Marathon, Florida. Ex. 111. The 2023 property taxes were paid by UM Corp., and the address

on the payment receipt is a P.O. Box in Hayward, Wisconsin associated with Seidling. Ex. 112.

The payment receipt indicates that UM Corp. made a single payment to the county treasurer for

property taxes on the Broken Arrow Condo Trust property and a property in the name of Bass

Lake Trust.

*Washburn Land Trust*

On August 14, 2017, Washburn Land Trust acquired a parcel of real estate from Washburn County.  Ex. 113.  On October 30, 2017, Washburn Land Trust entered into a Contract for Complete Beneficial Interest of Trust and Trust with Marcelo Lamoza.  Ex. 117. Seidling signed the document on behalf of Washburn Land Trust.  The online property tax records indicate that the property is still in the name of Washburn Land Trust. https://tax.co.washburn.wi.us/access/master.asp (search PIN 65-016-2-41-13-35-1 01-000-005000).  The registered address for Washburn Land Trust is 132 N. Indies.

Washburn Land Trust may have owned additional parcels at some point.  The Trustee presented evidence of seven other Contract for Complete Beneficial Interest of Trust agreements. Exs. 114, 115, 116, 118, 119, 120, 121.  Seidling signed all the documents on behalf of Washburn Land Trust.

*Washburn Land Trust 2018-1*

On July 11, 2018, Washburn Land Trust 2018-1 acquired a parcel of real estate from Washburn County.  Ex. 124.  On May 11, 2019, Washburn Land Trust 2018-1 entered into a Contract for Complete Beneficial Interest of Trust and Trust agreement for the property.  Ex. 125.  Seidling signed the document on behalf of Washburn Land Trust.  The online property tax records indicate that the property is still in the name of Washburn Land Trust 2018-1. https://tax.co.washburn.wi.us/access/master.asp (search PIN 65-034-2-39-12-35-3 01-000-001010).  The registered address for Washburn Land Trust 2018-1 is 132 N. Indies.  The 2023 property taxes were paid by UM Corp.  Ex. 127.

*Washburn Land Trust 2018-3*

On July 11, 2018, Washburn Land Trust 2018-3 acquired a parcel of real estate from Washburn County.  Ex. 128.  The online property tax records indicate that the property is still in

the name of Washburn Land Trust 2018-3.  https://tax.co.washburn.wi.us/access/master.asp

(search PIN 65-281-2-39-12-31-2 03-000-001600).  The registered address for Washburn Land

Trust 2018-3 is 132 N. Indies.  *Id.*  The 2023 property taxes were paid by Universal Management

Trust.  Ex. 130.

### *Washburn Land Trust 2019-1*

On July 17, 2019, Washburn Land Trust 2019-1 acquired a parcel of real estate from

Washburn County.  Ex. 131.  Between July and September 2022, Washburn Land Trust 2019-1

entered into at least four separate Contract for Complete Beneficial Interest of Trust and Trust

agreements for the same property with different purchasers.  Exs. 132, 133, 134, 137.  Seidling

signed all the agreements on behalf Washburn Land Trust 2019-1.  Each of the agreements

indicates that the buyer made a down payment.  When asked where the funds were deposited,

Seidling could not or would not answer.  He said he would need to find copies of the checks

given by the purchasers and reconcile those with a bank account.  On July 12, 2023, Washburn

Land Trust 2019-1 entered into a "Lease with Option to Purchase" contract for the same

property.  Ex. 138.  Seidling signed the document as trustee of Washburn Land Trust 2019-1

despite his claim that he resigned as trustee of all trusts on October 31, 2022.  The property is

still in the name of Washburn Land Trust 2019-1, and the registered address is 132 N. Indies.

Ex. 140.

### *Washburn Land Trust 2019-2*

On July 17, 2019, Washburn Land Trust 2019-2 acquired a parcel of real estate from

Washburn County, Wisconsin.  Ex. 143.  Washburn Land Trust 2019-2 still owns the property,

and the registered address is 132 N. Indies.  Ex. 144.  The 2023 property taxes were paid by

Universal Management Trust.  Ex. 145.  The same payment from Universal Management Trust

was also used to pay the property taxes for a property owned by Hidden Lake Land Trust.

*Ojibwa Rd Land Trust*

On August 10, 2017, St. Croix Trust acquired a parcel of real estate in Washburn County, Wisconsin at a foreclosure sale.  Ex. 165 at 1.  On April 30, 2019, Dorothea Saavedra signed a Trustee's Deed conveying the property from St. Croix Trust to Ojibwa Rd Land Trust.  *Id.* at 2. The deed was recorded on May 13, 2019.  As noted above, Mrs. Saavedra credibly testified at trial that she did not understand herself to be the trustee of any trust and did not understand the effect of any of the documents she signed at Seidling's request.

Before the deed was recorded, on May 8, 2019, Seidling signed a Contract for Complete Beneficial Interest of Trust and Trust agreement with Jerome and Dorothea Saavedra on behalf of "Ojibwa Rd Land Trust as assignee of St. Croix Trust."  Ex. 166.  The Saavedras testified at trial that they thought they were entering into a contract to purchase the property, that they made payments to Universal Management as directed by Seidling, and that Seidling was the only person with whom they interacted with regarding the property or the agreement.

The property is still in the name of Ojibwa Rd Land Trust.  *See* https://tax.co.washburn.wi.us/access/master.asp (search PIN 65-034-2-39-12-27-3 02-000-002000).  The registered address is 132 N. Indies.

*Donald Williams Living Trust*

On August 8, 2018, the Donald Williams Living Trust acquired a parcel of real estate in Washburn County, Wisconsin at a foreclosure sale.  Ex. 170.  The return address for Donald Williams Living Trust on the Sheriff's Deed is a P.O. Box associated with Seidling in Stone Lake, Wisconsin.  Between 2018 and 2021, Seidling signed two lease agreements, an option to purchase and a Contract for Complete Trust Interest related to the property on behalf of Donald Williams Living Trust.  Exs. 171, 172, 173.  The property is still in the name of Donald Williams Living Trust, and the registered address is 132 N. Indies.  Ex. 174.

*Hidden Lake Land Trust*

On September 26, 2018, R. Johnson Family Irrevocable Trust purchased a parcel of real estate in Washburn County, Wisconsin at a foreclosure sale. Ex. 188 at 1. R. Johnson Trust transferred the property to McGowan Trust, W.A. *Id.* at 2. Seidling signed the deed on behalf of R. Johnson Trust, and the return address for McGowan Trust is Seidling's address at 152 N. Indies Drive in Marathon, Florida. On January 5, 2021, Seidling transferred the property from McGowan Trust to Hidden Lake Land Trust. *Id.* at 3. The return address for Hidden Lake Land Trust is Seidling's address at 152 N. Indies Drive in Marathon, Florida.

Hidden Lake Land Trust owns at least two parcels that were part of that property, Tax ID Nos. 7184 and 36304. Exs. 189, 191. The registered address for both parcels is Seidling's address at 132 N. Indies Drive in Marathon, Florida. The 2023 property taxes for both parcels were paid by Universal Management Trust, and the taxes for parcel 7184 were paid together with property taxes for a parcel owned by Washburn Land Trust 2019-2. Ex. 197. Seidling signed at least four Contract for Complete Beneficial Interest of Trust agreements in 2021 and 2022 for the parcels owned by Hidden Lake Land Trust. Exs. 192, 194, 195, 196.

*Range Line Road Trust*

Range Line Road Trust owns at least one parcel of real property in Burnett County, Wisconsin. The property was initially acquired by Hudson Diesel MPPP in 2002. Ex. 239. On August 22, 2005, Seidling caused Hudson Diesel MPPP to transfer the property to Burnett Land Trust. *Id.* at 2. On September 20, 2021, Seidling caused Burnett Land Trust to transfer the property to Indies FLP Trust. *Id.* at 3. On January 27, 2022, Seidling caused Indies FLP Trust to transfer the property to Range Line Road Trust. *Id.* at 4. Other than the deeds transferring the property, there are no documents related to the transfers and none of the trusts paid consideration for receipt of the property. Seidling testified that several citations were issued against the

84

property when it was in the name of Indies FLP Trust.  He said that he "wanted to get it out of that name before judgments were attached."

On June 8, 2023, Range Line Road Trust entered into a land contract with Rueben Smith. *Id.* at 5.  Seidling signed the contract as trustee of Range Line Road Trust despite his claim that he resigned his position as trustee on October 31, 2022.  *Id.* at 7.  The registered address for the property is 132 N. Indies, and the 2023 property taxes were paid by Universal Management Trust.  Ex. 244.

*Welch Road Land Trust*

Welch Road Land Trust owns at least one parcel of real property in Burnett County, Wisconsin.  The property was initially transferred to Midwest Lending Services, an entity affiliated with Seidling, in August 2008.  Ex. 246.  On September 22, 2010, Seidling caused Midwest Lending Services to transfer the property to Webster Land Trust.  *Id.* at 3.  On October 18, 2021, Seidling caused Webster Land Trust to transfer the property to Indies FLP Trust.  *Id.* at 5.  On January 27, 2022, Seidling caused Indies FLP Trust to transfer the property to Welch Road Land Trust.  *Id.* at 6.  Other than the deeds transferring the property, there are no documents related to the transfers and none of the trusts paid consideration for receipt of the property.  As with the Range Line Road Trust, the property had citations issued against it when it was in the name of Indies FLP and Seidling did not want a judgment entered against Indies FLP Trust.

The public records indicate that the registered address for the property was 132 N. Indies at the end of 2023.  *See* https://web.burnettcounty.org/access/master.asp (search Tax ID 34232, view Tax Bill).  The 2023 property taxes were paid by Universal Management Corporation of Wisconsin.  Ex. 248.

*Abdo Land Trust*

On October 2, 2015, CS Land Trust acquired a parcel of property from Burnett County. Ex. 253 at 1.  The return address for CS Land Trust is a P.O. Box associated with Seidling in Shell Lake, Wisconsin.  On December 18, 2019, Seidling caused CS Land Trust to transfer the property to Milford, LLC.  *Id.* at 2.  The return address for Milford, LLC is 152 N. Indies.  On July 29, 2021, Seidling caused Milford, LLC to transfer the property to Abdo Land Trust.  *Id.* at 3.  The return address for Abdo Land Trust is 132 N. Indies.

Abdo Land Trust still owns the property, and the registered address is 132 N. Indies.  Ex. 254.  The 2023 property taxes were paid by Universal Management Trust.  Ex. 254.  The same payment sent by Universal Management Trust was also used to pay the taxes for properties in the name of BW Land Trust and Zblocki Enterprises.  Ex. 255.

*Spencer Lake Land Trust*

On November 17, 2005, Seidling caused Hudson Diesel MPPP to transfer a parcel of property in Burnett County, Wisconsin to Spencer Lake Land Trust.  Ex. 256.  The return address for the deed is a P.O. Box associated with Seidling in Hayward, Wisconsin.  Spencer Lake Land Trust still owns the property, and the registered address is 132 N. Indies.  Ex. 257.

*Indies Land Trust*

On May 3, 2016, Indies Land Trust acquired a parcel of real estate in Chippewa County, Wisconsin.  Ex. 273 at 3.  Indies Land Trust still owns the property, and the registered address is 132 N. Indies.  Ex. 274.

*Bass Lake Trust*

On August 16, 1996, Pacific Financial Services, an entity associated with Bernard Seidling, acquired a parcel of real estate in Sawyer County, Wisconsin.  Ex. 276 at 1.  On September 15, 2009, Seidling caused Pacific Financial Services to transfer the property to Bass

Lake Trust, though the deed was not recorded until January 14, 2011. *Id.* at 2. Seidling caused Bass Lake Trust to enter into a series of Rental/Lease Agreements for the property between 2019 and 2022. Exs. 278, 279, 281, 282, 283. Bass Lake Trust still owns the property, and the registered address is 132 N. Indies. Ex. 285. The 2023 property taxes were paid by Universal Management Trust. *Id.*

*Hertel Trust*

In July 2017, Hertel Trust acquired a parcel of real estate in Burnett County, Wisconsin at a foreclosure sale. Ex. 325. Hertel Trust still owns the property, the registered address is 132 N. Indies, and the 2023 property taxes were paid by Universal Management Trust. Ex. 326.

*Hay Creek Land Trust*

In January 2017, FLP Partnership Trust acquired a parcel of real estate in Burnett County, Wisconsin. Ex. 328 at 1. On May 1, 2018, Seidling caused FLP Partnership Trust to transfer the property to Goindies Trust. *Id.* at 3. On October 18, 2021, Seidling caused Goindies Trust to transfer the property to FLP Indies Trust. *Id.* at 5. On January 27, 2022, Seidling caused FLP Indies Trust to transfer the property to Hay Creek Land Trust. *Id.* at 7. Hay Creek Land Trust still owns the property, and the registered address is 132 N. Indies. Ex. 329.

*1785 Shake Dubois Lake Land Trust*

On October 19, 2018, Seidling caused Hubbard Trust to transfer two parcels of real estate in Burnett County, Wisconsin to 1785 Shake Dubois Lake Land Trust. Ex. 336 at 6. 1785 Shake Dubois Lake Land Trust still owns both parcels. https://web.burnettcounty.org/access/master.asp (search 1785 under Last/Org. name). The registered address for both parcels is 132 N. Indies. *Id.* The 2023 property taxes for both parcels were paid by UM Corp. *Id.* (view Tax Records for 2023). The same payment sent by UM Corp. was also used to pay the taxes for a property in the name of McKenzie 1.42A Trust.

*Saint Croix Trust*

In June 2017, Saint Croix Trust acquired two parcels of real estate in Burnett County,

Wisconsin at a foreclosure sale.  Ex. 340.  Both properties are still in the name of St. Croix Trust,

and the registered address for both is 132 N. Indies.  Exs. 341, 343.  Seidling testified that

Universal Management paid the 2023 property taxes for both parcels, and that neither parcel

generates any income.

*Pilgrim-Dunn Trust*

In 2011, Pilgrim-Dunn Trust acquired a parcel of real estate in Dunn County, Wisconsin

from Red Stone Trust.  Ex. 357 at 14.  Red Stone Trust was a trust affiliated with Seidling, and a

Wisconsin state court found that Seidling was the grantor of the trust.  *Id.* at 8-11.  The state

court's order describes a convoluted series of transfers of the property by Seidling that "served

no legitimate business purpose."  *Id.* at 10.  Pilgrim-Dunn Trust still owns the property, and the

registered address is a P.O. Box in Hayward, Wisconsin associated with Seidling.  Ex. 358.

*J&J Land Trust*

In 2019, J&J Land Trust acquired a parcel of real estate in Sawyer County, Wisconsin at

a foreclosure sale.  Ex. 360 at 2.[14]  J&J Land Trust still owns the property, and the registered

address is 132 N. Indies.  https://tas.sawyercountygov.org/Access/master.asp (search site address

no. 13743).

*Couderay Trust*

In August 2017, Couderay Trust acquired a parcel of real estate in Sawyer County,

Wisconsin at a foreclosure sale.  Ex. 363.  Couderay Trust still owns the property, the registered

---

[14] Another trust associated with Seidling acquired the property at a foreclosure sale in 2017.  Ex. 360 at 1.  Seidling testified that the first sale related to the second mortgage, and that the first mortgage holder foreclosed two years later and he bought the property again using a different trust.

address is 132 N. Indies, and the 2023 property taxes were paid by Universal Management Trust. Ex. 364.

*Barron County Crystal Lake Land Trust*

In October 1999, the Christine A. Seidling Living Trust acquired a parcel of real estate in Barron County, Wisconsin. Ex. 391 at 1-6. In January 2011, Seidling caused Christine's trust to transfer the property to Barron County-Crystal Lake Land Trust. *Id.* at 7-8. The Barron County Crystal Lake Land Trust still owns the property, and the registered address is 132 N. Indies. Ex. 392.

*Port Wing Trust*

Port Wing Trust owns real property in Bayfield County, Wisconsin. Ex. 395. The registered address is 132 N. Indies. *Id.*

*Grantsburg Grell/Borg Road Land Trust*

In September 2017, Grantsburg Grell/Borg Road Land Trust acquired a parcel of real estate from Burnett County. Ex. 397. In March 2023, Seidling caused Grantsburg Grell/Borg Road Land Trust to enter into a Contract for Complete Beneficial Interest of Trust and Trust agreement related to the property. Ex. 398. The agreement was signed by Roger Hanson. Seidling claimed that Hanson was the acting trustee for the trust, even though he also claimed that he had made someone named Kevin Swanson trustee of all the trusts in October 2022. The Court finds that Seidling signed the contract as Roger Hanson, or that Seidling caused someone named Roger Hanson to sign the document. Grantsburg Grell/Borg Road Land Trust still owns the property, and the registered address is 132 N. Indies. Ex. 399.

*Lafayette Land Trust*

In May of 1998, Four Star Properties, Inc., an entity associated with Seidling, acquired a parcel of real estate in Chippewa County, Wisconsin. Ex. 413 at 3. In December 1998, Seidling

caused Four Star Properties to transfer the property to Angela Seidling, his daughter.  *Id.* at 1.  In

April 2007, Seidling caused Angela Seidling to transfer the property to Lafayette Land Trust,

purportedly through a power of attorney.  *Id.* at 4.

On November 5, 2020, Seidling caused Lafayette Land Trust to enter into a Contract for

Complete Beneficial Interest of Trust agreement with First Choice Landscape, LLC, an entity

owned by Austin Mahal.  Ex. 414 at 7-8.  Mahal testified that it was his intent to use the property

for his business, and that he has invested $400,000-$500,000 for his business.  Mahal and First

Choice Landscape needed permits and other permissions to build the business on the property.

Because Seidling chose to structure his real estate transactions in a manner that would avoid

recording the purchaser's interest, Mahal could not obtain the necessary permits on his own.

Seidling provided Mahal with a document titled "Notice of Co-Trustee Status" dated March 31,

2022.  Ex. 414 at 6.  The document "certifies that Austin Mahal is a Co-Trustee of the Lafayette

Land Trust" for purposes of building on the property and obtaining permits and other

applications.  *Id.*  Mahal used the document to obtain the necessary permit, and his business is

presently operating from the property.  There is no other evidence that Mahal was ever a trustee

of Lafayette Land Trust.

*Midwest Financial Trust*

In June 2002, Seidling caused Angela Seidling, his daughter, to transfer several parcels of

real estate in Chippewa County, Wisconsin to Four Star Properties, Inc., purportedly acting

through a power of attorney.  Ex. 417 at 1.  In September 2002, Seidling caused Four Star

Properties to enter into two land contracts with a third party.  *Id.* at 3-8.  The land contracts were

not recorded until September 1, 2006.

On December 31, 2004, Seidling caused Four Star Properties to convey the vendor's

interest in the land contracts to Midwest Financial Trust.  *Id.* at 9-10.  The transfer was not

recorded until September 12, 2006.  Midwest Financial Trust still owns the properties, subject to

the land contracts, and the registered address is 132 N. Indies.  Ex. 418.

### Yellow River Trust

In December 2009, Seidling caused his sole proprietorship named RM Enterprises a/k/a

C.S. Enterprises to transfer several parcels of real estate in Chippewa County, Wisconsin to

Yellow River Trust.  Ex. 420 at 4.  The return address for Yellow River Trust is a P.O. Box in

Eau Claire, Wisconsin associated with Seidling.  Yellow River Trust still owns two of the

parcels, and the registered address for both is 132 N. Indies.  Ex. 421.

### MS Trust

In July 1999, Hudson Diesel MPPP acquired several parcels of real estate in Trempealeau

County, Wisconsin.  Ex. 438 at 1-7.  In May 2007, Seidling caused the property to be transferred

to MS Trust.  *Id.* at 8-10.  MS Trust still owns the property, and the registered address is 132 N.

Indies.  Ex. 439.  Seidling testified that he caused the 2023 property taxes to be paid for all the

parcels.

### RLN Trust

In October 1998, Seidling's son, Neil Seidling, entered into a land contract with third

parties for a parcel of real estate in Barron County, Wisconsin.  Ex. 441 at 1-3.  In December

1998, Neil Seidling assigned his interest in the land contract to the Bernard C. Seidling Living

Trust.  *Id.* at 6-7.  Neither document was recorded until 2006.  On June 27, 2006, Seidling caused

the Bernard C. Seidling Living Trust to assign its interest in the land contract to RLN Trust.  *Id.*

at 4-5.  RLN Trust still owns the property, subject to the land contract, and the registered address

is 132 N. Indies.  Ex. 442.

*V/OWMR Land Trust*

In August 2005, V/OWMR Land Trust acquired a parcel of real estate in Vilas County, Wisconsin.  Ex. 444 at 1-2.  The return address for the deed was a P.O. Box in Hayward, Wisconsin associated with Seidling.  V/OWMR Land Trust still owns the property, and the registered address is 132 N. Indies.  Ex. 445.

*RJC Trust*

In October 2003, Greenery Enterprises acquired a parcel of real estate in Pierce County, Wisconsin.  Ex. 447 at 1.  In September 2007, Seidling caused Greenery Enterprises to transfer the property to RD Expressways, with a return address to a P.O. Box in Hayward, Wisconsin associated with Seidling.  *Id.* at 2.  CJR Enterprises, an entity associated with Seidling, initiated a foreclosure action related to the property and purchased the property at a foreclosure sale in 2010.  *Id.* at 3.  In August 2010, Seidling caused CJR Enterprises to transfer the property to RJC Trust.  *Id.* at 4.  The return address for RJC Trust is a P.O. Box in Eau Claire, Wisconsin associated with Seidling.  RJC Trust still owns the property, and the registered address is 132 N. Indies.  Ex. 448.

*McKenzie 1.42A Trust*

On September 10, 2007, Seidling caused Hudson Diesel MPPP to transfer a parcel of real estate in Burnett County, Wisconsin to McKenzie Land Trust.  Ex. 496 at 1.  On September 13, 2007, Seidling caused McKenzie Land Trust to transfer the property to Smith Family Trust.  *Id.* at 3.  On October 10, 2007, Seidling caused Smith Family Trust to transfer the property to Octobird Family Limited Partnership.  *Id.* at 6.  On December 28, 2009, Seidling caused Octobird Family Limited Partnership to transfer the property to McKenzie 1.42A Trust.  *Id.* at 7.

McKenzie 1.42A Trust still owns the property, and the registered address is 132 N. Indies.  Ex. 497.  The 2023 property taxes were paid by UM Corp., and the same payment sent

by UM Corp. was also used to pay the taxes for a property in the name of 1785 Shake Dubois

Lake Land Trust.  https://web.burnettcounty.org/access/master.asp (search Tax ID 18508, view

Tax Records for 2023, view Receipt).

The Trustee presented evidence of an "Option to Purchase" agreement related to the

property dated July 13, 2023.  Ex. 498.  The document bears a typewritten signature of "Roger

Hansen TTEE" on behalf of McKenzie 1.42A Trust.  The Court finds that Seidling likely

prepared the document and applied a fictitious typewritten name.

<u>Sole Proprietorships</u>

The following entities own real property in Wisconsin and Florida.  The record does not

include any evidence that the properties were validly incorporated in any state.  The Court

therefore finds that each of the entities is a sole proprietorship and alter ego of Seidling.

*DGW Corporation*

The property located at 132 N. Indies Drive in Marathon, Florida is currently in the name

of DGW Corporation.  Exs. 306, 307.  The registered address for DGW Corporation is a P.O.

Box in Hayward, Wisconsin associated with Seidling.  Ex. 307.

Seidling testified that he does not know whether DGW Corporation is a trust or a

corporation.  There was no evidence presented at trial that DGW Corporation is registered as a

corporate entity with any state, nor was there any evidence of a trust agreement or other

document establishing a valid trust by the name of DGW Corporation or of intent by any settlor

to create a trust in that name.  The Court therefore finds that DGW Corporation is a sole

proprietorship and alter ego of Seidling.

*Zblocki Enterprises*

In 1996, Hudson Diesel MPPP entered into a land contract with Joseph Menard for

property in Burnett County, Wisconsin.  Ex.  401 at 1-3.  The land contract was not recorded

until March 6, 2006.  *Id.* at 1.  Seidling caused Hudson Diesel MPPP to assign the land contract

to Zblocki Enterprises in July 2008.  *Id.* at 4.  Zblocki Enterprises foreclosed the land contract in

2009, but the order confirming the foreclosure was not recorded until February 3, 2011.  *Id.* at 6-

7.  Seidling caused Zblocki Enterprises to transfer the property to Menardo Trust through a deed

recorded on October 1, 2010.  *Id.* at 5.

The property is still in the name of Zblocki Enterprises, perhaps because the foreclosure

order was not recorded until after the deed to Menardo Trust.  Ex. 402.  The registered address

for the property is 132 N. Indies.  Seidling testified at trial that Zblocki Enterprises is a sole

proprietorship.

*Sprucewood Enterprises*

On September 5, 2002, Seidling caused Four Star Properties, Inc. to assign the vendor's

interest in a land contract for a parcel of real estate in St. Croix County, Wisconsin to

Sprucewood Enterprises.  Ex. 464 at 5.  On September 10, 2002, Seidling caused Sprucewood

Enterprises to file a lis pendens against the property related to an action to foreclose the assigned

land contract.  *Id.* at 1.  On April 10, 2003, Seidling caused Sprucewood Enterprises to convey

the property back to Four Star Properties, Inc.  *Id.* at 2.  Seidling signed as "Trustee" of

Sprucewood Enterprises.  The next day, April 11, 2003, Seidling caused Sprucewood Enterprises

to file a satisfaction of the lis pendens related to the foreclosure action.  *Id.* at 3.

In November 2006, Seidling caused Four Star Properties, Inc. to convey the property to

Sprucewood Trust.  *Id.* at 6.  On July 21, 2023, Seidling caused to be recorded a foreclosure

judgment awarding the property to Sprucewood Enterprises.  *Id.* at 7-8.  The judgment had been

signed in on March 4, 2003; there is no indication in the record as to why it was not recorded for

more than 20 years.  The property is still in the name of Sprucewood Enterprises, with a

registered address of a P.O. Box in Stone Lake, Wisconsin associated with Seidling.  Ex. 465.

The Court therefore finds that Sprucewood Enterprises is a sole proprietorship and alter ego of Seidling.

*CP Ltd Partnership*

In November 2008, "CP Ltd Partnership c/o Bernard Seidling" acquired a parcel of real estate with an address of 2104 Fogarty Avenue in Key West, Florida at a foreclosure sale.  Ex. 467 at 1.  On March 2, 2009, Seidling caused CP Ltd Partnership to grant a mortgage interest in the property to Metro Financial Services.  *Id.* at 3.  Seidling signed the mortgage as "GP" of CP Ltd Partnership.

On August 28, 2023, Seidling signed a Quit Claim Deed as the "authorized agent" of CP Ltd Partnership conveying the property to "Juan Rodriguez of 132 N. Indies Drive, Marathon, FL."  Ex. 467 at 5.  The return address on the deed for Juan Rodriguez is a P.O. Box in Hayward, Wisconsin associated with Seidling.  *Id.*  The property is currently in the name of Juan Rodriguez with a registered address of 132 N. Indies.  Exs. 468, 469.

The Trustee presented evidence of a series of rental agreements for the property.  Ex. 470.  The first one, dated in January 2014, is signed by Christine Seidling as "Agent."  *Id.* at 2-5. The remaining agreements were all signed by Seidling as "Owner/Agent."  *Id.* at 6-50.  The most recent one was signed in early February 2023.  *Id.* at 50.

Seidling maintained at trial that the property was validly transferred to someone named Juan Rodriguez, but he gave evasive and non-responsive answers to the Court's questions regarding the transaction.  He could not say whether CP Ltd Partnership received any consideration for the transfer, and he could not say who authorized Seidling to make the transfer. As noted above, the Court finds that Juan Rodriguez does not exist.  The Court also finds that there are no other persons associated with CP Ltd Partnership.  In addition, there is no evidence indicating that CP Ltd Partnership is a validly established or incorporated separate legal entity.

The Court therefore finds that CP Ltd Partnership is a sole proprietorship and alter ego of Seidling.

*Dew Line Enterprises*

In July 2008, Dew Line Enterprises acquired a parcel of real estate in Chippewa County, Wisconsin.  Ex. 499.  The property is still in the name of Dew Line Enterprises, with a registered address of 132 N. Indies.  Ex. 500.

**Seidling claims that Dew Line Enterprises is a trust, and that he was the trustee at one time.  There is no evidence of a trust agreement or other document creating or supporting the existence of Dew Line Enterprises as a valid trust.  Seidling often uses the word "Enterprises" when he transfers a property to a sole proprietorship.  The Court finds that Dew Line Enterprises is a sole proprietorship and alter ego of Seidling.**  *Hayward LLC*

Hayward, LLC was organized as a Wisconsin limited liability company in 2012.  Ex. 346.  The names and addresses of the registered agent and the organizer are not associated with Seidling anywhere else in the record.  Annual reports filed with the Wisconsin Department of Financial Institutions in 2022 and 2023 indicate that the LLC's managers are Darryl and Ruth Mast.  Ex. 345.  Their address in Hayward, Wisconsin is near Seidling's Hayward residence, but their names and their address are not otherwise associated with Seidling anywhere else in the record.

The Court finds that the Hayward, LLC entity registered with the State of Wisconsin is not the same Hayward LLC at issue in this adversary proceeding.  There is no evidence that an entity named Hayward LLC with an address or other information associated with Seidling was registered with or incorporated in any state.  The Court therefore finds that Hayward LLC is a sole proprietorship and alter ego of Seidling.

Hayward LLC owns a parcel of property in Sawyer County, Wisconsin.  Ex. 354.  The registered address is 132 N. Indies, and the 2023 property taxes were paid by Universal Management Trust.  *Id.*  Between 2019 and 2023, Seidling caused Hayward LLC to enter into

several Rental/Lease Agreements for the property.  Exs. 347, 348, 349, 350, 351, 352.  Seidling

instructed the lessees to make their rental payments payable to one of the "servicing entities"

described above.

Partnership

*King Street Family Limited Partnership*

King Street Family Limited Partnership was registered with the Wisconsin Department of

Financial Institutions on October 31, 2002.  *See*

https://apps.dfi.wi.gov/apps/CorpSearch/Details.aspx?entityID=K031138&hash=297755442&se

archFunctionID=2dc90d51-deba-4608-b860-

04fd121e5edf&type=Simple&q=king+street+family.  *See also* Ex. 298.  The 2021 document

prepared by Christine Seidling indicates that Oasis Family Limited Partnership owned 99% of

the partnership interests in King Street.  Ex. 527.  Because the Court finds that Seidling owns all

the partnership interests in Oasis, Seidling necessarily owns at least 99% of the partnership

interests in King Street.  Christine's document indicates that the other 1% interest is owned by

DKLCO Trust, and that Seidling owns 100% of DKLCO Trust.  The Court finds that Seidling

therefore owns 100% of King Street Family Limited Partnership.

In April 2009, Seidling transferred the property located at 132 N. Indies Drive in

Marathon, Florida from himself to King Street Family Limited Partnership.  Ex. 304 at 1-3.  On

February 22, 2022, Seidling caused King Street Family Limited Partnership to transfer the

property to DGW Corporation.  *Id.* at 8.  Seidling signed the deed as "General Partner" of King

Street Family Limited Partnership.  The return address for DGW Corporation is a P.O. Box in

Hayward, Wisconsin associated with Seidling.  The property is currently in the name of DGW

Corporation.

It is unclear if King Street Family Limited Partnership still owns any real or other property.  While King Street owned the 132 N. Indies property, Seidling caused King Street to grant at least two mortgages on the property, one of which was to Seidling Family Trust.  Ex. 304 at 4-7.  Seidling claimed he did not know who held the mortgages, or how much may be owed.

## CONCLUSIONS OF LAW

When a debtor files bankruptcy, an estate is created that consists of any property (with some limited exceptions) in which he holds a legal or equitable interest.  11 U.S.C. § 541(a).  In a chapter 7 case, it is the case trustee's responsibility to collect the assets of the estate, liquidate them, and distribute the proceeds to creditors who file a proof of claim.  In this case, the Trustee is attempting to fulfill that duty by marshaling assets that the Trustee says are owned by Seidling and are therefore property of the estate.

"While federal law determines when a debtor's interest in property is property for purposes of section 541, state law governs whether the debtor has such an interest."  *In re Wagner*, 530 B.R. 695, 701 (Bankr. E.D. Wis. 2015) (citing *Barnhill v. Johnson*, 503 U.S. 393, 398 (1992) and *Butner v. United States*, 440 U.S. 48, 54-55 (1979)).  The Trustee bears the burden to prove that Seidling has an interest in the property at issue under the applicable state law.  *See In re Dordevic*, 67 F.4th 372, 378-79 (7th Cir. 2023) (recognizing trustee's burden and concluding courts should apply "preponderance of the evidence" standard of proof to bankruptcy turnover actions).

The Trustee seeks to recover assets held in the name of many different entities and trusts, arguing that the entities and trusts are not separate entities or ought to be disregarded.  The Court will address each type of entity separately.

### Sole Proprietorships

A sole proprietorship is "[a] business in which one person owns all the assets, owes all the liabilities, and operates in his or her personal capacity."  SOLE PROPRIETORSHIP, Black's Law Dictionary (12th ed. 2024).  It is a well-established principle that the assets of a debtor's sole proprietorship are property of the debtor's bankruptcy estate.  *See*, *e.g.*, *In re Anderson*, 623 B.R. 199, 218 (Bankr. D. Conn. 2020) ("[A]ssets of a sole proprietorship are assets of the debtor[.]"); *In re Stringer*, 586 B.R. 435, 442 (Bankr. S.D. Ohio 2018) ("Section 541 does not except assets garnered through or 'owned by' a proprietorship or trade name."); *In re Lewis*, 461 B.R. 414, 420 (Bankr. E.D. Ky. 2011) ("As a sole proprietorship, Lewis Auto Sales is not a separate legal entity and the inventory of Lewis Auto Sales belongs to the Debtor as property of his estate."); *In re Christenberry*, 336 B.R. 353, 356 (Bankr. E.D. Tenn. 2005) ("[A]ny property owned by Ms. Christenberry doing business as Little Pigeon Roost became property of the Debtor's bankruptcy estate when she filed her Voluntary Petition.").  Therefore, any assets that Seidling owned under a fictitious name, a "d/b/a," or a sole proprietorship are property of the bankruptcy estate.

Seidling has claimed that his various entities are separate legal persons and that he does not hold the assets in his personal capacity.  The record does not contain any evidence to support his claim.  There is sufficient evidence that the entities are sole proprietorships because Seidling used names consistent with the names that he often uses for sole proprietorships and because Seidling controlled the assets held in those names.  Seidling must therefore come forward with some evidence to support his claim of a separate legal existence.

Under Wisconsin law, a partnership can be formed without the filing of documents with the state, but the person asserting the existence of the partnership bears the burden to prove it exists.  *See In re McCarthy*, 554 B.R. 866, 869 (Bankr. W.D. Wis. 2016) ("[A]s the parties

claiming that a partnership exists, the McCarthys still bear the burden of demonstrating that they

have met the necessary requirements for partnership formation."); *Heck & Paetow Claim Serv.,*

*Inc. v. Heck*, 93 Wis. 2d 349, 359, 286 N.W.2d 831, 836 (1980) ("The burden of proof of

establishing a partnership relationship is on the party claiming that such a valid relationship

exists."). Seidling did not present any evidence that the entities at issue were validly formed

partnerships between or among him or any other individuals or entities.

All other corporate forms, including business corporations, nonstock corporations,

limited liability companies, and limited partnerships, can be formed only by filing the

appropriate records with the Wisconsin Department of Financial Institutions. *See* Wis. Stat.

§ 180.0203(1) ("The corporate existence begins when the articles of incorporation become

effective under s. 180.0123."); Wis. Stat. § 180.0123(1)(a) ("[A] record filed by the department

under this chapter is effective on the date that it is received by the department for filing."); Wis.

Stat. § 181.0203(1) ("The corporate existence [of a nonstock corporation] begins when the

articles of incorporation become effective under s. 181.0209."); Wis. Stat. § 181.0209(1)(a)

("[A] record filed by the department under this chapter is effective on the date that it is received

by the department for filing."); Wis. Stat. § 183.0201(1) ("One or more persons may act as

organizers to form a limited liability company by signing and delivering to the department for

filing articles of organization."); Wis. Stat. § 183.0201(4)(a) ("A limited liability company is

formed when the articles of organization become effective under s. 183.0207."); Wis. Stat.

§ 183.0207(1) ("[A] record filed under this chapter is effective . . . on the date that it is received

by the department for filing."); Wis. Stat. § 179.0201(1) ("To form a limited partnership, a

person must deliver a certificate of limited partnership to the department for filing."). Seidling

did not present any evidence that the entities were registered to do business in Wisconsin or in

any other state.

The Court therefore concludes that the following entities are sole proprietorships:

> DGW Corporation
> Zblocki Enterprises
> Sprucewood Enterprises
> CP Ltd Partnership
> Dew Line Enterprises
> Hayward LLC
> Chain of Islands Limited Partnership

Any assets held in the name of these entities are property of the bankruptcy estate.

### Trusts

Most of the entities named in the Trustee's complaint are, or purport to be, trusts. A trust is "generally understood to be 'a fiduciary relationship with respect to property, subjecting the person by whom the title to the property is held to equitable duties to deal with the property for the benefit of another person, which arises as a result of a manifestation of an intention to create it.'" *Northwest Nat'l Ins. Co. of Milwaukee v. Midland Nat'l Bank*, 292 N.W.2d 591, 600 (Wis 1980) (quoting 21 Restatement (Second) Trusts § 2 (1959)); *see also Americold Realty Tr. v. Conagra Foods, Inc.*, 577 U.S. 378, 383 (2016) (under traditional common law principles a trust is "not considered a distinct legal entity, but a 'fiduciary relationship' between multiple people"). A trust relationship typically has three parties, although one or more of them can be the same person. The settlor is the person who creates the trust and often provides the initial trust property. Restatement (Third) of Trusts § 3 (2003). The settlor is also frequently referred to as the grantor or the trustor.[15] *Id.* The trustee is the person to whom the trust property has been entrusted. *Id.* The beneficiary is the person for whose benefit the trustee holds the trust property. *Id.* The trustee owes fiduciary duties to the beneficiary to ensure that the trust

---

[15] As noted above, Seidling testified to his belief that the trustor and grantor are interchangeable, but that the settlor serves some other role, which he said was akin to a "manager." Seidling is incorrect on the law.

property is preserved, and invested if appropriate, and to distribute the property to the beneficiary under the terms of the trust instrument.

Many modern trust relationships have supplanted this traditional understanding, and there are now many trusts that are governed by different rules and are sometimes understood to be separate entities. *See* Wis. Stat. § 701.0102 (listing the types of trusts excluded from Wisconsin's Trust Code). The only such trust that might be relevant here is a business trust, also sometimes called a common trust. Such trusts are subject to the requirements of Wis. Stat. § 226.14. Common trusts with more than 5 beneficiaries or trusts that sell or propose to sell beneficial interests in the trust must register with the Wisconsin Department of Financial Institutions. Wis. Stat. § 226.14(1)(a). None of the trusts at issue in this case were so registered, even though many of them purported to sell beneficial interests in the trusts.

The Court need not decide exactly what type of trusts these were, or were not, because the Court concludes that the trust assets are property of Seidling's bankruptcy estate regardless of the type of trust.

The Trustee asserts that the property of all the trusts named as defendants in this action is property of the estate under three theories. First, he argues that the trusts were not properly created. Second, he argues that the trusts are revocable and that their assets are therefore part of the bankruptcy estate. Third, he argues that the trusts are sham entities that ought to be set aside. The Court concludes that all three theories have merit.

### *Creation of the Trusts*

Seidling argues that the trusts are validly formed, and that he is, or was, merely the trustee for the benefit of another, which would place the property outside the reach of the bankruptcy estate. *See* 11 U.S.C. § 541(b)(1), (d). The Trustee argues that no trusts were ever created, so the trusts are all essentially alter egos of Seidling under fictitious names.

The trust documents, where they exist, often refer to Wisconsin law, and the Trustee argues that the existence of the trusts should be analyzed under Wisconsin law, a point that Seidling does not counter. The Court will therefore use Wisconsin law to determine whether the trusts were validly formed.

"The burden of proof to show the existence of a valid trust is on the party asserting the existence of the trust. The party must show that the acts of the settlor were sufficient to create a trust." *Rameker v. Peterson (In re Assoc. Enters., Inc.)*, 234 B.R. 718, 720 (Bankr. W.D. Wis. 1999). "It is not necessary to create a trust by written instrument but where it is alleged that a trust is created by parole the evidence concerning the creation and the terms of the trust must be clear and convincing." *Swazee v. Lee*, 259 Wis. 136, 137, 47 N.W.2d 733, 733 (1951).

Before 2013, trusts in Wisconsin were governed by the common law. Under the common law, "formation of a trust requires three elements: (1) trustees who hold property and are subject to equitable duties to deal with the property for the benefit of others; (2) beneficiaries to whom the trustees owe these equitable duties; and (3) trust property that is held by the trustees for the beneficiaries." *MacLeish v. Boardman & Clark LLP*, 2019 WI 31, ¶ 53, 386 Wis. 2d 50, 71, 924 N.W.2d 799, 809. In addition, the settlor must manifest a clear intent to create the trust. *Id.* at ¶ 54 ("'[I]n order to create a trust the intention of the testator must be manifest and mandatory.'") (quoting *Paine v. Shero (In re Doe's Will)*, 192 Wis. 333, 335, 212 N.W. 781 (1927)); *Id.* ("'No trust is created unless the settlor manifests an intention to impose enforceable duties . . . .'" (quoting *Wilson v. Dixon (In re Wadleigh's Estate)*, 250 Wis. 284, 291, 26 N.W.2d 667 (1947)).

In 2013, Wisconsin adopted the Wisconsin Trust Code, which is codified in chapter 701 of the Wisconsin Statutes. The Trust Code does not apply to certain trusts, such as business trusts, but for all other trusts, the Trust Code supplies the requirements for creation of a trust. *See* Wis. Stat. § 701.0102. The Trust Code provides that a trust can be created, as relevant here,

by "[a] declaration by an owner of property that the owner holds identifiable property as trustee

or declaration by any person who intends to create a trust with the expectation that property of

the person or others will be transferred to the trust" or "[a] declaration of an intent to create a

trust with the intention that the trust will later be funded by assets of the person who created the

trust or by another person with legal authority to fund the trust.  The person making the

declaration is considered to have created the trust, regardless of whether the person funds the

trust with the person's own assets."  Wis. Stat. § 701.0401(2), (5m).

The Trust Code also includes specific requirements for creation of a trust:

> A trust is created only if all of the following are satisfied:
> (a) The settlor of the trust has capacity, as defined in sub. (4), to create the trust, unless the trust is created by court order or by an agent, guardian of the estate, conservator, or representative payee with authority to act.
> (b) The settlor indicates an intention to create the trust; or a statute, regulation, common law, other provision having the effect of law, judgment, or decree creates or authorizes the creation of a trust.
> (c) The trust has a definite beneficiary or is one of the following:
>    1. A charitable trust.
>    2. A trust for the care of an animal, as provided in s. 701.0408.
>    3. A trust for a noncharitable purpose, as provided in s. 701.0409.
> (d) The trustee has duties to perform.
> (e) The same person is not the sole trustee and sole beneficiary, and there are no remainder beneficiaries other than the person's estate.

Wis. Stat. § 701.0402(1).

"The capacity required to create a trust is the same as the capacity to make a will."  Wis.

Stat. § 701.0402(4).  "Any person of sound mind 18 years of age or older may make and revoke

a will."  Wis. Stat. § 853.01.  It may be that a trust governed by the Trust Code cannot be created

by a person other than an individual.  The capacity provision in section 853.01 certainly indicates

that a person making a will must be an individual.  It is not clear how a corporate entity could be

"of sound mind" as required to have capacity to make a will.  And, of course, a corporate entity

has no need for a will.  But the definition of "person" in the Trust Code is broad and includes "an

individual, corporation, business trust, estate, trust, partnership, limited liability company,

association, joint venture, government; governmental subdivision, agency, or instrumentality;

public corporation; or any other legal or commercial entity." Wis. Stat. § 701.0103(17).  This

broad definition suggests that corporate entities within that definition could have capacity to

create a trust under the Trust Code.  It may also be that a non-individual can create a trust, it just

would not be a trust subject to the provisions of the Trust Code.  Neither the Trustee or Seidling

addressed any of these minutiae, and the Court need not delve into it.

Some of the trusts at issue were purportedly created before 2013, and others were created

after 2013.  The Court need not decide whether the common law or Trust Code applies for any of

the trusts, whether created before or after 2013, because the Court concludes that Seidling did

not provide sufficient evidence to prove that the trusts were created under either the common law

or the Trust Code.

Both the common law and the Trust Code require evidence that the settlor intended to

create the trust.  For many of the trusts, Seidling did not produce a governing trust document.  He

also did not provide any evidence of the existence or identity of any settlor, much less evidence

of the intent of any such settlor to create a trust.  The absence of any trust document or other

reliable evidence of an intent to create a trust is sufficient to defeat Seidling's claim that the

trusts are valid and that their assets are separate and apart from his own.

For the trust documents that Seidling did produce, or that the Trustee was able to locate,

the documents are not sufficient evidence of any settlor's intent to create a trust.  Many of them

are not signed.  For those trusts, the Court finds that the unsigned trust agreements are not

sufficient evidence of the intent of a settlor to create the trust, particularly without additional

evidence of the settlor's intent.

The ones that are signed are not reliable or credible evidence of the creation of a trust. Often there exist multiple trust agreements for the same trust, but with different settlors and beneficiaries.  For example, the record includes three different trust agreements for Indies FLP Trust.  Exs. 1, 2, 3.  Each identifies a different beneficiary.  Even accepting Seidling's testimony that the settlor was the same as the beneficiary, there cannot be three different settlors at different times for the same trust.

Moreover, the Court finds that Seidling prepared several of the trust agreements well after the supposed date on the documents.  The documents are not reliable evidence of the creation of a trust if the trust already supposedly existed at the time the documents were prepared, particularly because the agreements do not identify the property that was supposedly already in trust.  *See In re Assoc. Enters, Inc.*, 234 B.R. at 721 ("The trust res must be described with particularity sufficient to ascertain the subject property."); Wis. Stat. § 701.0401(2) (trust may be created by a declaration "that the owner holds *identifiable* property").

The only evidence in the record supporting the existence of the trusts is the unreliable trust agreements, and Seidling's testimony that he wanted the properties to be in separate trusts. None of the evidence is sufficient to prove that a settlor who is not Seidling intended to create a trust.

For these reasons, the Court concludes that none of the trusts named in the Trustee's Second Amended Complaint was validly created.  Without a valid trust, the trusts are merely fictitious business names and can be treated as sole proprietorships of Seidling.

*Revocability of the Trusts*

The invalidity of the trusts is sufficient to bring their assets into the bankruptcy estate, but the Court concludes that the Trustee's other two theories also have merit.  Even if the trusts are valid, their assets are nevertheless property of the estate.

Trust property is not generally considered to be property of a bankruptcy estate. *See In re Marrs-Winn Co.*, 103 F.3d 584, 589 (7th Cir. 1996) (trust property "can only be distributed to trust beneficiaries, and not to the creditors of the bankruptcy estate"). However, when a trust is revocable, the settlor of the revocable trust is treated as the owner of the trust property and the trust property can be distributed to the settlor's creditors. *In re Luedke*, No. 20-20729-BEH, 2020 WL 4342242, at *3 (Bankr. E.D. Wis. July 28, 2020). Thus, if Seidling is the settlor and has the power to revoke the trusts, then any property held in the trusts is property of the bankruptcy estate.

The Wisconsin Trust Code provides that "[u]nless the terms of a trust expressly provide that the trust is irrevocable, there is a rebuttable presumption that the settlor may revoke or amend the trust." Wis. Stat. § 701.0602. Under the common law, the default rule is that a trust is irrevocable unless the settlor reserves the power of revocation. *See Findorff v. Findorff*, 3 Wis. 2d 215, 224, 88 N.W.2d 327, 332 (1958).

Most of the trust agreements in the record indicate that the trusts are revocable. If those trusts are valid, then they are plainly revocable. Five of the trust agreements have no provision regarding revocability or indicate that they are irrevocable. Ex. 146 (Florida Land Trust); Ex. 366 (Georgetown Polk Trust); Ex. 485 (Seidling Family Trust IV); Ex. 286 (Oakridge Land Trust); and Ex. 206 (VNAL Dec Trust). For the reasons explained in the discussion of the facts above, the Court concludes that none of these trusts is, in fact, irrevocable. There is a later agreement indicating that the Florida Land Trust is revocable, the purported beneficiary of the Georgetown Polk Trust no longer exists, and Seidling signed documents for the Seidling Family Trust IV indicating that the trust is revocable. For the Oakridge Land Trust, no settlor is identified, and Seidling is both the trustee and the only identified beneficiary. The VNAL Dec Trust is discussed below.

The assets in a revocable trust are property of the bankruptcy estate only if the debtor has

the power to revoke the trust.  Seidling signed documents confirming that he has the power to

revoke many of the trusts.  *See* Ex. 13 at 52; Ex. 14 at 28; Ex. 15 at 74; Ex. 62 at 47; Ex. 63 at

34; Ex. 82 at 4-5; Ex. 263 at 38.  Christine Seidling also testified that the trusts created by

Seidling were "always revocable."  ECF No. 207 at 16.  In addition, the overwhelming evidence

at trial indicates that Seidling formed all the trusts, he made the decisions regarding which assets

were placed in which trusts, he directed the acquisition of the assets, and he directed the

disposition of the assets.  Seidling argues that he was merely acting as trustee for the trusts, but

he kept no records that would allow him to distribute funds or property to any beneficiary of the

trusts.

Because Seidling created and wholly controlled the trusts, the Court concludes that

Seidling had the power to revoke all the trusts.  Therefore, any assets held by the trusts are

property of the bankruptcy estate.

*Piercing of Trust Form*

There is a well-known legal principle known as piercing the corporate veil, also referred

to as the alter ego doctrine.  In the usual scenario, an individual owner of a corporation can be

held liable for the debts of the corporation under certain circumstances.  "The alter ego doctrine

enables a court to disregard the corporate form when it is used to accomplish an improper [or

unlawful] purpose."  *Select Creations, Inc. v. Paliafito Am., Inc.*, 852 F. Supp. 740, 773 (E.D.

Wis. 1994).  "A court will apply the following factors to determine whether the corporate form is

a mere sham: failure to observe corporate formalities, non-payment of dividends, siphoning of

funds of the corporation by the dominant stockholder, non-functioning of other officers or

directors, and the absence of corporate records."  *Olen v. Phelps*, 200 Wis. 2d 155, 163, 546

N.W.2d 176, 180-81 (Ct. App. 1996).

In *Olen*, the Wisconsin Court of Appeals recognized that the alter ego doctrine can sometimes be applied in reverse so that a corporate entity is liable for the debts of its individual owner. *Id*. at 163-64. The Court of Appeals affirmed the trial court's determination that the assets of the corporate entity at issue could be used to satisfy the debts of Phelps, the entity's owner. In doing so, the court applied much the same analysis as the traditional alter ego doctrine – the corporate entity had no formal records and did not observe corporate formalities, the profits of the corporate entity were used to pay personal expenses, and the owner manipulated the assets of the entity to avoid his own liabilities. *Id*. at 162.

The Wisconsin Supreme Court has also endorsed use of the reverse alter ego or veil piercing doctrine in *Wiebke v. Richardson & Sons, Inc.*, 83 Wis. 2d 359, 265 N.W.2d 571 (1978). In that case, the plaintiff made a loan to the corporation's individual owner, and she sued the corporation to collect on the note. The court held that "the corporation is liable on the underlying obligation because the separate identity of the corporation and its shareholder must be disregarded." *Id.* at 363. The court held that a corporation should be disregarded and its assets used to pay the debts of the owner "if corporate affairs are organized, controlled and conducted so that the corporation has no separate existence of its own and is the mere instrumentality of the shareholder and the corporate form is used to evade an obligation, to gain an unjust advantage or to commit an injustice." *Id.*

Wisconsin courts have not applied this doctrine to allow creditors to reach the assets of a trust controlled by a debtor. However, there are cases where courts have determined that the assets of a trust are property of a bankruptcy estate under an alter ego theory. *See In re Schwarzkopf*, 626 F.3d 1032 (9th Cir. 2010) (applying the alter ego/reverse veil piercing doctrine to reach the assets of a trust where the court found that the debtor controlled the trusts and their assets); *In re Maghazeh*, 310 B.R. 5, 17 (Bankr. E.D.N.Y. 2004) (holding that alter ego doctrine

can be applied where the debtor exercised complete domination over the trust, the debtor used the trust to hide personal assets and to perpetrate a fraud).

In *Schwarzkopf*, the chapter 7 trustee sought to recover assets the debtor transferred to two irrevocable trusts.  On appeal, the Ninth Circuit concluded one trust was invalid and could be disregarded and the other trust was the debtor's alter ago.  626 F.3d at 1036-38.   The court relied on several facts similar to those applied in the context of reverse corporate veil piercing – the appointed trustee of the trusts maintained no books or records for the trusts and often intermingled their funds; the trusts shared a bank account; the trustee transferred money between the trusts when he determined that one needed funds; and one trust made purported "loans" to the second trust that were not documented, had no terms for repayment, and were never repaid; and the trusts paid each other's expenses.  *Id*. at 1036.

In *Maghazeh*, the bankruptcy court held that "alter ego" theory could be applied to pierce an irrevocable trust that a chapter 7 debtor had created for the alleged benefit of his children.  The court found that the debtor controlled and dominated the trust; he contributed all the assets the trust ever owned; he used his own funds to purchase collateral mortgages for the trust; the trust's bank accounts were funded by the debtor; and the purported beneficiaries knew almost nothing about the trust.  310 B.R. at 18-19.

The Court holds that, in light of Wisconsin's endorsement of reverse veil piercing, Wisconsin courts would recognize and apply a reverse veil piercing, alter ego, or sham trust theory under the circumstances of this case.

The facts in this case are reminiscent of those in *Schwarzkopf* and *Maghazeh* in that Seidling exercised complete dominion and control over all the trusts.  He determined which properties to purchase, he determined which funds would be used to purchase the properties, he entered into contracts with third parties on behalf of the trusts, he collected the payments from

those third parties, he deposited those payments into accounts that he chose, he commingled the funds owned by the trusts into a single account, he paid the taxes and other expenses related to the properties from commingled funds, he determined whether and when to sell the properties, he determined where the proceeds of a sale transaction would be deposited, and the address for each and every trust is an address associated with Seidling.

Seidling was the trustee for all the trusts, and his actions were not necessarily inconsistent with a trustee's duties. But there are several other facts that demonstrate Seidling's complete domination and control, over and above any duties as trustee. First, Seidling directed that all ongoing payments from third parties be sent to a "servicing entity," but the individual, property-owning trusts did not have contracts with these "servicing entity" trusts. And the servicing entities did not keep books and records to show which funds they received belonged to which trusts. The funds for every trust were commingled and used to pay expenses of the trusts collectively. In particular, the commingled funds were used to pay the property for Seidling's personal residence in Hayward, Wisconsin even though no funds had been received by the trust that owns his residence.

Second, Seidling transferred the properties between and among the trusts and himself without observing any formalities. He simply transferred the properties when it was convenient for whatever sale or other transaction was afoot. When Seidling transferred properties to himself or a fictitious business name, Seidling made the trust assets vulnerable to actions by his own personal creditors.

Third, Seidling caused several persons, including the Saavedras and Chad Raasch to sign documents on behalf of some of the trusts. Sometimes he prepared a new trust document showing them as trustee, and sometimes he did not. He did not observe any formalities in appointing additional or new trustees, he did not give these purported trustees any control

whatsoever over the properties or trusts, and he did not inform any beneficiaries of the change in

trustees. Seidling retained complete control over who was a trustee and what authority they

would have. Indeed, even after Seidling supposedly resigned as trustee in October 2022, the

ostensible new trustee, Kevin Swanson, had no authority over the trust assets.

Fourth, Seidling readily admitted at trial that he used the trusts to shield assets from his

creditors, and that the trusts were intended to hold property for Seidling's benefit and the benefit

of his former wife, Christine. He said that he did not want to hold property in his own name,

which is the reason that he had created the trusts. Christine testified that all property in which

she may have had an interest has been distributed to her, and she signed a disclaimer of any

interest in all the trusts and other entities named in the Trustee's complaint. Therefore, Seidling

is the only person with any interest in any of the trusts or their assets and there is no true trust

relationship where Seidling was acting as trustee holding property for another's benefit.

For all these reasons, the Court concludes that the trusts are alter egos of Seidling and

their separate form should be disregarded.

### Trust Assets as Property of the Estate

For the reasons set forth above, the Court concludes that the property owned by the

following trusts is property of Seidling's bankruptcy estate under 11 U.S.C. § 541 and that the

Trustee is entitled to a declaration as such:

> Indies FLP Trust
> Universal Management Trust
> Mason Land Trust
> Washburn Trust
> Ottercreek Trails Trust
> LCO Trust
> LCO Trust II
> Maple Grove Trust
> Spooner Land Trust
> Bayfield Land Trust
> Silver Land Trust

Polk Land Trust
Chippewa Land Trust
Oakridge Land Trust
BW 25935 State Road 35 Trust
Pegasus Trust
Excell Land Trust
Milwaukee Land Trust
BW Land Trust
Georgetown Polk Trust
Brown Valley Trust
DW Trust
JT Trust
Ryan-Siegel Land Trust
Chippewa Falls Trust
Hertel Land Trust
Catherine Lake Land Trust
Rain-Tree Investments Trust
Sunshine LP
Bren Land Trust
Royal Land Enterprises Trust a/k/a Royal Land Enterprises, Inc.
Broken Arrow Condo Trust
Washburn Land Trust
Washburn Land Trust 2018-1
Washburn Land Trust 2018-3
Washburn Land Trust 2019-1
Washburn Land Trust 2019-2
Ojibwa Rd Land Trust
Donald Williams Living Trust
Hidden Lake Land Trust
Range Line Road Trust
Welch Road Land Trust
Abdo Land Trust
Spencer Lake Land Trust
Indies Land Trust
Bass Lake Trust
Hertel Trust
Hay Creek Land Trust
1785 Shake Dubois Lake Land Trust
Saint Croix Trust
Pilgrim-Dunn Trust
J&J Land Trust
Couderay Trust
Barron County Crystal Lake Land Trust
Port Wing Trust
Grantsburg Grell/Borg Road Land Trust
Lafayette Land Trust
Midwest Financial Trust

> Yellow River Trust
> MS Trust
> RLN Trust
> V/OWMR Land Trust
> RJC Trust
> McKenzie 1.42A Trust

The Trustee named the following other trusts in the caption of his Second Amended

Complaint:

> Polk Trust
> Five Star Land Trust
> Indies Trust
> Wisconsin Trust
> ZDWA Irrevocable Trust

The Trustee did not include any claims for relief with respect to these trusts in the body of his

complaint.  There also was no evidence at trial regarding these trusts or the assets they may hold.

Therefore, the Court has not ordered any relief with respect to those trusts.

There is one final trust that bears further discussion – VNAL Dec Trust.  The status of

this trust was most hotly contested by Seidling.  The trust agreement in the record does not

identify a settlor anywhere in the document.  However, Seidling testified that he was the settlor

of the trust, and that he intended to create a trust for his benefit through 2013 and then for the

benefit of his grandchildren.  There was also evidence at trial that this trust has its own tax ID

number and that it has filed tax returns in the past, although it does not appear that the trust filed

taxes in recent years.  The Court therefore concludes that there is sufficient evidence in the

record to establish that this trust was a valid trust.

The trust agreement provides that the trust is irrevocable, but Seidling has acted

inconsistently with the supposed irrevocability of the trust.  Seidling caused Chad Raasch to sign

documents as trustee of the trust, even though the agreement plainly provides that Christine

Seidling would become the successor trustee if Seidling could not or would not serve.  Seidling

testified that he is unsure whether the land contract vendee for the property in the name of

VNAL Dec Trust is making payments under the land contract, and he caused UM Corp. to pay

the 2023 property taxes with commingled funds that included payments related to properties

owned by other trusts.  Moreover, there are no agreements between VNAL Dec Trust and any of

the "servicing entities" that would allow them to collect and hold funds owned by the trust.

Seidling also testified to his belief that VNAL Dec Trust is the beneficiary of or has an

ownership interest in other trusts, entities, and properties mentioned at trial.  But Seidling agreed

that he has no accounting that would show which assets belong to the VNAL Dec Trust.

Seidling's actions are wholly and utterly inconsistent with any intent to keep the assets

that may be in the name of VNAL Dec Trust separate and apart from other entities and revocable

trusts.  Rather, he appears to have treated VNAL Dec Trust the same as any of his other trusts,

exercising complete control and dominion over the trust and its assets without regard to its

irrevocability or the interests of the beneficiaries.  Therefore, the Trustee can reach the assets of

the trust either because the trust is revocable or because the trust is an alter ego of Seidling that

ought to be disregarded.  *See Schwarzkopf*, 626 F.3d at 1039-40 (concluding that assets in a trust

labeled as irrevocable were property of the bankruptcy estate).

### Partnerships

The Trustee's Second Amended Complaint names three limited partnerships that appear

to be validly formed under Wisconsin law – Oasis Family Limited Partnership, Universal

Management Limited Partnership, and King Street Family Limited Partnership.  As discussed

above, the Court finds that Seidling owns 100% of the partnership interests in each of these

partnerships.  This conclusion means that Seidling's partnership interests are property of the

bankruptcy estate.

The Court also concludes that the partnership form can be disregarded and that assets in the partnerships are property of the bankruptcy estate and can be used to satisfy the claims of Seidling's creditors.  As discussed above, Wisconsin courts have recognized the doctrine of reverse veil piercing to allow creditors to reach corporate assets.  *See Olen*, 200 Wis. 2d at 163; *Wiebke*, 83 Wis. 2d at 363.  Application of that doctrine to reach the assets of these three partnerships is appropriate under the facts of this case.

Seidling has not followed any corporate formalities for any of the partnerships, and he exercised full control and dominion over the partnerships and their assets.  Seidling caused Oasis Family Limited Partnership and Universal Management LP to be "servicing entities" for Seidling's many trusts and other entities.  There were no contracts or agreements governing the purported servicing relationship, and Seidling caused the funds received for the trust properties to be commingled with the partnerships' separate assets.  Seidling also caused assets of the partnerships to be dispersed without any reason, documentation, or consideration.  Seidling caused tens or hundreds of thousands of dollars to be transferred between the Oasis and Universal Management bank accounts with no explanation.  He caused Universal Management to fund a $2 million loan to his acquaintances; the payments made on that loan were commingled with funds from other contracts in the name of trusts and other entities, and the commingled funds were used to pay expenses of the various properties, trusts, and entities controlled by Seidling.  Seidling transferred the 132 N. Indies property from King Street to DGW Corporation, a fictitious entity that is a sole proprietorship of Seidling without consideration.

The Court therefore concludes that Oasis Family Limited Partnership, Universal Management LP, and King Street Family Limited Partnership are alter egos of Seidling, that he used the entities to shield assets from his creditors, and that the assets held by the partnerships are property of the bankruptcy estate.

## Universal Management Corporation of Wisconsin, Inc.

The final defendant is Universal Management Corporation of Wisconsin, Inc.  Seidling formed this entity on October 19, 2023, over a year after he filed bankruptcy.  Seidling is the registered agent, and the entity's principal office is Seidling's home address in Hayward, Wisconsin.  Seidling agreed that he is the 100% owner of UM Corp.

Before forming UM Corp., Seidling instructed third parties to send their rental and other payments to "Universal Management."  He deposited those payments into accounts held by Universal Management Trust or Universal Management LP.  After forming the corporation, Seidling caused checks made out to "Universal Management" as well as checks made out to "Universal Management Trust" to be deposited into a bank account owned by the corporation.

The Court has concluded that all assets of Universal Management Trust and Universal Management LP are property of the bankruptcy estate, as are the real properties owned by the other trusts and entities.  Pursuant to 11 U.S.C. § 541(a)(6), the "[p]roceeds, product, offspring, rents, or profits" of property of the estate are also property of the estate.  The rental and other payments made by third parties under contracts entered into by the trusts and other entities are property of the estate under § 541(a)(6).  Seidling transferred that property to UM Corp. without authorization, and those transfers are therefore subject to recovery under 11 U.S.C. §§ 549 and 550.

The Trustee's complaint does not include a request that specific transfers be avoided and recovered, though the Trustee could hardly be blamed for this shortcoming.  The Court entered a preliminary injunction that, among other things, required Seidling to provide an accounting to the Trustee of all payments received on account of the properties owned by the trusts named in the complaint.  Seidling did not provide the information, despite the Court's repeated orders requiring him to do so.

Nevertheless, the Court cannot conclude based on the evidence presented at trial that every dollar deposited with UM Corp. is necessarily property of the estate.  Even if it were, the relief available to the Trustee would be a judgment against UM Corp., and the Court cannot enter a judgment without knowing the amount for which the corporation is liable as a transferee of estate property.

Following the Court's oral ruling on July 10, 2024, the Trustee agreed that he had not submitted proof at trial of particular transfers to be avoided.  The Court therefore dismissed the claim against UM Corp. without prejudice.

## CONCLUSION

For the foregoing reasons, the Court concludes that, with the exception of Polk Trust, Five Star Land Trust, Indies Trust, Wisconsin Trust, ZDWA Irrevocable Trust, and Universal Management Corporation of Wisconsin, Inc., the assets held by the trusts and entities named in the Trustee's Second Amended Complaint are property of the bankruptcy estate.

Dated: August 23, 2024

Rachel M. Blise
U.S. Bankruptcy Judge